UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GLORIA BROWN,                          )
    Plaintiff                           )
                                        )
v.                                     )   CIVIL ACTION
                                        )   NO. 05-CV-11167-MBB
                                        )
YUM! BRANDS, INC. and                  )
LOJON PROPERTY II LLC,                 )
    Defendants                          )

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**
**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**and**
**MOTION FOR SANCTIONS PURSUANT TO FED.R.CIV.P. RULE 11**

**Statement of Material Facts Not in Dispute.**

    The defendants' have attempted to foreclose any discovery which might refute the self-serving, conclusory affidavit on which its "undisputed" facts are based by a pre-emptive motion for summary judgment. The plaintiff objects to the defendants' literally and figuratively offensive use of summary judgment; denies that any of the purported facts set forth in the defendants' Statement of Material Facts Pursuant to Local Rule 56.1 are true; and respectfully moves for sanctions, for the reasons set forth below. The plaintiff further moves to strike the Affidavit of Linda J. Gregg, for failure to comply with Fed.R.Civ.P. Rule 56(e) and to award the plaintiff her attorneys' fees and costs pursuant to Fed.R.Civ.P. Rule 56(f), for the reasons set forth in her motion to strike, incorporated by reference herein and filed herewith.

**Statement of Law.**

    The plaintiff accepts the statement of law as to summary judgment set forth by the defendants in their Memorandum, but respectfully points out the absence of any citation to a case which stands for the proposition that this Honorable Court or any court should or can allow

summary judgment before the plaintiff has had a full and fair opportunity to refute the

defendants' self-serving denial of liability.

**Argument.**

As to LOJON Property II, LLC ("LOJON"), the affiant, Linda J. Gregg, claims that KFC

Corporation,[1] "transferred" the KFC restaurant property on which the plaintiff fell to LOJON on

August 15, 2003.[2] However in its Answer to the plaintiff's Complaint, LOJON admits to

"demising" it on the date of the plaintiff's injury to an unidentified third party:

> [Complaint] 6. On or about June 21, 2002, defendant LOJON was the owner of
> the real estate located at 625 American Legion Highway, Boston (Roslindale),
> MA 02131.

> [Answer] 6. The Defendant LOJON Property II, LLC avers that the property was
> demised as of the date of the Plaintiff's accident to a third party and that this
> Defendant had no operational, commercial activity or responsibility for said
> property.

If LOJON did not own it, it could not have demised it. Therefore, LOJON's Answer contradicts

Gregg's Affidavit.

> As to YUM!, according to Gregg's Affidavit:

> 10. At no time has YUM! Brands, Inc. operated, managed, controlled, conducted,
> maintained or supervised the premises, the owners or the employees of the KFC
> restaurant located at 625 American Legion Highway, Roslindale (Boston), MA, *or
> any other location in the State of Massachusetts*. [Emphasis added.]

---

[1]As explained in the Plaintiff's Motion to Amend Her Complaint to Add Additional
Defendants, including KFC Corporation, it appears that KFC of America, Inc., a California
corporation, was operating the restaurant at the time of the plaintiff's injury. According to the
California Secretary of State, KFC of America, Inc., ceased to exist by merger with KFC
Corporation, a Delaware Corporation, on December 31, 2002 about six months after the
plaintiff's accident. According to the Massachusetts Secretary of State's computerized records,
nor was KFC Corporation ever licensed to do business in Massachusetts.

[2]The plaintiff's injury occurred on June 21, 2002.

YUM's and her duplicity is proven by the sworn testimony of its real estate manager,[3] Scott Orr,

as recited in YUM's brief[4] in a case before the Massachusetts Appeal Court, Awad v. Tricon

Global Restaurants, Inc., et al., 60 Mass.App.Ct. 1116, 803 N.E.2d 359 (2004):

> Scott Orr, a real estate manager for Tricon, testified at trial, that *all Kentucky Friend Chicken restaurants* have coolers utilizing exterior compressors, kitchen vents which exhaust to the exterior of the building, identifying illuminated signage, exterior lighting, parking lots, and serve the same menu utilizing the same food containers. (Transcript Vol. II, pp. 150-152, 154-59, 174-79, 185-88). Orr also testified that *all Kentucky Fried Chicken restaurants utilize a quality assurance program entitled CHAMPS* (Transcript Vol. II, pp. 125-31; Exhibit Vol. 000441-446). Pursuant to the CHAMPS program, which emphasizes among other things exterior cleanliness, *each restaurant's manager is required to perform a checklist at least three times each day.* (Transcript Vol. II, pp. 185-86). Moreover, the restaurant manager and his crew have an obligation to make certain that the restaurant's exterior areas are clean at all times and to clean the walkway and parking lot as often as necessary to meet this obligation. (Transcript Vol. II, pp. 152-54, 185-86). Brief of Defendants/Appellees Tricon Global Restaurants, Inc. And Judith A. And Eileen Robbins (Exhibit 4). [Emphasis added.]

When it suits YUM's purpose in obtaining a zoning variance[5] to build a corporately owned

---

[3]On May 16, 2002, YUM! Brands, Inc. changed its name from TRICON Global Restaurants, Inc. See YUM! Brands, Inc.'s December 28, 2002 Form 10-K report to the United States Securities and Exchange Commission, p. 3, attached as Exhibit 1, and Massachusetts Secretary of State's Certificate, attached as Exhibit 2.

[4]The appeal involves the granting of a zoning variance given to TRICON in February of 2000 for the construction of a corporately owned Kentucky Friend Chicken ("KFC") restaurant in Worcester, Massachusetts. TRICON became YUM! in May of 2002 (see fn. 3, *supra*). The decision was issued in February of 2004. A copy of the decision is attached as Exhibit 3.

[5]Awad [the plaintiff opposing the zoning variance] also testified that he was concerned about litter on a public median strip near his property and the public sidewalks. (Transcript Vol. IV, pp. 425-236). Specifically, that prospective tenants [of his adjacent property] would have a poor first impression of the neighborhood as a result of any litter on the median or sidewalks. (Transcript Vol IV, pp. 427-2.) Awad was also concerned about noise, "light pollution," and "cooking smells." (Transcript Vol. IV, pp. 427-28, 430-33.)

4

KFC,[6] YUM micromanages every detail of the appearance, maintenance and operation of "all

Kentucky Friend Chicken restaurants." When it suits YUM!'s purpose in dodging its liability, it

has nothing to do with KFC.

YUM's duplicity is also proven by its Form 10-K 2002 Annual Report to the Securities

and Exchange Commission (Exhibit 1), which presents YUM to investors as being the

controlling entity behind KFC and its other proprietary brands:

> YUM, the registrant, *together with its restaurant operating companies* and other
> subsidiaries, is referred to in the Form 10-K annual report ("Form 10-K)" as the
> Company. [Emphasis added].

> *YUM consists of five operating segments: KFC*, Pizza Hut, Taco Bell, LJS [Long
> John Silver's]/A&W and YUM Restaurants International ("YRI" or
> "International." For financial reporting purposes, *management* considers the four
> U.S. operating segments to be similar and, therefore, has aggregated them into a
> single reportable operating segment. [Emphasis added].

> *YUM is the world's largest quick service restaurant ("QSR") company* based on
> number of system units, with nearly 33,000 units in over 100 countries and
> territories. *The YUM organization is currently made up of six operating
> companies* organized around five restaurant concepts including its three original
> concepts, KFC, Pizza Hut and Taco Bell, and two acquired concepts, LJS and
> A&W (the "Concepts"). The six operating companies are KFC, Pizza Hut, Taco
> Bell, LJS, A&W and YRI. [Emphasis added].

> Through its five Concepts, *the Company develops, operates, franchises and
> licenses a worldwide system of restaurants* which prepare, package and sell a
> menu of competitively priced food items. *These restaurants are operated by the
> Company* or, under the terms of franchise or license agreements, by franchisees or
> licensees who are independent third parties, or by affiliates in which we own a

---

[6]Gregg's Affidavit, claiming that YUM "is not a retailer selling KFC food products" (¶8)
and that YUM "does not directly own any KFC restaurants in Massachusetts"(¶9 ), is, at the
least, disingenuous, because, as is demonstrated by <u>Awad</u>, *supra*, YUM was actively attempting
to open its own corporate KFC restaurant in Worcester and would have done so, had its efforts
not been thwarted by the Appeals Court.

5

non-controlling equity interest.[7]

Gregg is also not candid with the Court in her self-serving and conclusory assertion that:

> YUM! Brands did not and does not exercise control over the day-to-day activities of KFC of American Inc. or KFC Corporation. (Gregg Affidavit, ¶10)

According to YUM's Form 10-K:

> The restaurant management teams are responsible for the day-to-day operation of each unit and for ensuring compliance with operating standards. CHAMPS - which stands for Cleanliness, Hospitality, Accuracy, Maintenance, Product Quality and Speed of Service - is *our core systemwide program* for training, measuring and rewarding employee performance against key customer measures. *CHAMPS is intended to align the operating process of our entire system around one set of standards.* RGM's [restaurant general managers] efforts, including CHAMPS performance measures, *are monitored by area managers or market coaches.* Market coaches typically work with approximately six to twelve restaurants. *The Company's restaurants are visited from time to time by various senior operators to help ensure adherence to system standards and mentor restaurant team members.* [Emphasis added].

In summary, YUM both takes credit for and represents to the public that it is intimately involved

in operating its KFC restaurants.

Although YUM has cited the basic law for holding a parent corporation liable for a

subsidiary, it has conveniently left out the application of that law that pertains to this case:

> Still another such formulation is contained in the Beneficial case [Commonwealth v. Beneficial Fin. Co., 360 Mass. 188, 275 N.E.2d 33 (1971), cert. den. sub nom.], where the court quoted with approval the following statement from United States v. Brown & Sharpe Mfg. Co., 141 F.Supp. 520, 526 (D.R.I.1956): '(W)here (in addition to a corporation's ownership of the capital stock of a subsidiary) it is also shown that the business conducted by the subsidiary is a part of the business of the parent corporation, and where such ownership of stock in a subsidiary is employed not for the purpose of participating in the affairs of the subsidiary in a manner normal and usual with stockholders but for the purpose of making it a

---

[7]KFC of America Inc was not and KFC Corporation is not a franchisee, licensee or affiliate in which YUM has a non-controlling equity interest; but rather the former was and the latter is a "wholly owned subsidiary of YUM! Brands, Inc." (Gregg Affidavit, ¶3)

6

mere agent or department of the parent corporation, the courts will look through the form to the realities of the relation between the corporations and will hold that in such cases the subsidiary is a mere agent or department for carrying on the business of the parent corporation.' 360 Mass. at 291--292, 275 N.E.2d at 92. Westcott Const. Corp. v. Cumberland Const. Co., Inc., 3 Mass.App.Ct. 294 at 298-99, 328 N.E.2d 522 (1975).

It is indisputable, based on YUM's Form 10-K, that the all of the separate KFC corporations are merely the fingers on YUM's corporate arm. By YUM's admission, they make up a single KFC "operating segment" which YUM treats as part of its own business of being "the worlds largest quick serve restaurant company."

