UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GLORIA BROWN,<br>    Plaintiff | )<br>)<br>) |
| v. | )  CIVIL ACTION<br>)  NO. 05-CV-11167-MBB<br>) |
| KFC CORPORATION,<br>    Defendant | )<br>)<br>) |

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
TO EXCLUDE FROM THE TRIAL PORTIONS OF THE
VIDEOTAPED TRIAL TESTIMONY OF DR. TIMOTHY E. FOSTER**

The defendant KFC Corporation ("KFC") has moved to strike portions of the videotaped deposition of Dr. Timothy E. Foster taken by the plaintiff for use at trial. Although KFC concedes that Dr. Foster is a "treating physician" to whom Fed.R.Civ.P., Rule 26 disclosure requirement for expert witnesses does not apply[1] with regard to his treatment of the plaintiff's knees,[2] it argues that he is not qualified to testify as to her back injury and, even if he was qualified, he should be precluded from doing so, because he did not treat her back. It further seeks to exclude Dr. Foster's determination that the plaintiff is permanently and totally disabled, even though such a determination is well within the scope of a treating physician.[3] KFC advances its argument by failing to provide this Honorable Court with material deposition

---

[1] A treating physician is not required to comply with the expert disclosure requirement of Fed.R.Civ.P. 26 where the physician's testimony is based upon personal knowledge and observation rendered during the course and care of treatment. See, Garcia v. City of Springfield Police Department, 230 FRD 247, 249 (D. Mass. 2005).

[2] As stated above, Dr. Foster is an orthopedist whose medical practice is limited to treating shoulder and knee injuries. KFC's Memorandum, p. 3.

[3] KFC insisted upon and received authorization to obtain the plaintiff's Social Security Disability records, which documents her permanent disability.

-2-

testimony adverse to its position.[4] As discussed in detail below, Dr. Foster is by education, training and experience an orthopaedic surgeon who is qualified to treat any musculo-skeletal complaint,[5] regardless of whether he limits his surgical practice to "sports medicine," and has treated the plaintiff as a patient with multiple complaints, including her back, which is well documented in his records. He was identified as a witness in the plaintiff's Rule 26 disclosure and notably KFC has not claimed any prejudice by his testimony, but rather seeks to gain a procedural advantage.

I.  **Dr. Foster Is Qualified To Testify As To Any Type of Orthopedic Injury For Which He Has Treated The Plaintiff.**

KFC argues that "Dr. Foster is an orthopedist whose medical practice is limited to treating shoulder and knee injuries." Memorandum, p. 3. Regardless of what Dr. Foster might electively do with regard to his surgical practice, he is qualified to treat any form of musculo-skeletal problem, including the back. Moreover, the suggestion that Dr. Foster does not do back surgery is a gross mischaracterization of his testimony. Although he has *recently* limited his surgical practice to sports medicine, he has extensive experience as a spine surgeon:

> Q [Mr. Lewis] You had started to describe your experience treating backs. Could you give us a little bit more detail as to what it was that you've done with regard to back treatment?

---

[4]KFC has provided this Honorable Court with a hard copy of Dr. Foster's deposition transcript as an Exhibit to its motion. The relevant portions of the Dr. Foster's deposition testimony to which the plaintiff makes reference are set forth in the text or as footnotes in her Memorandum and, for this Honorable Court's economy and convenience, the plaintiff incorporates by reference that deposition transcript as an Exhibit to her Memorandum as well.

[5]*Orthopedics*. A branch of medicine concerned with the correction or prevention of deformities, disorders, or injuries of the skeleton and associated structures (as tendons and ligaments). U.S. National Library of Medicine, 8600 Rockville Pike, Bethesda, MD 20894.

-3-

A [Dr. Foster] The Readers Digest version is I did extra training in sports medicine at the Massachusetts General Hospital and Children's Hospital. When I came on staff here, the chairman of orthopedic surgery was a spine surgeon and he was going to retire and he asked if I would take over his practice for him, and so for one year, I scrubbed, meaning I operated on every single one of his patients with him, and then when he retired, I took over the spine practice here at the hospital as well as doing sports medicine, and that's an awfully odd combination because there are not many people in the country who do that.