**Conclusion**

WHEREFORE, for the foregoing reasons, the plaintiff opposes the defendants' motion for summary judgment, moves to strike the Affidavit of Linda J. Gregg and for sanctions pursuant to Fed.R.Civ.P. Rule 11.

Respectfully submitted,

The plaintiff,
By her attorneys,

John N. Lewis
BBO# 298520
JOHN N. LEWIS & ASSOCIATES
21 Merchants Row, 5th Floor
Boston, MA 02109
(617) 523-0777

**CERTIFICATE OF SERVICE**
I hereby certify that I served a copy of the foregoing on the attorney of record for each party and/or party pro se by mail on 9/1/05.
Sworn and subscribed to ___

## EXHIBIT 1

# UNITED STATES

# SECURITIES AND EXCHANGE COMMISSION

Washington, D. C. 20549

# FORM 10-K

[X]ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE
ACT OF 1934 *[FEE REQUIRED]* for the fiscal year ended December 28, 2002

OR

[ ]TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES
EXCHANGE ACT OF 1934 *[NO FEE REQUIRED]*

For the transition period from _____ to _____.

Commission file number 1-13163

# YUM! BRANDS, INC.

(Exact name of registrant as specified in its charter)

North Carolina
(State or other jurisdiction of
incorporation or organization)

13-3951308
(I.R.S. Employer
Identification No.)

1441 Gardiner Lane, Louisville, Kentucky
(Address of principal executive offices)

40213
(Zip Code)

Registrant's telephone number, including area code: (502) 874-8300

Securities registered pursuant to Section 12(b) of the Act:

**Title of Each Class**

**Name of Each Exchange on**

## **Which Registered**

Common Stock, no par value

New York Stock Exchange

Rights to purchase Series A
Participating Preferred Stock,
no par value of the Registrant

New York Stock Exchange

Securities registered pursuant to Section 12(g) of the Act:

None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes  X  No __

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  [X]

The aggregate market value of the voting stock (which consists solely of shares of Common Stock) held by non-affiliates of the registrant as of June 15, 2002 computed by reference to the closing price of the registrant's Common Stock on the New York Stock Exchange Composite Tape on such date was $9,335,860,595.

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes  X  No __

The number of shares outstanding of the registrant's Common Stock as of February 28, 2003 was 293,337,872 shares.

### **Documents Incorporated by Reference**

Portions of the definitive proxy statement furnished to shareholders of the registrant in connection with the annual meeting of shareholders to be held on May 15, 2003 are incorporated by reference into Part III.

### **PART I**

## **Item 1.Business.**

YUM! Brands, Inc. (referred to herein as "YUM" or the "Company"), formerly known as TRICON Global Restaurants, Inc., was incorporated under the laws of the state of North Carolina in 1997. The principal executive offices of YUM are located at 1441 Gardiner Lane, Louisville, Kentucky 40213, and its telephone number at that location is (502) 874-8300.

YUM, the registrant, together with its restaurant operating companies and other subsidiaries, is referred to in this Form 10-K annual report ("Form 10-K") as the Company. Prior to October 6, 1997, the business of the Company was conducted by PepsiCo, Inc. ("PepsiCo") through various subsidiaries and divisions.

This Form 10-K should be read in conjunction with the Cautionary Statements on pages 39 and 40.

## **(a)General Development of Business**

In January 1997, PepsiCo announced its decision to spin-off its restaurant businesses to shareholders as an independent public company (the "Spin-off"). Effective October 6, 1997, PepsiCo disposed of its restaurant businesses by distributing all

of the outstanding shares of common stock of YUM to its shareholders. YUM's Common Stock began trading on the New York Stock Exchange on October 7, 1997 under the symbol "YUM." Prior to that date, from September 17, 1997 through October 6, 1997, YUM's Common Stock was traded on the New York Stock Exchange on a "when-issued" basis.

On May 7, 2002, YUM completed the acquisition of Yorkshire Global Restaurants, Inc. ("YGR"), the parent company and operator of Long John Silver's ("LJS") and A&W All-American Food Restaurants ("A&W"). Additionally, on May 16, 2002, following receipt of shareholder approval, the Company changed its name from TRICON Global Restaurants, Inc. to YUM! Brands, Inc.

As used in this Form 10-K, references to YUM or the Company include the historical operating results of the businesses and operations transferred to the Company in the Spin-off and since May 7, 2002, acquired from YGR. Additionally, throughout this Form 10-K, the terms "restaurants," "stores" and "units" are used interchangeably.

## (b)Financial Information about Operating Segments

YUM consists of five operating segments: KFC, Pizza Hut, Taco Bell, LJS/A&W and YUM Restaurants International ("YRI" or "International"). For financial reporting purposes, management considers the four U.S. operating segments to be similar and, therefore, has aggregated them into a single reportable operating segment. Operating segment information for the years ended December 28, 2002, December 29, 2001 and December 30, 2000 for the Company is included in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") in Part II, Item 7, pages 17 through 39 and in the related Consolidated Financial Statements and footnotes in Part II, Item 8, pages 41 through 79.

## (c)Narrative Description of Business

### General

YUM is the world's largest quick service restaurant ("QSR") company based on number of system units, with nearly 33,000 units in over 100 countries and territories. The YUM organization is currently made up of six operating companies organized around five restaurant concepts including its three original concepts, KFC, Pizza Hut and Taco Bell, and two acquired concepts, LJS and A&W (the "Concepts"). The six operating companies are KFC, Pizza Hut, Taco Bell, LJS, A&W and YRI.

2

### Restaurant Concepts

Through its five Concepts, the Company develops, operates, franchises and licenses a worldwide system of restaurants which prepare, package and sell a menu of competitively priced food items. These restaurants are operated by the Company or, under the terms of franchise or license agreements, by franchisees or licensees who are independent third parties, or by affiliates in which we own a non-controlling equity interest ("Unconsolidated Affiliates").

In each Concept, consumers can dine in and/or carry out food. In addition, Taco Bell, KFC, LJS and A&W offer a drive-thru option in many stores. Pizza Hut offers a drive-thru option on a much more limited basis. Pizza Hut and, on a much more limited basis, KFC offer delivery service.

Each Concept has proprietary menu items and emphasizes the preparation of food with high quality ingredients as well as unique recipes and special seasonings to provide appealing, tasty and attractive food at competitive prices.

The franchise program of the Company is designed to assure consistency and quality, and the Company is selective in granting franchises. Under the standard franchise agreement, franchisees supply capital – initially by paying a franchise fee to YUM, purchasing or leasing the land and building and purchasing equipment, signs, seating, inventories and supplies and, over the longer term, by reinvesting in the business. Franchisees then contribute to the Company's revenues through the

payment of royalties based on a percentage of sales.

The Company believes that it is important to maintain strong and open relationships with its franchisees and their representatives. To this end, the Company invests a significant amount of time working with the franchisee community and their representative organizations on all aspects of the business, including new products, equipment and management techniques.

The Company is actively pursuing the strategy of multibranding, where two or more of its Concepts are operated in a single unit. In addition, the Company is testing multibranding options involving one of its Concepts and a restaurant concept not owned by or affiliated with YUM. By combining two or more restaurant concepts, particularly those that have complementary daypart strengths in one location, the Company believes it can generate higher sales volumes from such units, significantly improve returns on per unit investment, and enhance its ability to penetrate a greater number of trade areas throughout the U.S. and internationally. Through the consolidation of market planning initiatives across all of its Concepts, the Company has established, or is in the process of establishing in the case of LJS and A&W, multi-year development plans by trade area to optimize franchise and company penetration of its Concepts and to improve returns on its existing asset base. The development of multibranded units may be limited, in some instances, by prior development and/or territory rights granted to franchisees.

At year-end 2002, there were 1,975 multibranded units in the worldwide system. These units were comprised of 1,918 units offering food products from two of the Concepts (a "2n1"), 51 units offering food products from three of the Concepts (a "3n1") and 6 units offering food products from one of the Concepts and a restaurant concept not owned by or affiliated with YUM.

### Restaurant Operations

Through its Concepts, YUM develops, operates, franchises and licenses a system of both traditional and non-traditional QSR restaurants. Traditional units feature dine-in, carryout and, in some instances, drive-thru or delivery services. Non-traditional units, which are typically licensed outlets, include express units and kiosks which have a more limited menu and operate in non-traditional locations like malls, airports, gasoline service stations, convenience stores, stadiums, amusement parks and colleges, where a full-scale traditional outlet would not be practical or efficient.

3

The Company's restaurant management structure varies by concept and unit size. Generally, each Company restaurant is led by a restaurant general manager ("RGM"), together with one or more assistant managers, depending on the operating complexity and sales volume of the restaurant. Each restaurant usually has between 10 and 35 hourly employees, most of whom work part-time. The Company's six operating companies each issue detailed manuals covering all aspects of their respective operations, including food handling and product preparation procedures, safety and quality issues, equipment maintenance, facility standards and accounting control procedures. The restaurant management teams are responsible for the day-to-day operation of each unit and for ensuring compliance with operating standards. CHAMPS – which stands for Cleanliness, Hospitality, Accuracy, Maintenance, Product Quality and Speed of Service – is our core systemwide program for training, measuring and rewarding employee performance against key customer measures. CHAMPS is intended to align the operating processes of our entire system around one set of standards. RGMs' efforts, including CHAMPS performance measures, are monitored by area managers or market coaches. Market coaches typically work with approximately six to twelve restaurants. The Company's restaurants are visited from time to time by various senior operators to help ensure adherence to system standards and mentor restaurant team members.

RGMs attend and complete their respective operating company's required training programs. These programs consist of initial training, as well as additional continuing development and training programs that may be offered or required from time to time. Initial manager training programs generally last at least six weeks and emphasize leadership, business management, supervisory skills (including training, coaching, and recruiting), product preparation and production, safety, quality control, customer service, labor management, and equipment maintenance.

Following is a brief description of each Concept:

*KFC*

- KFC was founded in Corbin, Kentucky by Colonel Harland D. Sanders, an early developer of the quick service food business and a pioneer of the restaurant franchise concept. The Colonel perfected his secret blend of 11 herbs and spices for Kentucky Fried Chicken in 1939 and signed up his first franchisee in 1952. KFC is based in Louisville, Kentucky.

- As of year-end 2002, KFC was the leader in the U.S. chicken QSR segment among companies featuring chicken as their primary product offering, with a 46 percent market share in that segment which is nearly four times that of its closest national competitor.

- KFC operates in 88 countries and territories throughout the world. As of year-end 2002, KFC had 5,472 units in the U.S., and 6,890 units outside the U.S. Approximately 23 percent of the U.S. units and 22 percent of the non-U.S. units are operated by the Company.

- While product offerings vary throughout the worldwide system, traditional KFC restaurants offer fried chicken-on-the-bone products, primarily marketed under the names Original Recipe and Extra Tasty Crispy. Other principal entree items include chicken sandwiches (including the Twister), Colonel's Crispy Strips, Popcorn Chicken and, seasonally, Chunky Chicken Pot Pies. KFC restaurants also offer a variety of side items, such as biscuits, mashed potatoes and gravy, coleslaw, corn, Potato Wedges (in the U.S.) and french fries (outside of the U.S.), as well as desserts. Restaurant decor is characterized by the image of the Colonel, and KFC's distinctive packaging includes the "Bucket" of chicken.