So, for ten years, I practiced spine surgery and have operated on over a thousand backs and probably over a thousand necks as well, and when a new -- when another chairman came in, he thought that we should hire somebody who is just devoted to spine surgery alone and that I should pursue sports medicine, and I agreed to do that.

> Deposition of Timothy E. Foster, M.D., page 82, lines 5-23. (hereinafter "Depo., p. ___, l. ___")

II.  **Dr. Foster Is A "Treating Physician" within the meaning of Fed.R.Civ.P. Rule 26 With Regard To The Plaintiff's Back.**

   A.   **Dr. Foster Treated The Plaintiff's Back As A Matter of Fact.**

In order to further its argument, KFC uses a stilted definition of the term "treatment" to mean some form of therapy. In modern medicine a physician can and often does "treat"[6] a patient by diagnosing their condition and referring them to specialists or colleagues, particularly in a group practice, while continuing to follow them as their own patient:

> (WHEREUPON, Exhibit No. 4, **ER nursing report and discharge record, dated June 22, 2002**, marked for identification.) [bold added for emphasis]
>
> Q [Mr. Lewis][ Are these the type of records that, again, you usually use in diagnosing and treating a patient?
>
> A [Dr. Foster] Yes.

---

[6]*Treatment*: The administration or application of remedies to a patient or for a disease or injury; **medicinal or surgical management**; therapy. The American Heritage® Dictionary of the English Language, Fourth Edition Copyright © 2004, 2000 by Houghton Mifflin Company. Published by Houghton Mifflin Company

-4-

Q Have you reviewed these particular records?

A Yes.

Q Were they reviewed in the usual course of your **treatment** of Ms. Brown? [bold added for emphasis]

A Yes.

Q And what did you find significant in these records, if anything?

A The records describe Mrs. Brown **complaining of lumbar spine pain**, and it describes the patient's treatment in the emergency room as well as her post-emergency room instructions on what to do with her -- the pain in her lumbar spine, which, in laymen's terms, the lumber spine is the back. [bold added for emphasis]. Depo. p. 22, l. 1 - p. 23, l. 3.

\*                              \*                              \*

Q Let me show you this document, Dr. Foster, and ask if you can identify it, please.

**A This is an MRI report on Mrs. Brown, and this is specifically on her lumber spine.** [bold added for emphasis]

**Q Now, it says that you're the referring physician, is that correct?** [bold added for emphasis]

A Yes.

Q Why did you send her for an MRI of her spine if you were treating her knee?

A I do that as a courtesy to the patient, and the patient's complaining of lumbar spine pain. Although I don't treat  I don't typically treat lumbar spine pain, I do it as a courtesy to the patient, and I get the MRI scan, and then I would typically have the patient see a colleague of mine who is a spine specialist, and I find that the examination is much more fruitful if the patient has an MRI scan before she sees the spine specialist.

**Q What was the reason that you sent Ms. Brown for the MRI?** [bold added for emphasis]

**A She was complaining of lumbar spine pain.** [bold added for emphasis]

-5-

Q Did she describe it in any more detail than that?

A She was complaining of pain that was really limiting her and it was starting to become a problem for her. So, that's why we got the MRI scan.

Q What did the MRI scan that you have before you show, if anything?

MR. HOLLAND: Objection.

Q Dr. Foster, in your practice, it is customary for you to review MRI scans?

A Yes.

Q How many would you say you've reviewed in your medical career, roughly?

A I would say that I probably review over a thousand MRI scans a year.

Q And is this in the form that you normally receive for review of an MRI scan?

A Yes.

**Q Is it a record that you would normally use in the course of diagnosing and treating a patient?** [bold added for emphasis]

**A Yes.** [bold added for emphasis]

**Q Did you, yourself, review and interpret this particular report?** [bold added for emphasis]

**A Yes.** [bold added for emphasis]

Q What does that report say, Doctor?

MR. HOLLAND: Objection.

A There are several levels in the lumbar spine, and at the L4-L5 level, there was a disk bulge and protrusion of the disk as well, and at the L5-Sl level, there was also a disk bulge and protrusion. It gets much more detailed than that, but, in essence, she has a problem both at L4-L5 and at the L5-Sl level.