*Pizza Hut*

- The first Pizza Hut restaurant was opened in 1958 in Wichita, Kansas, and within a year, the first franchise unit was opened. Today, Pizza Hut is the largest restaurant chain in the world specializing in the sale of ready-to-eat pizza products. Pizza Hut is based in Dallas, Texas.

4

- As of year-end 2002, Pizza Hut was the leader in the U.S. pizza QSR segment, with a 15 percent market share in that segment.

- Pizza Hut operates in 85 countries and territories throughout the world. As of year-end 2002, Pizza Hut had 7,599 units in the U.S., and 4,431 units outside of the U.S. Approximately 23 percent of the U.S. units and 18 percent of the non-U.S. units are operated by the Company.

- Pizza Hut features a variety of pizzas, which may include Pan Pizza, Thin 'n Crispy, Hand Tossed, Sicilian, Stuffed Crust, Twisted Crust, The Big New Yorker, The Insider and The Chicago Dish. Each of these pizzas is offered with a variety of different toppings. In some restaurants, Pizza Hut also offers breadsticks, pasta, salads and sandwiches. The distinctive Pizza Hut image typically features a bright red roof.

*Taco Bell*

- The first Taco Bell restaurant was opened in 1962 by Glen Bell in Downey, California, and in 1964, the first Taco Bell franchise was sold. Taco Bell is based in Irvine, California.

- As of year-end 2002, Taco Bell was the leader in the U.S. Mexican QSR segment, with a 65 percent market share in that segment.

- Taco Bell operates in 12 countries and territories throughout the world. As of year-end 2002, there were 6,165 Taco Bell units in the U.S., and 267 units outside of the U.S. Approximately 21 percent of the U.S. units and 14 percent of the non-U.S. units are operated by the Company.

- Taco Bell specializes in Mexican-style food products, including various types of tacos, burritos, gorditas, chalupas, quesadillas, salads, nachos and other related items. Additionally, proprietary entree items include Grilled Stuft Burritos and Border Bowls. Taco Bell units feature a distinctive bell logo on their signage.

## *LJS*

- The first LJS restaurant opened in 1969 and the first LJS franchise unit opened later the same year. LJS is presently based in Lexington, Kentucky; however, the Company has announced its intention to move the LJS headquarters to Louisville, Kentucky in 2003.

- As of year-end 2002, LJS was the leader in the U.S. seafood QSR segment, with a 33 percent market share in that segment.

- LJS operates in 5 countries and territories throughout the world. As of year-end 2002, there were 1,221 LJS units in the U.S., and 28 units outside the U.S. Approximately 61 percent of the U.S. units are operated by the Company. All non-U.S. units are operated by franchisees.

- LJS features a variety of seafood items, including meals featuring batter-dipped fish, chicken, shrimp and hushpuppies. LJS units typically feature a distinctive seaside/nautical theme.

## *A&W*

- A&W was founded in Lodi, California by Roy Allen in 1919 and the first A&W franchise unit opened in 1925. A&W is presently based in Lexington, Kentucky; however, the Company has announced its intention to move the A&W headquarters to Louisville, Kentucky in 2003.

5

- A&W operates in 17 countries and territories throughout the world. As of year-end 2002, there were 665 A&W units in the U.S., and 182 units outside the U.S. Approximately 19 percent of the U.S. units are operated by the Company. All non-U.S. units are operated by franchisees.

- A&W serves A&W draft Root Beer and a signature A&W Root Beer float, as well as all-American pure-beef hamburgers and hot dogs.

## *International*

The international operations of the five Concepts are consolidated into a separate operating company (YRI), which has directed its focus toward franchise system growth and concentration of Company development in those markets in which the Company believes sufficient scale is achievable. YRI has developed global systems and tools designed to improve marketing, operations consistency, product delivery, market planning and development and franchise support capability. YRI is based in Dallas, Texas.

As of year-end 2002, YRI had 11,798 units. Approximately 20 percent of these units are operated by the Company. In 2002, YRI accounted for 35 percent of the Company's total system sales and 31 percent of the Company's revenues.

## Operating Structure

In all five of its Concepts, the Company either operates units or they are operated by independent franchisees or licensees. Franchisees can range in size from individuals owning just a few units to large publicly traded companies. In addition, the

Company owns non-controlling interests in Unconsolidated Affiliates who operate similar to franchisees. As of year-end 2002, approximately 23 percent of YUM's worldwide units were operated by the Company, approximately 63 percent by franchisees, approximately 8 percent by licensees and approximately 6 percent by Unconsolidated Affiliates.

## Supply and Distribution

The Company is a substantial purchaser of a number of food and paper products, equipment and other restaurant supplies. The principal items purchased include beef, cheese, chicken products, seafood, cooking oils, corn, flour, lettuce, paper and packaging materials, pinto beans, pork, seasonings, certain beverage products and tomato products.

Effective as of March 1, 1999, the Company, along with the KFC National Purchasing Cooperative, Inc. and representatives of the Company's KFC, Pizza Hut and Taco Bell franchisee groups, formed the Unified FoodService Purchasing Co-op, LLC (the "Unified Co-op") for the purpose of purchasing certain restaurant products and equipment in the U.S. The Company has also substantially integrated the purchasing activities for LJS and A&W into the Unified Co-op. The core mission of the Unified Co-op is to provide the lowest possible sustainable store-delivered prices for restaurant products and equipment. This arrangement combines the purchasing power of the Company and franchisee restaurants in the U.S. which the Company believes will further leverage the system's scale to drive cost savings and effectiveness in the purchasing function. The Company also believes that the Unified Co-op has resulted, and should continue to result, in closer alignment of interests and a stronger relationship with its franchisee community.

To ensure the wholesomeness of food products, suppliers are required to meet or exceed strict quality control standards. Long-term contracts and long-term vendor relationships are used to ensure availability of products. The Company has not experienced any significant continuous shortages of supplies, and alternative sources for most of these products are generally available. Prices paid for these supplies may be subject to fluctuation. When prices increase, the Company may be able to pass on such increases to its customers, although there is no assurance this can be done in the future.

6

Most food products, paper and packaging supplies, and equipment used in the operation of the Company's restaurants are distributed to individual restaurant units by third party distribution companies. Since November 30, 2000, McLane Company, Inc. ("McLane"), a subsidiary of Wal-Mart, has been the exclusive distributor for Company-operated KFCs, Pizza Huts and Taco Bells in the U.S. and for a substantial number of franchisee and licensee stores. McLane became the distributor when it assumed all supply and distribution responsibilities under an existing agreement between AmeriServe Food Distribution, Inc. ("AmeriServe") and the Company (the "AmeriServe Agreement"). McLane assumed the AmeriServe Agreement, as amended, as well as distribution agreements covering a substantial portion of the Pizza Hut and Taco Bell franchise system, and, to a lesser extent, the KFC franchise system simultaneously with its acquisition of the AmeriServe business. The AmeriServe business was acquired by McLane after AmeriServe filed for protection under Chapter 11 of the U.S. Bankruptcy Code and a plan of reorganization for AmeriServe (the "POR") was approved by the U.S. Bankruptcy Court on November 28, 2000. A discussion of the impact of the AmeriServe bankruptcy reorganization process on the Company is contained in Note 25 to the Consolidated Financial Statements on page 78. In connection with McLane's acquisition and assumption of the AmeriServe Agreement, the Company agreed to certain amendments, including an extension of the AmeriServe Agreement through October 31, 2010. Under the terms of the Agreement with McLane, Company-operated KFC, Pizza Hut and Taco Bell restaurants in the U.S. generally cannot use alternative distributors. The Company stores within the LJS system are covered under a separate agreement with McLane. A&W units are not currently serviced by McLane.

YRI and its franchisees use decentralized sourcing and distribution systems involving many different global, regional, and local suppliers and distributors. In certain countries, including China, YRI may own all or a portion of the distribution system.

## Trademarks and Patents

The Company and its Concepts own numerous registered trademarks and service marks. The Company believes that many of

these marks, including its Kentucky Fried Chicken®, KFC®, Pizza Hut®, Taco Bell® and Long John Silver's® marks, have significant value and are materially important to its business. The Company's policy is to pursue registration of its important marks whenever feasible and to oppose vigorously any infringement of its marks. The Company also licenses certain trademarks and service marks, including certain of the A&W trademarks and service marks (the "A&W Marks"), which are owned by A&W Concentrate Company (formerly A&W Brands, Inc.). A&W Concentrate Company, which is not affiliated with the Company, has granted the Company an exclusive, worldwide (excluding Canada), perpetual, royalty-free license (with right to sublicense) to use the A&W Marks for restaurant services.

The use of these marks by franchisees and licensees has been authorized in KFC, Pizza Hut, Taco Bell, LJS and A&W franchise and license agreements. Under current law and with proper use, the Company's rights in its marks can generally last indefinitely. The Company also has certain patents on restaurant equipment which, while valuable, are not material to its business.

## Working Capital

Information about the Company's working capital is included in MD&A in Part II, Item 7, pages 17 through 39 and the Consolidated Statements of Cash Flows in Part II, Item 8, pages 41 through 79.

## Customers

The Company's business is not dependent upon a single customer or small group of customers.

## Seasonal Operations

The Company does not consider its operations to be seasonal to any material degree.

7

## Backlog Orders

Company restaurants have no backlog orders.

## Government Contracts

No material portion of the Company's business is subject to renegotiation of profits or termination of contracts or subcontracts at the election of the U.S. government.

## Competition

The overall food service industry and the QSR segment are intensely competitive with respect to food quality, price, service, convenience, restaurant location and concept. The restaurant business is often affected by changes in consumer tastes; national, regional or local economic conditions; currency fluctuations; demographic trends; traffic patterns; the type, number and location of competing restaurants; and disposable purchasing power. Each of the Concepts compete with national and regional chains as well as locally-owned restaurants, not only for customers, but also for management and hourly personnel, suitable real estate sites and qualified franchisees.