**Q What did you do with regard to this particular information that you received from the MRI?** [bold added for emphasis]

-6-

**A  After I reviewed the information, I requested that she be evaluated by our spine specialist.** [bold added for emphasis]

Q  Who would that be?

A  At that time, it was Dr. Chris Bono. Chris is no longer here. He's now the chief of spine surgery at the Brigham Hospital.

**Q  And did you follow along with Dr. Bono in his evaluation of Ms. Brown?** [bold added for emphasis]

**A  Yes.** [bold added for emphasis]

      Depo. pp. 26, l. 1 - p. 29, l. 24

In fact, in Dr. Foster's office records[7] there is a letter from Dr. Bono to him discussing his findings with regard to the plaintiff. Moreover, after reviewing Dr. Bono's report and speaking with the plaintiff, Dr. Foster was not satisfied with his diagnosis of her complaints as muscular and sent her for a second opinion to another of colleague in his group practice, Dr. Ordia.

Q  [Mr. Lewis]I show you this next note, Dr. Foster, please. Can you identify it for me us?

A  [Dr. Foster] This is the office note for Mrs. Gloria Brown dated January 22, 2003.

Q.  And I really haven't asked you this, but have we been progressing in sequence with each of these notes being the one that follows the next one in order of your seeing her?

A  Yes. Yes, this is -- correct.

Q  And what happened on this visit?

A  She is complaining more of pain in her right knee. She's had some improvement in her left knee from the arthroscopic surgery, although she still has some painin her left knee, and I requested an MRI scan of her right knee at that time. **At that time, she was also complaining about her back, and I asked her**

---

[7]KFC was given medical authorizations to obtain Dr. Foster's notes and Dr. Bono's notes.

-7-

**to see my associate, Dr. Chris Bono, for his evaluation. I'm sorry. She had seen Dr. Bono, and she wasn't completely happy with that evaluation and we spoke about a second opinion from a neurosurgeon that I work with as well.**

Q And who is that neurosurgeon?

A Dr. Joe Ordia.

    Depo. p. 37, l. 1 - p. 38, 16.

\*                         \*                         \*

Q [Mr. Lewis] Let me show you this next three page document. Please tell us if you can recognize that.

A [Dr. Foster] Yes, this is a letter that is written to me by Dr. Joe Ordia, a neurosurgeon at the medical center, and it's a letter specifically regarding his initial consultation with Mrs. Brown.

Q You had previously testified, I believe, that you had referred her to Dr. Ordia when Ms. Brown had been dissatisfied with her visit with Dr. Bono, is that correct?

A Yes.

    Dep. p. 40, l. 20 - p. 41, l. 16.

Despite KFC's repeated efforts to compromise the integrity of Dr. Foster's testimony, he made it clear and unequivocal that he was not parroting other physician's opinions, but was testifying on the basis of his own factual findings, testimony conspicuously neglected by KFC:

    Q [Mr. Holland] So, any opinions you've offered here today concerning her back, they're based on records prepared by other treating physicians, isn't that correct?

    A [Dr. Foster] It's based upon her MRI imaging and from consultants.

    Q Other treating physicians?

    A Yes.

    Q So, you didn't perform any of those evaluations yourself?

-8-

A  No, **I listened to her history, I evaluated her back and referred her to consultants, and they followed her back.**

Q  And then you look at those back records and any opinions you excuse me. Strike that. You look at the records that the other physicians you referred her to prepared, and any opinions you offered about her back here today were based upon those records, isn't that correct?

A  **I would respectfully disagree. I looked at her MRI scan, and I go over her MRI scan in detail myself.** [bold added for emphasis]

    Depo. p. 74, l. 1 - 24.

\*             \*             \*

Q [Mr. Holland]  My question is, other than the MRI record, which is August 2002, any other basis, the only other basis for your opinions were records prepared by other treating physician, not yourself.

A [Dr. Foster]  **No, it's my own, my own thought process, my own opinion, my own evaluation of the MRI scan. That's why I agreed to have her see Dr. Ordia, because I was not happy with the consultation with Dr. Bono.** [bold added for emphasis].

    Depo. p. 75, l. 11 - 18.

\*             \*             \*

Q [Mr. Lewis]  You've talked about at least some of your opinion being based on various reviews of other physicians' records and evaluations, is that correct?

A [Dr. Foster]  Yes.