## Research and Development ("R&D")

The Company operates R&D facilities in Louisville, Kentucky; Dallas, Texas; Irvine, California; and Lexington, Kentucky. The Company expensed $23 million in 2002, $23 million in 2001 and $24 million in 2000 for R&D activities. From time to time, independent suppliers also conduct research and development activities for the benefit of the YUM system. The

## EXHIBIT 2



# The Commonwealth of Massachusetts
# William Francis Galvin

Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

### *YUM! BRANDS, INC.* Summary Screen

❓ Help with this form

Request a Certificate

**The exact name of the Foreign Corporation:** YUM! BRANDS, INC.

**The name was changed from:** TRICON GLOBAL RESTAURANTS, INC. on 5/23/02

**Entity Type:** Foreign Corporation

**Identification Number:** 133951308

**Old Federal Employer Identification Number (Old FEIN):** 000631351

**Date of Registration in Massachusetts:** 09/29/1998

**The is organized under the laws of:** State: NC    Country: USA   **on:** 05/30/1997

**Current Fiscal Month / Day:** 12 / 31                **Previous Fiscal Month / Day:** 00 / 00

**The location of its principal office:**
No. and Street:       1441 GARDINER LN.
City or Town:       LOUISVILLE              State: KY      Zip: 40213      Country: USA

**The location of its Massachusetts office, if any:**
No. and Street:
City or Town:                    State:        Zip:        Country:

**The name and address of the Registered Agent:**
Name:          CT CORPORATION SYSTEMS
No. and Street:    101 FEDERAL STREET
City or Town:    BOSTON                State: MA    Zip: 02110   Country: USA

**The officers and all of the directors of the corporation:**

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code | Expiration<br>of Term |
|---|---|---|---|
| PRESIDENT | DAVID C. NOVAK | 1441 GARDINER LN.,<br>LOUISVILLE, KY USA | |

| TREASURER | DENISE L. RAMOS | | |
|---|---|---|---|
| | | 1441 GARDINER LN., LOUISVILLE, KY 40213 USA | |

**business entity stock is publicly traded:** __

**The total number of shares and par value, if any, of each class of stock which the business entity is authorized to issue:**

| Class of Stock | Par Value Per Share Enter 0 if no Par | Total Authorized by Articles of Organization or Amendments *Num of Shares*    *Total Par Value* | Total Issued and Outstanding *Num of Shares* |
|---|---|---|---|
| No Stock Information available online. Prior to August 27, 2001, records can be obtained on microfilm. | | | |

   __ Consent     __ Manufacturer    __ Confidential Data    __ Does Not Require Annual Report

   __ Partnership    __ Resident Agent    __ For Profit        __ Merger Allowed

**Select a type of filing from below to view this business entity filings:**

ALL FILINGS
Amended Foreign Corporations Certificate
Annual Report
Annual Report - Professional
Application for Reinstatement

View Filings      New Search

**Comments**

© 2001 - 2005 Commonwealth of Massachusetts
All Rights Reserved

?
Help

# EXHIBIT 3

 Westlaw.

803 N.E.2d 359 (Table)                                                                                          Page 1
60 Mass.App.Ct. 1116, 803 N.E.2d 359 (Table), 2004 WL 253322 (Mass.App.Ct.)
**Unpublished Disposition**
**(Cite as: 60 Mass.App.Ct. 1116, 803 N.E.2d 359, 2004 WL 253322 (Mass.App.Ct.))**

**Briefs and Other Related Documents**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

Appeals Court of Massachusetts.
Robert AWAD,
v.
TRICON GLOBAL RESTAURANTS, INC. &
others. [FN1]

> FN1. Judith A. Robbins, Eileen Robbins, and
> zoning board of appeals of the city of
> Worcester.

**No. 02-P-1091.**

Feb. 11, 2004.

MEMORANDUM AND ORDER PURSUANT TO
RULE 1:28

***1 The plaintiff, Robert Awad, brought a complaint
in Superior Court pursuant to G.L. c. 40A. § 17,
challenging a variance and a special permit granted to
the defendant Tricon Global Restaurants, Inc. (Tricon),
by the Worcester zoning board of appeals which would
enable Tricon to build a drive-through Kentucky Fried
Chicken (**KFC**) restaurant. While concluding that
Awad had standing to maintain the suit, the judge
upheld the board's actions granting the variance and the
special permit. On appeal, Awad challenges only that
aspect of the Superior Court decision upholding the
validity of the variance.

*Background.* Tricon sought and obtained a special
permit [FN2] and variance in order to construct a **KFC**
with a drive-through window at 290 West Boylston
Street (locus) in Worcester. The locus is located in a
BL-1.0 zoning district which permits business uses
including drive-through take-out services and
restaurants. (A:7, 162) The locus, which is owned by

defendants Judith A. Robbins and Eileen Robbins, is
1.658 acres in size and is roughly triangular in shape.
(A:161, E:411) The locus currently contains a United
States Post Office, a billboard sign, and parking areas.
Customers of the post office and a nearby pub use the
locus for parking.

> FN2. Tricon needed a special permit in order
> to construct a drive-through restaurant
> pursuant to Worcester Zoning Ordinance art.
> IV, table 4.1. The board voted to approve the
> special permit on February 28, 2000. (E:1)

Tricon required a variance because its planned **KFC**
provided for fewer than the seventy-three off-street
parking spaces required by art. IV, table 4.4, of the
Worcester Zoning Ordinance. (E:66) The zoning board
granted Tricon's application for a variance on March
27, 2000. (E:4-5) Awad owns and manages residential
properties, including two apartment buildings located
adjacent to and across the street from the locus.

*Discussion.* Awad contends that the judge erred in
upholding the board's action in granting the variance
because Tricon failed to satisfy the stringent
requirements for a variance set forth in G.L. c. 40A. §
10. Tricon directs the bulk of its argument not to the
defense of the variance on its merits but to an attack on
Awad's standing to maintain the action challenging the
variance.

1. *Standing.* The plaintiff's status as a "person
aggrieved" is a jurisdictional prerequisite to judicial
review under G.L. c. 40A. § 17. *Nickerson v. Zoning
Bd. of Appeals of Raynham,* 53 Mass.App.Ct. 680, 681
n. 2 (2002). We review the judge's decision on
standing, a determination of fact, to ascertain whether
it was clearly erroneous. *Marashlian v. Zoning Bd. of
Appeals of Newburyport,* 421 Mass. 719, 722 (1996).

Only a "person aggrieved," one who suffers an
infringement of his or her legal rights, may challenge a
decision of a zoning board of appeals. *Id.* at 721. As an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

803 N.E.2d 359 (Table)                                                                                                  Page 2
60 Mass.App.Ct. 1116, 803 N.E.2d 359 (Table), 2004 WL 253322 (Mass.App.Ct.)
**Unpublished Disposition**
**(Cite as: 60 Mass.App.Ct. 1116, 803 N.E.2d 359, 2004 WL 253322 (Mass.App.Ct.))**

abutter, Awad enjoys a rebuttable presumption that he is a "person aggrieved." *Ibid.* Once his standing was challenged by the defendants, as it was here, it fell to Awad to offer credible evidence substantiating his claim of injury to his legal rights. *Id.* at 723.

Awad maintained at trial that the **KFC** would result in increased and detrimental competition for already scarce public parking spaces in the neighborhood of his residential properties and office. He testified as to his reliance on public parking for the operation of his business, citing among other things the need of prospective tenants who wish to view available apartments to park their cars in public spaces and the need for such parking by current tenants who own more than one car. (Tr:408-414) We are satisfied that the record supports the judge's determination that Awad's claim of injury is more than speculative. See *id.* at 722, 723. Mindful, moreover, that the words "person aggrieved" are not to be read narrowly, *Marotta v. Board of Appeals of Revere,* 336 Mass. 199, 204 (1957), we see no basis for thinking erroneous, let alone clearly erroneous, the judge's fact finding as to Awad's standing as a "person aggrieved." See *Marashlian, supra* at 722.

**\*\*\*2 2.** *Variance.* It is firmly established that "[n]o person has a legal right to a variance and they are to be granted sparingly." *Damaskos v. Board of Appeal of Boston,* 359 Mass. 55, 61 (1971). Our review focuses upon whether there was evidence of the factors necessary to satisfy the statutory prerequisites. *Broderick v. Board of Appeal of Boston,* 361 Mass. 472, 479 (1972). The Worcester Zoning Ordinance art. II, § 7(4)(C) (1991) (E:33), provides that the zoning board may grant a variance only after the following findings are made:

"(1) A literal enforcement of the provision of this Ordinance would involve a substantial hardship, financial or otherwise, to the petitioner or appellant.
"(2) The hardship is owing to circumstances relating to the soil conditions, shape and/or topography of such land or structures and especially affecting such land or structures but not affecting generally the zoning district in which it is located.
"(3) Desirable relief may be granted without

substantial detriment to the public good and without nullifying or substantially derogating from the intent or purpose of this Ordinance. [FN3]

> FN3. These provisions mirror the requirements of G.L. c. 40A, § 10.

"(4) The extent of the dimensional variance granted as it relates to floor space, bulk, number of occupants or other relevant measures shall be no greater than the minimum necessary to provide relief from the statutory hardship."

In granting the variance, the board explained the basis for its finding that a literal enforcement of the zoning ordinance would involve a substantial hardship to the petitioner by stating: "There is not sufficient space on the lot to allow the petitioner to comply with the off street parking requirement." The board went on to say that, because "[t]he size, shape and topography of the lot are insufficient to permit compliance with the off street parking requirement," the hardship is owing to circumstances relating to the soil condition, shape, or topography of the locus as required by art. II, § 7(4)(C)(2), of the zoning ordinance. (A:9)

A trial judge reviewing the decision of a zoning board of appeals hears the matter de novo and determines the validity of the board's decision based upon the evidence presented. See *Heavey v. Board of Appeals of Chatham,* 58 Mass.App.Ct. 401, 404 n. 5 (2003). At trial, the burden rested upon the defendants to produce evidence that the statutory prerequisites were met and that the variance was justified. *Dion v. Board of Appeals of Waltham,* 344 Mass. 547, 555-556 (1962). In upholding the variance, the judge explained: "The size of the lot is not sufficient to enable the petitioner to comply with the off-street parking requirements of the ordinance as literally computed." He also stated, "There is substantial hardship owing to the circumstances relating to the soil condition, shape or topography of the land by reason that the size, shape and topography of the lot are insufficient to permit the petitioner to comply with the literal off-street parking requirements of the zoning ordinance of the proposed use." (A:165)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

803 N.E.2d 359 (Table)                                                    Page 3
60 Mass.App.Ct. 1116, 803 N.E.2d 359 (Table), 2004 WL 253322 (Mass.App.Ct.)
**Unpublished Disposition**
**(Cite as: 60 Mass.App.Ct. 1116,  803 N.E.2d 359,  2004 WL 253322 (Mass.App.Ct.))**

**\*\*\*3** Notwithstanding the board's and the judge's references to soil condition, shape, and topography, the record does not support the finding that it was these factors that caused the number of parking spaces available to Tricon to be fewer than the zoning ordinance requires. (Tr. 202-230) Although the defendants presented testimony regarding the triangular shape of the locus, the slope of the locus's topography, and the proximity of the locus to protected wetlands, they did not establish any nexus between soil condition, shape, or topography and Tricon's inability to comply with the ordinance. It bears noting in this regard that a portion of the locus is already committed to other uses, i.e., the existing post office and an easement, and that not all 1.658 acres of the locus are available to Tricon for the proposed **KFC.** Otherwise put, presently existing uses rather than the size of the locus itself appear to be the operative constraints upon the space available to Tricon for parking. (Tr. 202-230)

Further, the size of the locus alone is insufficient justification for a variance. *Tsagronis v. Board of Appeals of Wareham,* 415 Mass. 329, 331-332 (1993). We have held that "[t]he size of a lot does not qualify as 'shape of the land' grounds for the grant of a variance." *Bertrand v. Board of Appeals of Bourne,* 58 Mass.App.Ct. 912 (2003). Similarly we have stated that "[v]ariances are not normally available to remedy deficiencies in frontage and area." *DiCicco v. Berwick,* 27 Mass.App.Ct. 312, 314 (1989).