Q  Is that something that's normally done in the course of a physician's medical practice, to rely on other physicians' evaluations and reports of treatment?

A  Yes.

Q  **In your own practice, can you characterize to what degree you would normally use other physicians' information in treating your own patient? Is it common?** [bold added for emphasis]

-9-

**A It's common, especially if I'm familiar with the -- with the physician and familiar with the physician's training and education and his expertise. So, I would rely on them quite a bit sometimes.** [bold added for emphasis]

       Depo. p. 86, l. 7-22.

\*     \*     \*

Finally, as to her the therapeutic *part* of her treatment, the plaintiff had been referred to a pain management clinic at, which was the treatment Dr. Foster would have prescribed.

Q [Mr. Lewis] On the basis of the information you received back from the physician to whom you referred Ms. Brown for her back pain, **what, if any, diagnosis did *you* come to?** [bold and italics added for emphasis]

MR. HOLLAND: Objection.

A [Dr. Foster] A similar diagnosis to Dr. Ordia, that she had a problem at L4-L5 and at L5-Sl.

Q And would that opinion be to a reasonable degree of medical certainty?

A Yes.

Q What, if anything, did you prescribe for this condition that you diagnosed?

MR. HOLLAND: Objection. Go ahead.

**A I had talks with Mrs. Brown regarding *treatment* of this, and it certainly seemed, initially, that we were trying to avoid spine surgery. So, it was recommended that she follow with a physical medicine and rehabilitation specialist.** That's a physician, a doctor who specializes in rehabilitation and **the management of pain** either through exercise or medication or both, and that's what was recommended to Mrs. Brown. [bold and italics added for emphasis]

Q So, would it be fair to say, then, that this was a recommendation for non-surgical treatment at this time?

A Yes.

MR. HOLLAND: Objection.

       Depo. p. 41, l. 17 - p. 42, l. 24.

-10-

\*                               \*                               \*

Q [Mr. Lewis] Now, you had mentioned receiving reports from the pain clinic. What reports were those?

A [Dr. Foster] Those are reports from the physicians at the pain clinic of the treatment of Mrs. Brown, **and every visit she had with the pain center, I would get a copy of those treating reports.** [bold added for emphasis]

Q And what was it that those reports were telling you with regard to what was going on with Ms. Brown, your patient?

MR. HOLLAND: Objection.

A They're pretty detailed reports, and they go over to her complaints, her pain, her treatment with medication and other modalities, and they're pretty complete reports that are in the chart.

**Q Were these reports the type of information that a physician following a patient would normally receive for the purpose of diagnosis and treatment?** [bold added for emphasis]

**A Yes.** [bold added for emphasis]

**Q Did the fact that she was already treating with a specific pain management program influence what type of treatment you provided her with regard to pain management?** [bold added for emphasis]

**A Yes.** [bold added for emphasis]

MR. HOLLAND: Objection.

To borrow Judge Selya's phrase, it is abecedarian that the a pain clinic does not send reports of a patient's condition to a physician, unless he is involved in treating her.

-11-

### B.  Dr. Foster Treated The Plaintiff's Back As A Matter of Law.

According to the Advisory Committee Notes to Fed.R.Civ.P. 26(b)(4) (1970):

> It should be noted that the subdivision does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. Such an expert should be treated as an ordinary witness.

The fundamental question is whether the testimony is from the physician as a percipient witness ("viewer or actor") or after the fact ("expert"). See, Quarantillo v. Consolidated Rail Corp., 106 F.R.D. 435 (N.D .Ill.E.D.1985), quoting Nelco Corp. v. Slater Elec. Inc., 80 F.R.D. 411, 414 (E.D.N.Y.1978). Unquestionably, Dr. Foster was not retained by the plaintiff or her attorneys for the purpose of rendering an expert opinion. As such, he is a fact witness and his opinions formed in the usual and customary course of his treatment of the plaintiff are admissible without the required Rule 26 disclosure. Whether Dr. Foster *treated* the plaintiff in conjunction or in consultation with other physicians and whether his examination was "cursory" goes to the weight of his testimony, not its admissibility.