Accordingly, we conclude that the size of the locus does not suffice to create a "substantial hardship" under Worcester Zoning Ordinance art. II, § 7(4)(C)(2), or G.L. c. 40A. § 10. Because the record does not support a determination that the soil condition, shape, or topography of the locus created Tricon's inability to conform to the zoning ordinance, we conclude that the variance was improperly granted. See *Tsagronis v. Board of Appeals of Wareham,* 415 Mass. at 331-332; *Shafer v. Zoning Board of Appeals of Scituate,* 24 Mass.App.Ct. 966, 967 (1987); *Mitchell v. Board of Appeals of Revere,* 27 Mass.App.Ct. 1119, 1120 (1989).

The judgment is reversed, and a new judgment is to enter annulling the decision of the zoning board of appeals that granted the variance as in excess of its authority.

*So ordered.*

60 Mass.App.Ct. 1116, 803 N.E.2d 359 (Table), 2004 WL 253322 (Mass.App.Ct.) Unpublished Disposition

**Briefs and Other Related Documents (Back to top)**

• 2003 WL 23940551 (Appellate Brief) Reply Brief of Plaintiff/Appellant (Jan. 28, 2003)Original Image of this Document (PDF)

• 2002 WL 32758955 (Appellate Brief) Brief of Defendant-Appellee Zoning Board of Appeals of the City of Worcester and Its Members (Dec. 16, 2002)Original Image of this Document (PDF)

• 2002 WL 32765348 (Appellate Brief) Brief of Defendants/Appellees Tricon Global Rstaurants, Inc. and Judith A. and Eileen Robbins (Dec. 16, 2002)Original Image of this Document (PDF)

• 2002 WL 32765349 (Appellate Brief) Brief of Plaintiff/Appellant (Sep. 11, 2002)Original Image of this Document with Appendix (PDF)

• 2002-P-1091 (Docket)

(Aug. 05, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## EXHIBIT 4

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

NO. A.C. 2002-P-1091

---

ROBERT AWAD
PLAINTIFF/APPELLANT

v.

TRICON GLOBAL RESTAURANTS, INC.
JUDITH A. AND EILEEN ROBBINS, AND
ZONING BOARD OF APPEALS OF
THE CITY OF WORCESTER AND ITS
MEMBERS
DEFENDANTS/APPELLEES

---

ON APPEAL FROM A JUDGMENT OF THE
WORCESTER SUPERIOR COURT

---

BRIEF OF DEFENDANTS/APPELLEES
TRICON GLOBAL RESTAURANTS, INC.
AND JUDITH A. AND EILEEN ROBBINS

---

Thomas J. Conte (BBO #566092)
James P. Hoban (BBO #633929)
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . iii

STATEMENT OF ISSUES PRESENTED FOR REVIEW . . . . . . 1

STATEMENT OF THE CASE  . . . . . . . . . . . . . . 2

STATEMENT OF THE FACTS . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . .13

    I.   THE TRIAL COURT CLEARLY ERRED IN FINDING
        THAT AWAD HAD STANDING TO BRING THIS ZONING
        APPEAL BECAUSE AWAD FAILED TO INTRODUCE ANY
        CREDIBLE EVIDENCE THAT HIS PRIVATE LEGAL OR
        PROPERTY INTERESTS WOULD BE HARMED. . . . 13

        A.   Awad's Presumptive Standing As An
             Abutter Was Challenged by Tricon. . .13

        B.   Awad Does Not Utilize On-Street Parking
             For His Business Or Personal Uses And
             Therefore His Unsubstantiated And
             Unsupported Concerns About Neighborhood
             Parking Do Not Provide Him With
             Standing To Contest The ZBA's Grant Of
             A Parking Variance. . . . . . . . . .18

        C.   The Restaurant Is A Use Permitted
             As Of Right In BL-1.0 District And
             All Kentucky Fried Chicken
             Restaurants Serve The Same Menu In
             The Same Containers, Have Exterior
             Lighting, Coolers, Kitchen Vents
             That Exhaust To The Exterior Of
             The Restaurant, And Identifying
             Illuminated Signage So That
             Concerns About Resulting Noise,
             Light and Odors Do Not Provide Awad
             With Standing . . . . . . . . . . .24

D.   Because Awad Failed To Meet His
Burden Of Proving A Credible
Threat Of Injury To His Private
Property Or Legal Interests He Was
Without Standing To Bring This Zoning
Appeal And The Trial Court Was Without
Subject Matter Jurisdiction To Consider
The Merits Of The Case. . . . . . . .25

II.  EVEN IF AWAD HAD STANDING TO BRING A ZONING
APPEAL AS A RESULT OF HIS OWNERSHIP OF 2
WATSON AVENUE, WHICH HE DOES NOT, THE TRIAL
COURT'S FINDINGS AFFIRMING THE ZBA'S GRANT
OF A PARKING VARIANCE IS NOT CLEARLY
ERRONEOUS. . . . . . . . . . . . . . . . . .25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . .30

## TABLE OF AUTHORITIES

### CASES

Barvenik v. Board of Alderman
Of Newton, 33 Mass. App. Ct. (1992) . . . . . 15, 25

Bell v. Zoning Board of Appeals of
Gloucester, 429 Mass. (1999) . . . . . . .15, 17, 25

Building Inspector of Lancaster
v. Sanderson, 372 Mass. (1977)  . . . . . . . . . 14

Chongris v. Board of Appeals of
Andover, 17 Mass. App. Ct. (1984) . . . . . . . . 14

Circle Lounge & Grille, Inc. v.
Board of Appeals of Boston,
324 Mass. (1949) . . . . . . . . . . . . . . .15, 25

Gordon v. Zoning Board of Appeals
Of Lee, 22 Mass. App. Ct. (1980)  . . . . . . . . 13

Harvard Square Defense Fund, Inc. v.
Planning Board of Cambridge, 27 Mass.
App. Ct. (1989) . . . . . . . . . . . . . 20, 24, 25

Marashlian v. Zoning Board of
Appeals of Newburyport, 421 Mass. (1996). 13, 15, 19,
. . . . . . . . . . . . . . . . . . . . . 23, 24, 27

Paulding v. Bruins, 18 Mass. App.
Ct. (1984). . . . . . . . . . . . . . . . 13, 14, 27

Planning Board of Marshfield
v. Zoning Board of Appeals of Pembroke,
427 Mass. (1998)  . . . . . . . . . . . . . . 14, 25

Rinaldi v. Board of Appeals of Boston,
50 Mass. App. Ct. (2001) . . . . . . . . . . .15, 25

Watros v. Greater Lynn Mental Health
& Retardation Assoc., Inc., 421 Mass.
(1995) . . . . . . . . . . . . . . . . . . . .14, 18

## Statutes

G.L. c. 40A, § 10 . . . . . . . . . . . . . . . . 26

G.L. c. 40A, § 17 . . . . . . . . . . . . . . . 13, 14

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Does an abutter have standing to contest the
    granting of a variance to the off-street parking
    requirement in connection with the construction of
    a restaurant as of right in another zoning
    district, where the abutter failed, once his
    standing was challenged, to offer any evidence at
    trial of particularized injury to his legal and
    property interest beyond his own speculative
    personal opinion?

2.  Are an abutter's unsubstantiated concerns that
    litter, noise, light, and odors will be released
    into the neighborhood as a result of the
    construction and operation of a restaurant, which
    is a use permitted as of right, sufficient to
    convey standing to contest a parking variance
    granted to the restaurant?

3.  Can the decision of the Superior Court on the
    merits of a Zoning Board of Appeals' decision
    granting a parking variance be "clearly
    erroneous," when the abutter challenging the grant
    of the variance failed to introduce any evidence
    that controverts trial court's findings that as a
    result of soil conditions, shape and topography
    not generally affecting property in the zoning

1

district such that literal enforcement of the 73-parking spaces required for the 46-seat restaurant would constitute a substantial hardship?

### STATEMENT OF THE CASE

Robert Award ("Awad") appeals a judgment of the Superior Court affirming the decision of the City of Worcester Zoning Board of Appeals ("ZBA") in granting Tricon Global Restaurants, Inc. ("Tricon") a variance to reduce the parking required for a 46-seat restaurant from 73-parking spaces to 41-parking spaces. (Appendix Vol. 000158-168, 000172.)[1] The restaurant itself is a use permitted as of right in zoning district BL-1.0. (Appendix Vol. 000162.) Judgment was entered on September 17, 2001, affirming the ZBA's decision. (Appendix Vol. 000171) Awad thereafter filed a timely notice of appeal "from the judgment entered on September 17, 2001." (Appendix Vol. 000172-73.)

### STATEMENT OF THE FACTS

On March 27, 2000, the ZBA conducted a hearing regarding Tricon's application for a Variance from the City of Worcester Zoning Ordinance's off-street parking requirement, which required 73-parking spaces for a 46-seat restaurant. (Exhibit Vol. 0000004-05.) Tricon

---

[1]    At trial, Awad also challenged the ZBA's grant of a special permit to operate a drive-through food

2

sought the variance in connection with its construction of a Kentucky Fried Chicken restaurant (sometimes the "Restaurant") at 290 West Boylston Street in Worcester in the BL-1.0 zoning district (the "site").[2] (Exhibit Vol. 000004-005.) The Restaurant itself is a use permitted as of right for the site.  (Exhibit Vol. 0000043.)  This application for a Variance was granted by the ZBA. (Exhibit Vol. 000005.)

As relevant to this appeal, Awad filed a complaint in the Worcester Superior Court on May 3, 2000, asserting that the ZBA's decisions to grant Tricon a parking variance improper because it was, *inter alia*, arbitrary, capricious, and made in excess of the ZBA's authority.  (Appendix Vol. 000003-11.)  Awad did not identify any specific injury to his private rights, private property interests, or private legal interests in his Complaint.

The site is located in the area of the junction of Interstate-290 and Interstate-190 in Worcester. (Transcript Vol. II, p. 196; Exhibit Vol. 000449.)  The

---

service window. However, Awad does not argue that issue on appeal and it is therefore waived.

[2]    The Greendale Post Office is also located on the parcel known as 290 West Boylston Street.  In their Brief Tricon and Judith A. and Eileen Robbins (the "Robbins") use the term "site" only to refer to that portion of the parcel with respect to which Tricon has a lease option and for which the ZBA granted a parking variance.

site is bounded on its northwest side by West Boylston
Street.   (Exhibit Vol. 000448.)   The site is bounded on
its east side by Barber Avenue. (Exhibit Vol. 000448.)