### III.  Dr. Foster's Testimony As To The Plaintiff's Disability Is Within The Scope Of A Treating Physician.

Physicians can and do make determinations of their patient's ability to work. Incidental to their examination and diagnosis, a physician routinely prescribes a period of time out of work and/or for return to adjusted employment. Based on his first hand knowledge of the plaintiff's condition, Dr. Foster testified that she was totally disabled.

> Q [Mr. Lewis] ... Do you, from time to time, do evaluations with regard to people's work capacity?
>
> A [Dr. Foster] Yes.

-12-

>Q In what context is that done?
>
>A I evaluate, specifically, my own patients who are – who have been injured on the job as to whether they're competent to return to – to their former job.
>
>>Depo. p 54, l. 20 - p. 55, l. 5.

KFC goes on to complain that there is no statement as to the plaintiff's disability in Dr. Foster's notes:

>Q [Mr. Holland] Anywhere in this document do you perform an evaluation or do you reference any evaluation of Ms. Brown's ability to perform work.
>
>A [Dr. Foster] An evaluation for a patient to return to work is typically a functional capacity evaluation, or a very detailed evaluation, which I would not typically do in my office.
>Q Did you do that?
>
>A. No, I didn't do that at the office visit.
>
>Q Did you do it at any office visit?
>
>A I did not do that at any office visit.
>
>Q So, you never at any point in time performed the evaluation that is necessary to determine whether a patient is able to work, isn't that correct?
>
>A No, but I will say that I typically, when people are walking with crutches or a cane –
>Q You've answered my question, sir.
>
>A – or if they're on pain medication –
>
>Q Sir
>
>A – they're not capable of working.
>
>>MR. HOLLAND: I move to strike that because you've answered my question sir, respectfully.
>
>>Depo. p. 77, l. 18 - p. 78, l. 16.

-13-

However, KFC offers no law to support its argument, that Rule Fed.R.Civ.P. Rule 26 precludes a physician from testifying as to his findings incidental to his treatment of a patient, unless it is contained in his notes. Moreover, the plaintiff is on Social Security Disability and so testified at her deposition, so her total disability should come as no surprise to KFC,[8] nor does KFC claim any prejudice.

### IV.     The Use Of "To Date" In Certain Questions By The Plaintiff Refers To The Dr. Foster's Treatment Of The Plaintiff As Recorded By Him.

In certain questions posed by the plaintiff to Dr. Foster, he was asked to base his testimony on his examination, diagnosis and treatment of the plaintiff "to date." In the course of the deposition, each and every date on which Dr. Foster saw the patient, as recorded in his office notes, is reviewed. Dr. Foster also testified that he regularly received copies of notes from the pain clinic and had access to the plaintiff's chart on the hospital's computerized records system.

> Q [Mr. Lewis] When you have referred a patient, do you continue to follow that patient's condition even though you may no longer be treating them for that condition?
>
> A [Dr. Foster] Yes, especially if I am concomitantly treating another injury, sure.
>
> Q And how do you follow the treatment of one of your patients you have referred?
>
> A By speaking with the patient and speaking with the physician that I've referred them to, we open a line of communication that we hold open during the treatment plan.
>
> Q Are there also common medical records available to you through the computer?

---

[8] See footnote 3, *supra*.

-14-

A    Through the computer, and our office charts are common charts. So, if one of my partners has a note in the chart, then I have access to that note. However, I will say, over the past few years, we have migrated toward an electronic medical records. So there may not be a written records. It may be an electronic record.

Depo. p. 11, l. 5 - 24.

KFC mischaracterizes the questions to argue that Dr. Foster is testifying as to *the plaintiff's condition* to date, even though he has not seen her for two years. The questions clearly refer to *Dr. Foster's records*.

V.    Conclusion.

WHEREFORE, The plaintiff hereby states her opposition to the defendant's motion to exclude from the trial portions of the videotaped trial testimony of Dr. Timothy E. Foster and prays that said motion be denied by this Honorable Court.

The plaintiff,
By her attorneys,

  /s/ John N. Lewis  
John N. Lewis
BBO# 298520
Lawrence R. Mehl, of Counsel
BBO# 566235
JOHN N. LEWIS & ASSOCIATES
21 Merchants Row, 5th Floor
Boston, MA 02109

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 26, 2007

  /s/ John N. Lewis  
John N. Lewis