The site is located wholly within the BL-1.0
zoning district, which is a limited business use
district. (Exhibit Vol. 000038, 000043-044, 000448.)
Uses permitted as of right within the BL-1.0 district
include: *food service without the sale of alcoholic
beverages*, bank and credit union, bank and credit union
with drive through window service, funeral home, health
club, indoor rental and service of equipment for home
and recreational uses, general office, professional
office, package store with no alcoholic beverage
consumption on the premises, radio or television
studio, research lab without manufacturing facilities,
retail sales with incidental fabrication and assembly,
service shops and personal service, transformer,
pumping station, sub-station, telephone exchange, and
club or lodge (private and non-profit).   (Exhibit Vol.
000042-044.)(emphasis added).

To the south of the site is the BG-3.0 zoning
district, which is a general business zoning district.
(Exhibit Vol. 000038, 000448.)  Uses permitted as of
right include: bus station or terminal and railroad
passenger station, motor vehicle service, repair, and

4

garage, wholesale business or storage conducted
entirely within an enclosed structure, retail sales
with incidental fabrication and assembly, theatres and
motion picture theatres, general office, professional
office, and food service including the sale and
consumption of alcoholic beverages.   (Exhibit Vol.
000042-044.)

To the east of the site, is the RG-5.0 zoning
district which is a general residential district.
(Exhibit Vol. 000448.)  Uses permitted as of right in
the RG-5.0 district include family day care home, group
residence (general or limited), high rise multifamily
dwelling, low rise multifamily dwelling, day care
center, licensed hospital or sanitarium, and nursing or
convalescent home.   (Exhibit Vol. 000041-044.)   With a
special permit, professional office, service shops and
personal service, and funeral home can also be operated
in the RG-5.0 district.

The boundary between the BL-1.0 district and the
RG-5.0 site runs down the middle of Barber Avenue.
(Exhibit Vol. 000448.)

North of the site, on the west side of Barber
Avenue between Bourne Street and Watson Avenue on-
street parking is permitted by resident permit only.
(Exhibit Vol. 000272, 000449.)   South and partially

5

adjacent to the site on the west side of Barber Avenue, between Ericsson Street and Wildey Avenue on street parking is permitted by resident permit only. (Exhibit Vol. 000272, 000449.)

On the east (RG-5.0) side of Barber Avenue between Bourne Street and Wildey Avenue on-street parking is permitted by resident permit only. (Exhibit Volume 000272, 000449.)

There is a railroad easement in close proximity to the site. (Exhibit Vol. 000450.) Other uses in the area of the site include the Greendale Mall, the Higgins Armory Museum, C & R Tire Company, Eddy's Pub, the Buffet King, a Citgo Gas Station, and the Greendale Post Office. (Transcript Vol. II, pp. 196, 199; Exhibit Vol. 000449-50).

The site has an unusual geometric shape and is basically triangular in shape. (Transcript Vol. II, p. 201, 203-04.) There is an 18-foot drop from the portion of the site at the intersection of West Boylston Street and Barber Avenue to the portion of the site located behind the Greendale Post Office. (Transcript Vol. II, p. 201.) There is a protected wetland pocket immediately adjacent to the site so that a portion of the 100-foot buffer zone required by the Massachusetts Wetlands Protection Act is located on the

6

southwest portion of the site. (Transcript Vol. II, pp. 201-03; Exhibit Vol. 000448.)   Moreover, the City of Worcester does not permit vehicle access to the site from the West Boylston Street side.   (Transcript Vol. II, pp. 204, 231-32.)

At trial, Awad testified that he owns three properties (1 Watson Avenue, 2 Watson Avenue, and 37 Barber Avenue) located in the RG-5.0 district. (Transcript, Vol. IV, p. 390.)

The only evidence introduced at trial as to the identity of abutters to the site were three certified lists of abutters prepared by the Assessor's Office of the City of Worcester and contained within the ZBA's files concerning Tricon's application the parking variance and Awad's testimony confirming that he had, in fact received notice of the ZBA's hearings and that his name appeared on the lists twice.   (Exhibit Vol. 000214, 000226, 000233; Transcript Vol. IV. pp. 393-94.)   In this regard, Awad's name does, in fact, appear on the certified lists of abutters twice – once with respect to "2 Watson Avenue Worcester MA 01606", and once with respect to "2 Watson Avenue Unit 1 Worcester MA 01606." (Exhibit Vol. 000214, 000226, 000233.) Neither of the other properties owned by Awad (1 Watson Avenue and 37 Barber Avenue) appear on the lists.

7

At trial, Tricon's traffic and parking engineer, Dermot Kelly ("Kelly"), who has more than 25 years of experience and was qualified by the trial court as an expert witness in traffic and parking engineering, testified that it was his professional opinion that the 41-parking spaces required by the variance would be more than adequate for the Restaurant. (Transcript Vol. II, pp. 247-52, 254.) It was Kelly's professional opinion that the proposed Restaurant would have a peak parking requirement of 24 to 26 parking spaces. (Transcript Vol. II, pp. 260.) In formulating his professional opinion, Kelly visited and considered parking and seating at other Kentucky Fried Chicken restaurants in Brockton, Framingham, Danvers, Salem, and Seabrook, as well as the proposed site, and a Burger King recently constructed in Worcester. (Transcript Vol. II, pp. 252-53; Exhibit Vol. 000280-000281.) The evidence demonstrated that most of these restaurants had significantly lower parking space to seat ratios than the 0.89 ratio provided under the parking variance. (Exhibit Vol. 000280-0000281.) For example, the Worcester Burger King (which also required a parking variance) provides 54-parking spaces for an 86-seat restaurant which is a parking space to seat ratio of 0.63. (Exhibit Vol. 000281.) Similarly, a

8

Kentucky Fried Chicken/Taco Bell restaurant recently
constructed in Hudson provides 30-parking spaces for
52-seat which is a parking space to seat ratio of 0.58.
(Exhibit Vol. 000281.)   In the case of the Seabrook
Kentucky Fried Chicken restaurant, 25-parking spaces
are provided for a 64-seat restaurant which is a
parking to seating ratio of 0.39. (Exhibit Vol.
000281.)

Kelly also considered the parking generation
figures published in Parking Generation Manual
published by the Institute of Transportation Engineers
based upon their studies. (Transcript Vol. II, pp.
256.)   The Parking Generation Manual suggests that the
peak weekday and peak Saturday parking demands for a
46-seat fast food restaurant are 26 spaces and 24
spaces, respectively.   (Exhibit Vol. 000280-000281.)
The Parking Generation Manual suggests that the peak
weekday and peak Saturday parking demands for a 2,720
square foot fast food restaurant are 25 spaces and 37
spaces, respectively.   (Exhibit Vol. 000280-000281.)
Kelly noted, however, that the Parking Generation
Manual's parking requirement figures are based upon
parking requirements for McDonald's, Burger King,
Wendy's and Taco Bell. (Transcript Vol. II, pp. 257.)
Kelly testified that based upon Institute of

9

Transportation Engineer literature and studies he has done, Kentucky Fried Chicken restaurants typically generate less parking demand than those restaurants. (Transcript Vol. II, pp. 257-59.)  Kelly also testified that based upon his professional experience, more than half of the cars entering the Restaurant will use the drive through window.  (Transcript Vol. II, pp. 262.) This opinion testimony by an expert qualified by the trial court concerning the adequacy of the 41 parking spaces required by the variance was unrebutted by Awad.

This expert testimony was also supported by the testimony of Frank Monteiro ("Monteiro"), a licensed professional engineer with 19 years of experience who was qualified by the trial court as an expert in site planning and civil engineering.  (Transcript Vol. II, pp. 189-195.)  Monteiro testified that he had been involved in the planning and development of approximately 150 fast-food restaurants.  (Transcript Vol. II, p. 191.)  Monteiro testified that based on his experience designing fast-food restaurants, and specifically Kentucky Fried Chicken restaurants, restaurants of this size are typically designed with approximately 35 parking spaces.  (Transcript Vol. II, p. 209.)

Awad did not introduce any rebuttal testimony from a traffic and parking expert at trial. Rather, Awad relied solely on his own speculative personal beliefs as to the impact that the development of the site would have on neighborhood parking. (Transcript Vol. IV, pp. 416-17, 421-24.) Specifically, Awad speculated that cars which presently park on the site would be displaced and would seek on-street parking in the RG-5.0 neighborhood making on-street parking more difficult. (Transcript Vol. IV, pp. 416-17, 421-24.) In reaching this personal conjecture, however, Awad conceded that he was unfamiliar with whether parking was available on West Boylston Street near his property. (Transcript Vol. IV, pp. 424.)

Awad does use on-street parking for his own business or personal uses. (Transcript Vol. IV, pp. 412-15.) In this regard, Awad's abutting property, 2 Watson Avenue (which contains five rental units and his office), has 15 off-street parking spaces. (Transcript Vol. IV, p. 400.)

Rather, Awad's concern was for guests of his tenants and prospective tenants. (Transcript Vol. IV, pp. 412-15.) With respect to prospective tenants, Awad testified that it was his objective to have long-term tenants. (Transcript Vol. IV, p. 404.) In fact, on

11

average, Awad's tenants stay for six years.
(Transcript Vol. p. 431.)

Awad also testified that he was concerned about
litter on a public median strip near his property and
the public sidewalks.  (Transcript Vol. IV, pp. 425-
26).  Specifically, that prospective tenants would have
a poor first impression of the neighborhood as a result
of any litter on the median or sidewalks.  (Transcript
Vol. IV, pp. 427-28.)  Awad was also concerned about
noise, "light pollution," and "cooking smells."
(Transcript Vol. IV, pp. 427-28, 430-33.)

Scott Orr, a real estate manager for Tricon,
testified at trial, that all Kentucky Fried Chicken
Restaurants have coolers utilizing exterior
compressors, kitchen vents which exhaust to the
exterior of the building, identifying illuminated
signage, exterior lighting, parking lots, and serve the
same menu utilizing the same food containers.
(Transcript Vol. II, pp. 150-152, 154-59, 174-79, 185-
88.)  Orr also testified that all Kentucky Fried
Chicken restaurants utilize a quality assurance program
entitled CHAMPS.  (Transcript Vol. II, pp. 125-31;
Exhibit Vol. 000441-446.)  Pursuant to the CHAMPS
program, which emphasizes among other things exterior
cleanliness, each restaurant's manager is required to

12

perform a checklist at least three times each day.
(Transcript Vol. II, pp. 185-86.)  Moreover, the
restaurant manager and his crew have an obligation to
make certain that the restaurant's exterior areas are
clean at all times and to clean the walkway and parking
lot as often as necessary to meet this obligation.
(Transcript Vol. II, pp. 152,-54, 185-86.)

The site was designed with screening trees and
shrubs along its bounds.  (Transcript Vol. II, pp. 205-
06; Exhibit Vol. 000448.)

**ARGUMENT**

I. **THE TRIAL COURT CLEARLY ERRED IN FINDING THAT
AWAD HAD STANDING TO BRING THIS ZONING APPEAL
BECAUSE AWAD FAILED TO INTRODUCE ANY CREDIBLE
EVIDENCE THAT HIS PRIVATE LEGAL OR PROPERTY
INTERESTS WOULD BE HARMED.**

A. **Awad's Presumptive Standing As An
Abutter Was Challenged By Tricon.**

On appeal, a trial court's findings under G.L. c.
40A, §17 will not be disturbed unless they are clearly
erroneous.  See Marashlian v. Zoning Board of Appeals
of Newburyport, 421 Mass. 719, 722 (1996); Paulding v.
Bruins 18 Mass. App. Ct. 707, 709 (1984); Gordon v.
Zoning Board of Appeals of Lee, 22 Mass. App. Ct. 343,
347 (1980).  With respect to this standard of review,
the Supreme Judicial Court has noted that: "A finding
is 'clearly erroneous' when although there is evidence

13

to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Building Inspector of Lancaster v. Sanderson, 372 Mass. 157, 160 (1977)(internal quotations and citations omitted).

It is well settled that Mass. G.L. c. 40A, §17 confers standing to prosecute a zoning appeal only to persons "aggrieved by a decision of the board." Paulding, 18 Mass. App. Ct. at 709. Aggrieved status is a jurisdictional prerequisite to maintaining a zoning appeal. See Chongris v. Board of Appeals of Andover, 17 Mass. App. Ct. 999 (1984). An action brought by a person who lacks standing under G.L. c. 40A, §17 must be dismissed for lack of subject matter jurisdiction. See Planning Board of Marshfield v. Zoning Board of Appeals of Pembroke, 427 Mass. 699, 703 (1998).

An abutter is entitled to a rebuttable presumption of standing. See Watros v. Greater Lynn Mental Health & Retardation Assoc., Inc., 421 Mass. 106, 111 (1995). However, once an abutter's standing is challenged, the abutter loses the benefit of the presumption and must prove that his own private rights, private property interests, or private legal interests have been adversely affected by the board's decision in a way

14

that is special and different from the concerns of the rest of the community. See, e.g., Bell v. Zoning Board of Appeals of Gloucester, 429 Mass. 551, 554 (1999); Rinaldi v. Board of Appeals of Boston, 50 Mass. App. Ct. 657, 659 (2001); Barvenik v. Board of Alderman of Newton, 33 Mass. App. Ct. 129, 132-33 (1992).

To meet this burden, the abutter must put forth credible evidence to substantiate claims of injury to their own legal or property rights. See Marashlian, 421 Mass. at 721. The abutter cannot meet this burden by speculative personal opinion. See Barvenik, 33 Mass. App. Ct. at 132. Rather, the abutter's alleged special injury must be demonstrated by direct facts. See, e.g., Bell, 429 Mass. at 554; Barvenik, 33 Mass. App. Ct. at 132-33. See also Circle Lounge & Grille, Inc. v. Board of Appeals of Boston, 324 Mass. 427, 430-31 (1949). In evaluating whether the abutter has standing to bring a zoning appeal, the court may consider the magnitude of the threat of harm to the abutter resulting from the board's decision compared to the magnitude of the threat of harm resulting from a use as of right. See Marashlian, 421 Mass. at 724.

Contrary to the assertions in Awad's brief, Awad's standing to bring this zoning appeal was vigorously challenged by Tricon at all stages of this litigation.

15

In this regard, at the very outset of this action,
Tricon asserted the failure to state a claim upon which
relief can be granted and Awad's lack of standing as
affirmative defenses.  (Appendix Vol. 000014-000016.)
On the first day of trial, Tricon moved to preclude the
introduction of any evidence on any issue other than
standing until Awad satisfied the Court that he had
standing to bring this zoning appeal.  (Trancript Vol.
I, pp. 16-27; Appendix Vol. 000027-000057).  At the
close of its case-in-chief[3] and again at the close of
all evidence, Tricon moved for a directed finding on
the basis of standing.  (Transcript Vol. III, p.344-45,
Transcript Vol. pp. 445-48; Appendix Vol. 000100-000104
and 000108-000113).  Moreover, during its case-in-chief
Tricon introduced evidence affirmatively demonstrating
that Awad would not suffer any injury to his private
rights, property interests or legal interests as a
result of the ZBA's decision, including studies and
testimony from a traffic and parking engineer with more
than 25 years of experience who was qualified as an
expert in those fields by the trial court, that the
parking required by the variance was more than adequate

---

[3]     Although Awad was the plaintiff, pursuant to the
trial court's ruling on the first day of trial, Tricon
was required to bear the burden of proof as it had
before the ZBA and therefore presented its case-in-
chief first.  (Transcript Vol. I, pp. 35-36.)

16

for the needs of the Restaurant.  (Transcript Vol. II,
pp. 247-52.)  As a result of Tricon's challenge to
Awad's standing, the burden of proof shifted to Awad to
come forward with credible evidence of a particularized
injury to his personal legal or property interests.
See Bell, 429 Mass. at 554.  Awad failed to do so.

    Although the trial court did not find that Awad
would suffer any harm as a result of the granting of
the parking variance, the trial court mistakenly found
that:  "Awad is an abutter and a person aggrieved by
the ZBA's grant of a special permit and variance."
(Appendix Vol. 000163.)  The trial court also found
that "[t]he property of Awad, an abutter, is on the
easterly side of the property in question and across
the street on *Barber Avenue*."  (Appendix Vol.
000161.)(emphasis added.)

    As noted above, although Awad identified three
residential rental properties he owns in the vicinity
of the site, only one, 2 Watson Avenue, appears on the
list of certified abutters.  (Transcript Vol. IV, pp.
390; Exhibit Volume, Ex.4., 000214, 000226, 000233.)
In this regard, Awad did not introduce any evidence
that the City of Worcester recognized either 1 Watson
Avenue or 37 Barber Avenue as abutting properties or
that they were omitted from the certified lists of

17

abutters in error.  As such, to the extent that the
trial court's finding that Awad was an abutter and
person aggrieved with standing to bring this zoning
appeal is premised on Awad's ownership of 37 Barber
Avenue, it is clearly erroneous as there is no
evidentiary basis to support it.

As noted above, Awad's name does, however, appear
on the list of certified abutters with respect to 2
Watson Avenue.  Thus, as an abutter with respect to 2
Watson Avenue, Awad did have a rebuttable presumption
of standing which was challenged by Tricon as described
above.  See Watros, 421 Mass. at 111.

> **B.  Awad Does Not Utilize On-Street Parking For
> His Business Or Personal Uses And Therefore
> His Unsubstantiated And Unsupported Concerns
> About Neighborhood Parking Do Not Provide Him
> With Standing To Contest The ZBA's Grant Of A
> Parking Variance.**

On appeal, Awad argues that he has standing
because he testified that his business of renting
residential apartments is "threatened by the proposed
KFC because parking in the neighborhood is already
insufficient."  (Appellant's Brief at 21-22.) However,
even if Awad's testimony on the Restaurant's impact on
on-street parking was competent evidence, which it is
not, it would not constitute credible evidence of a
harm to Awad's legal or property interests because Awad
does not utilize on-street parking for his business or

18

personal needs.[4]  (Transcript Vol. IV, pp. 412-15.)
Rather, Awad testified that his 2 Watson Avenue
property (which contains 5 units and his office) has a
parking lot with 15 spaces for the building's needs.[5]
(Transcript Vol. IV, p. 400.)  Awad's concerns focus on
the effect increased competition for on-street parking
will have on guests of his tenants and prospective
tenants.  Awad's concerns about the availability of on-
street parking for persons with whom he has no
contractual relationship is simply too remote and
attenuated from his own business and legal interests to
convey standing.[6]

----

[4]    As such, Awad's reliance on Marashlian for the
proposition that an abutter's fears about the impact
the grant of a parking variance will have on on-street
parking are sufficient to convey standing is misplaced.
In Marashlian, unlike this case, the evidence
demonstrated that both of the plaintiffs utilized on-
street parking for their business and personal needs.
See Marashlian, 421 Mass. at 723.
[5]    Of note, although his residential property at 1
Watson Street does not abut the site and therefore
cannot provide Awad with standing, Awad similarly
provides 8 off-street parking spaces for 4 rental units
at that property.  (Transcript Vol. IV, p.406.)  Thus,
the record evidence clearly demonstrates that Awad does
not personally or for business purposes utilize on-
street parking in the RG-5.0 district.
[6]    Moreover, the evidence at trial was that the RG-
5.0 side of Barber Avenue is designated as "Resident
Permit Parking Only."  (Exhibit Vol., Ex. 8, 000272.)
As such, any person legally parking in the RG-5.0 zone
has as much private right, property interest, and/or
legal interest in that street parking as guests of
tenants and/or prospective tenants. This alleged
increased competition for "Resident Permit Parking"
spaces among persons of equal entitlement would be

The only competent evidence before the trial court
was that the 41-parking spaces required by the parking
variance were more than adequate to meet the
Restaurants needs.  At trial, Tricon's traffic and
parking expert, Kelly, testified that it was his
professional opinion that the 41-parking spaces
required by the variance would be more than adequate
for the Restaurant.  (Transcript Vol. II, pp. 254.)  It
was Kelly's professional opinion that the proposed
Restaurant would have a peak parking requirement of 24
to 26 parking spaces.  (Transcript Vol. II, pp. 260.)
Kelly's opinion was based on his training, education,
and experience, studies he performed at other fast food
restaurants, literature published by the Institute of
Traffic Engineers, and comparisons with other recently
constructed restaurants.  (Transcript Vol. II, pp. 252-
53, 256-59, 262; Exhibit Vol. 000280-000281.)  In
addition, Kelly testified that based upon his
professional experience, more than half of the cars
entering the Restaurant will use the drive through

---

insufficient to convey standing on Awad, even if he
used on-street parking for his business, which he
conceded, he does not.  See Harvard Square Defense
Fund, Inc. v. Planning Board of Cambridge, 27 Mass.
App. Ct. 491, 493-94 (1989).  Moreover, for persons
illegally parking in the RG-5.0 district, there is
already a legal remedy available – ticketing and
towing.  Id.

window.   (Transcript Vol. II, pp. 262.)   This opinion testimony by an expert qualified by the trial court concerning the adequacy of the 41-parking spaces required by the variance was unrebutted by Awad.

This expert testimony was also supported by the testimony of Tricon's site planning and engineering expert, Monteiro, who has been involved in the planning and development of approximately 150 fast-food restaurants.   (Transcript Vol. II, p. 191.)   Monteiro testified that based on his experience designing fast-food restaurants, and specifically Kentucky Fried Chicken restaurants, restaurants of this size are typically designed with approximately 35 parking spaces.   (Transcript Vol. II, p. 209.)

Awad did not introduce any rebuttal expert testimony suggesting that the Restaurant would have peak parking requirements in excess of the 24 to 26 spaces that Kelly concluded the Restaurant would require.   Nor did Awad introduce any expert testimony that the 41 proposed parking spaces would be insufficient to meet the Restaurant's parking needs. As such, the only competent evidence before the trial court concerning Restaurant's parking requirements was Kelly's testimony that the restaurant had more than adequate parking to meet its needs.   Thus, the only

21

evidence before the trial court was that the granting

of the parking variance (as opposed to the construction

of the Restaurant as of right) would not have an

adverse impact on neighborhood parking.

It is clear that the trial court credited this

evidence, stating: "Although the Zoning By-laws

require, on the face of the by-law, seventy-three

parking spaces, the comparative figures of similar KFC

or other fast food service establishment locations

having a greater number seating capacity, but lower

number of parking spaces, justifies the conclusion of

the need of only forty-one spaces." (Appendix Vol.

000164.)  The trial court also found that the 41-

parking spaces required by the variance were "more than

adequate for the needs of the restaurant in question."

(Appendix Vol. 000166.)

The only evidence introduced by Awad concerning

parking was his own speculative personal testimony that

if the Restaurant was built, that cars which presently

park on the undeveloped, vacant site would be displaced

and would seek parking in the neighborhood making

parking more difficult. (Transcript Vol. IV, pp. 416-

17, 421-24.)  It is important to note that Awad's

unsubstantiated and unsupported personal conjecture

concerning future parking difficulties is not based on

22

personal belief that the 46-seat KFC will require more than 41 parking spaces required by the variance, but rather his personal belief that any development of the site will result in increased neighborhood parking difficulties as a result of the loss of the vacant site for use for parking.

In this regard, the trial court correctly ruled that a sit-down restaurant without alcoholic beverages is a use as of right in zoning district BL-1.0. (Appendix Vol. 000162.)  Thus, the Restaurant itself is a use permitted as of right in zoning district BL-1.0. The development of the Restaurant as of right, or any other use permitted as of right, would result in the loss of the vacant site for neighborhood parking purposes.  As such, the only purported harm identified by Awad is the purported harm resulting from the use permitted as of right and not as a result of the grant of the parking variance.  See Marashlian, 421 Mass. at 724.  Stated another way, the purported harm identified by Awad is one that Tricon is permitted to inflict on the neighborhood as of right under the zoning ordinances.

Thus, even if Awad used and had an assigned property interest, or legal interest, in on-street parking, which he does not, his testimony on this

23

subject would be no more than a generalized concern
shared by members of the community as a whole and not
an injury specific to him.  See <u>Harvard Square Defense
Fund, Inc. v. Planning Board of Cambridge</u>, 27 Mass.
App. Ct. 491, 493 (1989).

      **C.**    **The Restaurant Is A Use Permitted As Of Right
In BL-1.0 District And All Kentucky Fried
Chicken Restaurants Serve The Same Menu In
The Same Containers, Have Exterior Lighting,
Coolers, Kitchen Vents That Exhaust To The
Exterior Of The Restaurant, And Identifying
Illuminated Signage So That Concerns About
Resulting Noise, Light And Odors Do Not
Provide Awad With Standing.**

On appeal, Awad also contends that he has standing
to bring a zoning appeal because of his concern that
litter, noise, odors, and lighting will make the
"neighborhood less attractive to live in" and therefore
make his apartments more difficult to rent.
(Appellant's Brief at 24.)  However, the Restaurant
itself is a use permitted as of right in the BL-1.0
zoning district.  (Exhibit Vol. 000042-044.)  As such,
even if these concerns were supported by the evidence
at trial, which they are not, these concerns are
<u>causally related to the use of the site permitted as of
right</u> and not the grant of the variance and therefore
do not constitute a cognizable injury which conveys
standing upon Awad to contest the parking variance.
See <u>Marashlian</u>, 421 Mass. at 724.  Tricon is permitted

24

as of right to cause these purported injuries under the zoning ordinances.

> D.    Because Awad Failed To Meet His Burden Of
> Proving A Credible Threat Of Injury To His
> Private Property Or Legal Interests He Was
> Without Standing To Bring This Zoning Appeal
> And The Trial Court Was Without Subject
> Matter Jurisdiction To Consider The Merits Of
> The Case.

Because Awad failed to introduce any credible evidence to substantiate a plausible claim of injury to some private right, private property interest, or private legal interest, the trial court's finding that Awad was an abutter and person aggrieved is clearly erroneous. See Bell, 429 Mass. at 554; Rinaldi v. Board of Appeals of Boston, 50 Mass. App. Ct. 657, 659 (2001); Barvenik, 33 Mass. App. Ct. at 132-33; Harvard Square Defense Fund, Inc., 27 Mass. App. Ct. at 492-93; see also Circle Lounge & Grille, Inc., 324 Mass. at 430-31. As such, the trial court should not have reached the merits, but rather dismissed the complaint for lack of subject matter jurisdiction. See Planning Board of Marshfield, 427 Mass. at 703. The trial court's failure to do so is clear error.

**II.    EVEN IF AWAD HAD STANDING TO BRING A ZONING APPEAL
AS A RESULT OF HIS OWNERSHIP OF 2 WATSON AVENUE,
WHICH HE DOES NOT, THE TRIAL COURT'S FINDINGS
AFFIRMING THE ZBA'S GRANT OF A PARKING VARIANCE IS
NOT CLEARLY ERRONEOUS.**

25

On appeal, Awad asserts that the trial court's decision with respect to the parking variance was facially invalid, that the trial court had no authority to uphold the ZBA's grant of the parking variance because the trial court failed to analyze the feasibility of other permissible uses, and that the trial court's decision that the variance could be granted without substantial detriment to the public good was clearly erroneous. (Appellant's Brief at 5-6, 10, 16.)[7]

A variance may be granted where the zoning board specifically finds that owing to the circumstances relating to the soil conditions, shape, or topography affecting the land in question, but not generally affecting land in the zoning district in which it is located, a literal enforcement of the zoning laws would involve a substantial hardship, financial or otherwise, to the petitioner. G.L. c. 40A, §10. See also

---

[7]    In his Brief, Awad also argues that the ZBA had no such authority and that its decisions are therefore "facially invalid." (Appellant's Brief at 10.) However, Awad asserted this argument by way of pre-trial motion to remand to the ZBA for further findings which was denied. (Transcript Vol. I, pp. 1-15; Appendix Vol. 000058-62.) Awad did not take appeal from the denial of this pre-trial motion, but rather only "from the judgment entered on September 17, 2001." (Appendix Vol. 000172.) As such, this issue has not been preserved for appeal and is not properly before the Court.

26

Paulding, 18 Mass. App. Ct. at 710.  Although, perhaps,

not the most artfully drafted opinion, it is clear from

the trial court's opinion that it considered all of the

elements that Tricon was required to prove in order to

uphold the ZBA's grant of a parking variance and made

all required findings.

With respect to Awad's second argument, contrary

to Awad's assertions, the petitioner need not show, nor

the trial court find, that there is no other possible

permissible use for the land to establish that a

variance is warranted.  See Marashlian, 421 Mass. at

726.

Finally, the trial court's decision that the

variance could be granted without detriment to the

public good is well supported by the record and

therefore Awad's third argument similarly fails.

The trial court correctly held: "[t]here is a

substantial hardship owing to the circumstances

relating to the soil condition, shape, topography of

the land by reason that the size, shape, and topography

of the lot are insufficient to permit the petitioner to

comply with the literal off-street parking requirements

of the proposed use."  (Appendix Vol. 000165.)  The

trial court further held that the "substantial hardship

especially affects the land or structures but does not

27

affect generally the BL-1.0 zoning district in which it is located." (Appendix Vol. 000166.)   The trial court further held that the variance could be granted without detriment to the public because the majority of sales would be by drive-through, that 41-parking spaces was more than adequate for the Restaurant, and that no danger to vehicles, pedestrians, or abutting properties would result from granting the variance.   (Appendix Vol. 000166.)   The trial court held that the desired relief could be granted without nullifying or substantially derogating the intent or purpose of zoning ordinances.   (Appendix Vol. 000166.)     Indeed, the trial court held that the variance would promote the purposes of the City of Worcester Zoning Ordinances by allowing a new business to open in the Greendale area of Worcester providing employment opportunities for the City's residents, that it would improve the appearance of the presently vacant site, increase tax revenue for the City of Worcester, and was the most appropriate use for the land. (Appendix Vol. 000166.) No more was required to uphold the ZBA's grant of Tricon's petition for a parking variance.

The trial court's conclusions were supported by its subsidiary findings.  In this regard, the trial court found that the site is triangular in shape.

28

(Appendix Vol. 000161.)  That the 41-parking spaces required by the variance are the maximum that can be constructed at the site as a result of circumstances relating to soil condition, shape or topography of the site.  (Appendix Vol. 000165.)

These findings were amply supported by the record. At trial, Tricon's site planning and engineering expert, Monteiro, testified that the parcel had an odd, triangular geometric shape, that there was an unusual 18-foot drop from the portion of the site at the intersection of West Boylston Street and Barber Avenue to the portion of the site located behind the Greendale Post Office, and that there was a protected wetland pocket immediately adjacent to the site so that the 100-foot buffer zone required by the Massachusetts Wetlands Protection Act was partially on the southwest portion of the site and best engineering practice required that disturbances to the land within the buffer be minimized or avoided. (Transcript Vol. II, pp. 189-90, 194-95, 201-04.)  Monteiro also testified that the site was unusual in that the City of Worcester would not permit vehicle access to the site from the West Boylston Street side.  (Transcript Vol. II, pp. 204, 231-32.)

Awad did not introduce any evidence which controverts the judges findings with regard to shape and topography. Nor did he introduce any evidence which controverts the trial court's finding that 41-spaces was the maximum number of spaces that could be constructed on the site owing to circumstances of soil condition, shape or topography of the site and that, as such, literal enforcement of the zoning ordinance would constitute a substantial hardship.

## CONCLUSION

Based on the foregoing, Tricon and the Robbinses request that the Court reverse the trial court's finding that Awad had standing to bring this zoning appeal. In the alternative, Tricon and the Robbinses request that the court affirm the trial court's affirmance of the ZBA's grant of a parking variance.

TRICON GLOBAL RESTAURANTS,
INC. and JUDITH A. AND EILEEN
ROBBINS,
By their attorneys,

_____
Thomas J. Conte  (BBO #566092)
James P. Hoban  (BBO#633929)
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511

Dated:     December 16, 2002

31

## CERTIFICATE OF SERVICE

I, James P. Hoban, hereby certify, that on this 16th day of December 2002, I served a copy of the foregoing via hand delivery, to:

Roy A. Bourgeois, Esquire
George L. Dresser, Esquire
Nadia R. Totino Beard, Esquire
Bourgeois, Dresser & White
4 Dix Street
Worcester, MA 01609

Donald V. Rider, Jr., Esquire
City of Worcester, Law Department
455 Main Street
Worcester, MA 01608

James P. Hoban

32

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

NO. A.C. 2002-P-1091

ROBERT AWAD
PLAINTIFF/APPELLANT

v.

TRICON GLOBAL RESTAURANTS, INC., JUDITH A.
AND EILEEN ROBBINS, and
ZONING BOARD OF APPEALS OF
THE CITY OF WORCESTER AND ITS MEMBERS,
DEFENDANTS/APPELLEES

ON APPEAL FROM A JUDGMENT OF THE
WORCESTER SUPERIOR COURT

BRIEF OF DEFENDANTS/APPELLEES
TRICON GLOBAL RESTAURANTS, INC. AND JUDITH
A. AND EILEEN ROBBINS

Thomas J. Conte (BBO #566092)
James P. Hoban (BBO #633929)
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511