UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GLORIA BROWN, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 05-CV-11167-MBB |
| | ) | |
| KFC CORPORATION, | ) | |
| Defendant | ) | |

## JOINT PRETRIAL MEMORANDUM

**1.**   **Concise Summary of the Evidence:**

**Plaintiff:** On June 21, 2002, As the plaintiff was getting out of her car in the parking lot of the Kentucky Fried Chicken ("KFC") Restaurant in Roslindale, Massachusetts, she fell into a hole in the asphalt pavement adjacent to the marked space in which she parked her car, injuring her left knee and her back. KFC has admitted liability. As a result of her twisting fall and landing with her back against the left rear wheel of her car, the plaintiff suffered a torn meniscus in her left knee and lumbar spine pain from a disc bulge and protrusion of the disk at two levels in her back resulting in impaired mobility and chronic pain. None of the plaintiff's prior medical records document any pre-existing knee or back problems. According to her treating physician, Dr. Timothy Foster, because of the additional strain on her right knee, she developed a tear in the right meniscus, and one year later, she was not substantially improved. Before her injury, the plaintiff was an active, productive and energetic woman who worked, cared for her granddaughter and performed household chores. The plaintiff's medical expenses to date are approximately $50,000. At the date of the accident, Mrs. Brown , then age 53, was working for The Home for Little Wanderers, averaging 55 hours per week. With a work life expectation of another 12 years to age 65, due to her permanent disability and inability to return to work, she

2

has lost wages, including benefits, exceeding $400,000, exclusive of inflation.  The diminution in the quality of her life has been dramatic and her corresponding loss of enjoyment of being with and helping her family has been exceptionally difficult.

**Defendant**:  In this action, plaintiff alleges that on June 21, 2002, she fell at the KFC restaurant located at 625 American Legion Highway, Roslindale, Massachusetts ("the KFC Restaurant") and sustained injuries ("the alleged incident").  KFC has admitted liability.  Instead of seeking immediate assistance for her alleged injury, the plaintiff proceeded to go inside the KFC Restaurant, stand on line, and order food.  The General Manager of the KFC Restaurant at the time, Victor Gonzales, will testify to this, and plaintiff admitted it during her deposition. Further, according to Gonzales, plaintiff did not appear to be in pain.

After she got her food, plaintiff went back out to her vehicle and called her home, which was only a short distance away.  Her husband and daughter came to the KFC Restaurant, and her husband immediately began taking pictures of the pothole with a camera that he just happened to have in his car.

Plaintiff treated at the Emergency Room on the day of the alleged incident.  She did not complain of any back pain at the ER.  Rather, she complained only of left knee pain.  She was diagnosed with a knee sprain.

Plaintiff subsequently treated with Dr. Timothy Foster, an orthopedist.  Dr. Foster performed arthroscopic knee surgery on plaintiff's left knee in September, 2002 to repair a meniscus tear.  The surgery was performed on an outpatient basis, and it took approximately 90 minutes.  Dr. Foster's videotaped trial testimony was taken in December, 2006, and he testified that plaintiff still had eighty percent of her meniscus left after this surgery.  He further testified that the normal recover time for this surgery is three months.  Plaintiff has not had any other

3

surgeries as a result of the alleged incident.

Plaintiff first treated with Dr. Foster on July 17, 2002, and she last treated with him more than three years ago in December, 2003.  The last two times that plaintiff treated with Dr. Foster, he recommended further treatment to plaintiff for her knees.  Specifically, he recommended steroid injections to alleviate her alleged pain.  Plaintiff declined to have this treatment. Plaintiff had physical therapy at Boston Medical Center ("BMC") from 9/25/02 to 1/21/03.  She had a total of 19 physical therapy sessions.  The physical therapy records show that plaintiff made significant progress.  As of 10/25/02, she was complaining only that her knees were "sore" and rated her left knee pain only a 3 on a scale of 10.  The treatment notes from 11/26/02 state that at times plaintiff had no pain whatsoever in her left knee and that at worst her pain was 3/10. They further state that plaintiff was ambulating with a cane "for safety only".  The 1/21/03 physical therapy discharge notes state that plaintiff's left knee has improved "significantly". Similarly, the notes of her treatment with Dr. Cervantes of BMC on 11/26/02 state: "Pt notes a large improvement in her left knee w/ improved ROM and decrease pain."  Finally, Dr. Foster's treatment notes of 12/4/02 state that plaintiff "is working with physical therapy and making significant strides."

Plaintiff claims that she fell and injured her right knee in August, 2002.  She claims that this fall occurred because the cane that she was walking with slipped out from under her.  With respect to this putative right knee injury, Dr. Foster, testified that it was caused by overcompensation in plaintiff's gait as a result of the left knee injury.  He had no recollection whatsoever of plaintiff's claim that she fell in August, 2002 and injured her right knee. Further, during his deposition, Dr. Foster claimed that plaintiff had a meniscus tear in her right knee similar to that in her left knee.  However, plaintiff had an MRI of her right  knee on 2/9/03.

4

Dr. Foster's treatment notes of 7/9/03 state as follows: "She is status post an MRI scan in February, which reveals degenerative changes in her knee with no evidence of frank meniscal tear." (emphasis added). At no point did Dr. Foster recommend surgery on plaintiff's right knee. Rather, as a result of plaintiff's complaints of pain, he recommended only steroid injections, which plaintiff never had.

With respect to plaintiff's alleged back injury, plaintiff was involved in a motor vehicle accident on 6/2/02, which was a little less than three weeks prior to the alleged incident. She treated at the Emergency Room after this motor vehicle accident and complained of back pain. Dr. Foster referred plaintiff to a colleague, Dr. Bono, for evaluation of her back pain. Dr. Bono's Report dated 12/17/02 states: "This is a difficult patient to discern exactly where her pain is coming from. I think that she has a large amount of muscular pain that has never been treated before with physical therapy or conservative treatment." (emphasis added). Plaintiff obtained a second opinion concerning her alleged back injury from Dr. Ordia, a neurosurgeon from BMC. Prior to seeing Dr. Ordia, plaintiff had an MRI of her lumbar spine on 3/23/03. The MRI revealed only minimal degenerative changes and no evidence of a disc herniation.

Dr. Ordia's Report dated 4/3/03 reflects a diagnosis of back strain. Dr. Ordia's report further states that the MRI revealed only mild degenerative changes and that it did not show any evidence of neural compression. Finally, Dr. Ordia stated that no neurosurgical intervention was necessary, and that plaintiff's alleged injuries should resolve with physical therapy.

5

Apparently unsatisfied with the opinions of two back specialists that her back condition was nothing more than a strain that should resolve with physical therapy, in 2005, plaintiff saw yet another neurosurgeon for her alleged back injury, Dr. James Reed. She treated with Dr. Reed in May and August, 2005. Dr. Reed recommended further testing, and plaintiff never had this testing performed. She simply stopped treating with Dr. Reed.

Despite having been evaluated by three different neurosurgeons for her alleged back injury, and having been treated by at least nine other physicians for her alleged back pain, plaintiff will not offer testimony at trial from any physician who treated her for her back. Rather, she is attempting to rely on testimony from Dr. Foster, who is an orthopedic surgeon. Dr. Foster admitted that he only made a "cursory" examination of plaintiff's back. Dr. Foster's testimony concerning plaintiff's alleged back injury amounted to nothing more than that he believes that plaintiff will continue to have back pain because she has had back pain for four years. In any event, defendant has a motion pending to exclude Dr. Foster's testimony concerning plaintiff's alleged back injury on grounds that it is expert testimony that was not properly disclosed.

During his videotaped trial testimony in December, 2002, Dr. Foster also testified that he believes plaintiff is not able to work. Dr. Foster has not seen or examined plaintiff since December, 2003, however. Moreover, he based his opinion primarily on undisclosed data which he claims shows that injured persons who do not return to work after two years generally never return to work. Finally, he admitted that he never performed the test which is necessary to determine whether a person is disabled; i.e., a functional capacity evaluation.

Plaintiff also claims to have suffered from depression as a result of the alleged incident. She has twice before in her life been out of work on disability as a result of depression.

6

Notwithstanding her claims to never be able to work again, Dr. Reed's Report dated May 18,

2005 states that plaintiff "is an active caregiver for her grandchildren." Plaintiff's daughter

confirmed during her deposition that plaintiff watches her children while she is at work.

On the date of the alleged incident, plaintiff was 53 years old. She turned 54 on 8/31/02, which

was approximately two months after the alleged incident. Plaintiff's W-2 for the year 2001 from

her employer, The Home for Little Wanderers, shows that her total wages for that year were $27,

995.27 and that after taxes, social security, etc. she took home $22,340.64.

2.    **Undisputed Facts:**

      a. KFC was negligent in the maintenance of its parking lot.

      b. KFC Corporation is the successor in interest to KFC of America, Inc. At the time of

      the alleged incident KFC of America, Inc. owned and operated the KFC Restaurant.

3.    **Contested Issues of Fact.**

      1. The nature and extent of the plaintiff's injuries.

      2. The nature and extent of the plaintiff's disability.

4.    **Jurisdictional Questions.**

      None of which the parties are presently aware.

5.    **Pending Motions.**

      **Plaintiff**: Although the defendant requested and received three (3) additional months in

which to retain medical experts to rebut the plaintiff's treating physician's testimony and

although it requested and obtained the right to have the plaintiff submit to two medical

examinations by its experts, the  defendant has neither seasonably supplemented its answers to

interrogatories, nor made the required expert disclosures, and the plaintiff intends to bring a

motion in limine to strike those portions of Dr. Froelich's videotape deposition testimony that

were not disclosed in his Curriculum Vitae and report provided to the plaintiff prior to his

deposition, including, among other things, his testimony as to the existence of something called

"symptom amplification" and as to "literature" which shows that people who bring law suits are

prone to exaggerate their injuries or prolong their disability. The plaintiff will also seek to

preclude Dr. Feldmann, one of the defendant's medical experts, from testifying beyond what has

been disclosed in his Curriculum Vitae and report, which is the only information as to the facts

and opinions on which he will testify provided to the plaintiff.

    **Defendant**:  Defendant provided plaintiff with Expert Reports from its experts, Drs.

Froehlich and Feldmann, on June 26, 2007, which was two weeks after their IME's of plaintiff

on June 12, 2007.  These Reports fully disclose their testimony.  For example, plaintiff asserts

that during his videotaped trial testimony, Dr. Froehlich testified concerning "symptom

amplification" and that this was not disclosed in his Expert Report.  However, on page 4 of his

Report dated June 12, 2007, Dr. Froehlich states: Ms. Brown "continues to have a normal

neurologic exam except for some gross inconsistencies consistent with pain amplification and a

chronic pain type syndrome." (emphasis added).  Further, on page 3 he states: "Palpation in the

mid-lumbar level even the lightest touch causes her to report symptoms down her right leg,

which she describes as pins and needles.  She also describes considerable pain in the coccyx

area.  This was to the lightest touch . . . Light stroking of her lower lumbar region causes her to

report symptoms in her right calf."  These types of reactions to the lightest touch is exactly what

Dr. Froehlich testified constitutes symptom/pain amplification during his videotaped trial

testimony.

    With respect to Dr. Froehlich's testimony concerning the correlation between litigation

and the length of time a person is out of work, this testimony was elicited during cross-

8

examination of Dr. Froehlich by plaintiff's counsel. During cross-examination, plaintiff's

counsel asked Dr. Froehlich if he expects that plaintiff will eventually return to work. In

response, he testified that he did not. Plaintiff's counsel asked Dr. Froehlich for the basis for this

belief, and in response, Dr. Froehlich testified that there are studies in the worker's

compensation setting that show that once someone has been out of work for a substantial period

of time, the person is not likely to return to work. He further added that: "[t]here are some

studies that suggest that people involved in litigation have a lower return-to-work rate." This

testimony was in response to a question asked by plaintiff's counsel. It was directly responsive

to the question. Further, plaintiff's counsel did not move to strike the answer or any part thereof.

There was some minimal elaboration on this testimony during re-direct. In any event, the notion

that defendant should have somehow figured out in advance of the videotaped trial testimony

what plaintiff's counsel's cross-examination would be and disclosed Dr. Froehlich's responses in

his Expert Report is absurd.

6.     **Issues of Law.**

    **Defendant**:  The defendant raises the following evidentiary issue:  Admissibility of

plaintiff's putative receipt of disability payments.  Defendant opposes any attempt by Plaintiff to

enter into evidence at trial her Social Security Administration ("SSA") disability determination

or the fact that she is receiving disability payments.  The finding that plaintiff met the SSA's

definition of disability is irrelevant, because a jury will be applying a different standard[1] and

prejudicial because defendant will have no opportunity to obtain testimony from a SSA

employee regarding the basis for such determination or to cross-examine the SSA concerning its

---

[1] See, e.g. Cooper v. Carl A. Nelson & Co., 211 F.3d 1008, 1018 (7th Cir. 2000); see also Cuddy
v. L & M Equipment Co., 352 Mass. 458, 464, n. 4 (Mass. 1967).

9

determination.[2] Moreover, quite obviously, defendant was not permitted to appear before the SSA and submit evidence to controvert plaintiff's claim of disability.

Pursuant to Rule 403,[3] evidence may be excluded which is unfairly prejudicial, confuses the issues or misleads the jury. Here, admission of plaintiff's SSA disability determination would be fundamentally unfair because of defendant's inability to elicit testimony regarding its foundation or to challenge it in any regard. It would confuse the issues because it employs a different standard than the common law of Massachusetts. Finally, it would mislead the jury because it would cause them to think that the issue of plaintiff's disability had already been conclusively determined by a governmental body.

**Plaintiff**: The plaintiff opposes the defendant's motion on the ground that her receipt of Social Security Disability benefits as a result of the injuries she suffered when she fell at the KFC restaurant is unfairly prejudicial in light of the testimony solicited from the defendant's medical experts, Dr. Froelich, an orthopaedic surgeon, that, in his opinion, the plaintiff suffered

---

[2]The records produced by the SSA indicate that the SSA determined that plaintiff is capable of performing jobs that involve sedentary to medium exertion levels. Defendant's counsel contacted the Massachusetts Rehabilitation Commission ("the Commission") which made this determination on behalf of the SSA. Defendant's counsel was informed that plaintiff did not qualify for disability based upon her medical condition, but rather based upon some type of sliding scale used by the SSA which involves vocational considerations and her age. Defendant's counsel was further informed that for obvious reasons, the SSA does not permit the Commission to provide testimony in legal cases. If the Commission and/or the SSA were required to provide testimony in legal cases involving persons who have made SSA disability claims, the Commission and the SSA would have little time to do anything else. Accordingly, defendant will not be able to elicit any testimony explaining the SSA's decision and the standard applied by the SSA.

[3] Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

10

a minor injury to her left knee, which has been successfully repaired, and that she only suffered a back strain, which should have resolved in four to six weeks, and Dr. Feldmann, a neurosurgeon, that the plaintiff suffered only a back strain, and their conclusion that the plaintiff is <u>not</u> permanently and totally disabled as a result of the accident. In order to answer an obvious question in the jury's mind, as to whether she is on disability, if she is disabled, as she and her doctor claim, and to rebut the testimony of the defendant's medical experts, this Honorable Court should exercise its discretion under FedR.Civ.P. Rule 403 by allowing the evidence. The defendant elected to have its medical experts discredit the plaintiff and her treating physician on the issue of the plaintiff's injury and her disability. Having raised the issue, it should not be allowed to withhold relevant contradictory information from the jury.

**7. <u>Requested Amendments to the Pleadings</u>.**

> None.

**8. <u>Additional matters to aid in the disposition of the action</u>.**

> None of which the parties are presently aware.

**9. <u>Probable Length of Trial</u>.**

> Three full days.

**10(a). <u>List of Witnesses</u>.**

> <u>**Plaintiff:**</u>

> 1.  Gloria Brown (plaintiff)
>     80 Seminole Street
>     Hyde Park, MA  02136
>     (617) 361-0851

> 2.  Akirah Brown (plaintiff's granddaughter)
>     80 Seminole Street
>     Hyde Park, MA  02136
>     (617) 361-0851

11

3.    Timothy E. Foster, MD (Videotaped deposition)
      Boston Medical Center
      720 Harrison Avenue
      Boston, MA  02118

5.    Keeper of the Records of Boston Medical Center
      720 Harrison Avenue
      Boston, MA  02118

6.    Keeper of the Records of Dr. Foster
      Boston Medical Center
      720 Harrison Avenue
      Boston, MA  02118

7.    Keeper of the Records of The Home for Little Wanderers
      271 Huntington Avenue
      Boston, MA  02115

8.    Keeper of Records
      Shields MRI
      161 Granite Ave, Dorchester
      and
      Mass Bay Regional MRI Center
      Boston, MA

**Defendant:**

1.    Victor Gonzales (former KFC Assistant Manager)
      47 Beechland Street, Apt. 166
      Roslindale, MA
      (617) 327-2132

2.    Gloria Brown (plaintiff)
      80 Seminole Street
      Hyde Park, MA

3.    Sharyon Brown (plaintiff's daughter)
      11 Hillis Road
      Hyde Park, MA

4.    Arikah Brown (plaintiff's granddaughter)
      11 Hillis Road
      Hyde Park, MA

12

5.    Keeper of the Records of Boston Medical Center
      720 Harrison Avenue
      Boston, MA  02118

6.    Keeper of the Records of Dr. Foster
      Boston Medical Center
      720 Harrison Avenue
      Boston, MA  02118

7.    Keeper of the Records of The Home for Little Wanderers
      271 Huntington Avenue
      Boston, MA  02115

**10(b).  Expert Witnesses:**

**Plaintiff:**

1.    Timothy E. Foster, M.D.
      Boston Medical Center
      720 Harrison Avenue,
      Boston, MA  02118

Dr. Foster received his M.D. degree from Boston University School of Medicine in 1986. He did a surgical internship at Dartmouth Medical Center, attached to Dartmouth Medical School in Hanover, New Hampshire and he did an orthopedic surgical residency at Boston University affiliated hospitals, including Boston Medical Center, Lahey Clinic Medical Center and Shriner's Hospital for Crippled Children.  He is a member of the Academy of Orthopedic Surgeons and a diplomat of the Board of Orthopedic Surgery, commonly referred to as being "board certified."  He did extra training in sports medicine at the Massachusetts General Hospital and Children's Hospital. When Dr. Foster came on staff at Boston Medical Center, he was asked by the Chairman of the Orthopedic Surgery Department,  a spine surgeon, to take over his practice when he retired, so for one year Dr. Foster operated on every one of his patients with him and, when he retired, he took over the spine practice at the hospital, as well as doing sports

13

medicine. For ten years, Dr. Foster practiced spine surgery and he has operated on over a thousand backs and probably over a thousand necks as well. When another Chairman came in, he hired a physician who did only spine surgery and Dr. Foster then limited his practice to sports medicine. Dr. Foster evaluates his patients who have been injured on the job as to whether they're competent to return to their former job and has also served as an impartial physician for workers' compensation claims.

Consistent with his deposition testimony, Dr. Foster is expected to testify as to his review of the plaintiff's hospital and medical records, including the ambulance record, the Boston Medical Center record, Dr. Ordia's and Dr. Bono's consultation reports, the radiology reports, including the MRI's of the plaintiff's knees and back, his office notes and the Boston Medical Center Pain Center records; the history he received of the plaintiff's injury of her left knee and back when she fell in a pothole in a Kentucy Friend Chicken restaurant's parking lot on June 21, 2002, his examination of her knees and back on her office visits; his treatment, including his surgery on her left knee, his review of her MRI's, including the MRI of her back; his diagnosis of her knee and back pain; his prescriptions for various types of medication, including pain and anti-inflammatory; his recommended therapy and concurrence with other physician's treatment plans; his prognosis of her recovery from her knee and back injuries; her disability as the result of her knee and back injury and chronic pain; and the causal relationship of her left knee, right knee and back injury, her pain and her disability to her fall on June 21, 2002.

Consistent with his deposition testimony, Dr. Foster is expected to testify that he first saw the plaintiff in his office on July 17, 2002, at which time he took an oral history regarding her injury and the problems that she was having. He performed a physical examination and obtained radiographic studies and then he reviewed his treatment plan with her. In particular,

14

according to his office note of that date, she came in complaining of pain knee and, after taking a history of her injury and some background information, he formed a preliminary diagnosis that she had a meniscus tear and suggested that she should have an MRI for further evaluation. Upon examination, he found that her knee was significantly swollen ("2+ effusion) and that she walked painfully ("antalgic gait") with a knee brace and crutches. He requested that she have an MRI scan. During the office visit, Dr. Foster also reviewed the Boston Medical Center Emergency Room discharge report, which described the plaintiff as complaining of lumbar spine pain and described her ER treatment, including post-ER instructions for what to do about her back pain. Subsequently, Dr. Foster received the MRI scan report from the Radiology Department, which showed a medial meniscal tear, confirming his diagnosis. Dr. Foster saw the plaintiff next on August 1, 2002, when she returned to his office to discuss the MRI scan. At that time, because of the tear in the meniscus, he recommended that she consider arthroscopic surgery, which is surgery to repair her meniscus. The plaintiff agreed and the surgery was scheduled by Dr. Foster's office. Dr Foster also ordered an MRI scan of the plaintiff's back, because she was complaining of lumbar spine pain that was limiting her and was starting to become a problem. Dr. Foster, after personally reading and interpreting the MRI scan, was of the opinion that there was a disc bulge and protrusion at the L4-5 and L5-S1 levels. After he reviewed the MRI, Dr. Foster referred the plaintiff to a spine specialist, Dr. Chris Bono, and followed along with Dr. Bono in his evaluation of Ms. Brown. Dr. Foster performed arthroscopic surgery on the plaintiff's left knee on September 6, 2002. It was done as an outpatient at Boston Medical Center. He found that she had a meniscal tear, as he thought, but she also had evidence of an injury to the cartilage of her patella, meaning the smooth coating over the bone was damaged. There were loose pieces of cartilage that were hanging down from the kneecap into the joint

15

which were removed and the area was then smoothed. Her knee was bandaged and had a cooling device put on. On September 12, 2002, the plaintiff returned to Dr. Foster's office where he checked her incisions and her range of motion to make sure that she was not getting stiff. She's was also given a refill for pain medication and she was referred to physical therapy. Dr. Foster saw the plaintiff in his office on October 10, 2002, for her approximately one-month follow-up after surgery. He checked her incisions, range of motion, whether she had any tenderness remaining in her knee and evaluated her progress in therapy and complaints. The plaintiff reported that she was having low back pain. Dr. Sobieraj, her primary care doctor, had already scheduled her to see a neurologist within the next couple days, so Dr. Foster waited for the report. Dr. Foster saw the plaintiff in his office on December 4, 2002, for an approximately three month follow-up examination  He checked her incisions, checked her range of motion and they spoke about her physical therapy. She reported that she was still walking with a with a cane. Dr. Foster recommended that she continue with physical therapy, because he thought that she was having some improvement from the therapy and asked her to come back to see him in about five weeks.  Dr. Foster also briefly spoke with the plaintiff about her right knee, which was bothering her at that time. Dr Foster 's opinion was that it was not uncommon when patients have an injury, that, after walking with crutches for a prolonged period of time or having difficulty ambulating, that their other knee will begin to become problematic for them. Dr. Foster saw the plaintiff in his office on January 22, 2003. She had some improvement in her left knee from the arthroscopic surgery, but still had some pain, but was complaining more of pain in her right knee. Dr. Foster requested an MRI scan of her right knee. It showed changes of her medial meniscus, as well as a thinning of her cartilage. It was Dr. Foster's opinion that the plaintiff had a tear in the meniscus of her right knee similar to her left knee.  The plaintiff was

16

also complaining about he back and Dr. Foster referred her to his associate, Dr. Joseph Ordia, a

neurosurgeon. In the in the notes, Dr. Ordia describes the patient's MRI scan and the patient's

specific problems that she has in her spine similar to what Dr. Bono had stated. On the basis of

the information Dr. Foster received back from Dr. Bono, his diagnosis was that the plaintiff had

a protruding discs at L4-L5 and at L5-Sl. Dr. Foster discussed treatment options with the

plaintiff and it was decided to avoid spine surgery. He recommended that she follow-up with a

physical medicine and rehabilitation specialist for the management of her back pain either

through exercise or medication or both. Dr. Foster saw the plaintiff in his office on April3,

2003. He observed that she continued to have pain in both of her knees and limitation of her

range of motion, which limited her normal activities. It was his impression at that time that the

plaintiff had been through a therapy program which eventually was not of significant benefit and

he asked her to come back in three months to consider surgery on her right knee. It was Dr.

Foster's opinion that the cause of the plaintiff 's injury to her left knee was her fall in the KFC

parking lot and that the cause of the injury to her right knee was from her walking on the

crutches. Dr. Foster saw the plaintiff in his office on July 9, 2003. He reviewed the MRI scan of

her right knee. She was still having bilateral  knee pain. She was still having problems with

walking, as well as going up and down stairs. He examined her knees and noted that she was

tender throughout her knee examination  He ordered  X-rays as well. Dr. Foster recommended

that the plaintiff undergo Synvisc injections, a genetically engineered substance which would be

injected into the knee. She declined. Dr. Foster saw the plaintiff in his office on December 3,

2003, which was her last visit. He noted that she was crying during the office visit and very

upset about her pain. He examined her knees and found that there was no significant

improvement. Dr. Foster again recommended that she have the Synvisc injections and gave her

a prescription for the Synvisc that she could have filled, if she wanted to have the injections. Dr. Foster is of the opinion, to a reasonable degree of medical certainty, that there is a causal relationship between the plaintiff's fall on June 21, 2002, and the injury to her left knee for which he treated her, her left knee pain, her subsequent surgery, which he performed, and her disability. Dr. Foster is of the opinion, to a reasonable degree of medical certainty, that there is a causal relationship between the plaintiff's fall on June 21, 2002, and the condition of her right knee for which he treated her. Dr. Foster was of the opinion, to a reasonable degree of medical certainty, that there is a causal relationship between Ms. Brown's fall on June 21, 2002, and the injury to her back resulting in protruding discs at L4-5 and L5-S1 for which he treated her, her back pain and her treatment for chronic back pain. Dr. Foster's prognosis to a reasonable degree of medical certainty, is that there is not going to be any further substantial improvement, but rather there may be slow progressive worsening of her condition over a long period of time. Dr. Foster, prognosis, to a reasonable degree of medical certainty, is that the plaintiff is also going to have problems with her right knee and that he does not expect any improvement. Dr. Foster's opinion, to a reasonable degree of medical certainty, is that after four years of having lumbar spine pain, she is not going to have significant improvement in her lumbar spine. Dr. Foster is of the opinion, to a reasonable degree of medical certainty, that the plaintiff is unable to work due to her knee and back pain.

Consistent with his deposition testimony, Dr. Fosters's opinions, in general, are based on his education, training and experience as an orthopedic surgeon, his review of the plaintiff's medical records, the medical history given to him by the plaintiff she fell in a pot hole in the parking lot of a KFC restaurant on June 21, 2002, his physical examination of the plaintiff, his review of the plaintiff's MRI scans of her knees and back and other radiology reports, the reports

18

of Dr. Ordia and Dr. Bono and the lack of improvement in the condition of the plaintiff's knees and back as her observed them during them time she was under his care. In particular, Dr. Foster's opinion, that there is a causal relationship between the plaintiff's fall on June 21, 2002, and the condition of her left knee for which he treated her is based on the facts that she had no prior history of knee pain and the findings at the time of surgery, which correlated with the history she gave of what happened to her knee when she fell. Dr. Foster's opinion, that there is a causal relationship between Mrs. Brown's fall on June 21, 2002, and the condition of her right knee for which he treated her is based on the facts that she was compensating for her left knee with her gait pattern and that about an estimated twenty percent of the people on crutches or a cane begin to complain about the opposite extremity, after they have been on crutches or using a cane for a prolonged period of time. Dr. Foster's opinion, that there is a causal relationship between Ms. Brown's fall on June 21, 2002, and the condition of her back for which he treated her is based on her history of falling a striking her back against the metal hub of her SUV, his examination of her back and of his interpretation of the MRI of her back and of the consultation reports of Dr. Ordia and Dr. Bono. Dr. Foster's prognosis, that there is not going to be any further substantial improvement, but rather there may be slow progressive worsening of the plaintiff's condition over time, is based on the facts that people who do not have substantial improvement within a two year period of time usually do not show any substantial improvement. Dr. Foster, opinion, that the plaintiff is going to continue to have problems with her right knee, perhaps a slow deteriorating course, is based on the fact that people who do not have substantial improvement within a two year period of time usually do not show any substantial improvement. Dr. Foster's opinion, that after four years of having lumbar spine pain, the plaintiff is not going to have any significant improvement in her condition, is based on his examination of her back

19

and of his interpretation of the MRI of her back and of the consultation reports of Dr. Ordia and

Dr. Bono. Dr. Foster's opinion, that the plaintiff is unable to work is based on his examination

and treatment of the plaintiff's knees and back, the plaintiff's continuing complaints of severe

knee and back pain and treatment at the BMC Pain Clinic, which has not been successful, and

data showing that patients, such as the plaintiff, who are out of work for more than two years are

not able to return to work.

**Defendant:**

1.      Dr. John A. Froehlich
        University Orthopedics, Inc.
        2 Dudley Street
        Providence, R.I.  02905

Dr. Froehlich is an orthopedic surgeon, and he practices at University Orthopedics, Inc.,

in which he is a partner.  He is a 1979 graduate of Cornell University, and a 1983 graduate of the

University of Rochester School of Medicine.  He is affiliated with Rhode Island Hospital and the

Miriam Hospital, and is an Assistant Clinical Professor in the Division of Sports Medicine and

Reconstructive Surgery at Brown University School of Medicine.

Dr. Froehlich's trial testimony was videotaped on July 26, 2007.  Dr. Froehlich testified

as follows: He reviewed the entirety of Ms. Brown's medical records concerning the treatment

she received for the injuries she alleges to have suffered as a result of the fall at the KFC

Restaurant as well as voluminous prior medical records.  In addition, he conducted an

Independent Medical Examination of Ms. Brown on June 12, 2007, during which he conducted

an examination of plaintiff's knees and back.

Based upon his expertise, review of Ms. Brown's medical records and IME of Ms.

Brown, Dr. Froehlich expressed the following opinions to a reasonable degree of medical

certainty: He testified that the injury that Ms. Brown sustained to her left knee as a result of the incident at the KFC Restaurant was a minor meniscus tear, which should have completely resolved in no more than three months. Further, he testified that the injury that plaintiff sustained to her back was a minor strain.

On a daily basis, Dr. Froehlich performs knee surgeries of the type that was performed on Ms. Brown. The surgery takes approximately 20 minutes once the patient is prepped and is in the operating room.

Dr. Froehlich also examined plaintiff's back. He testified that he performs similar examinations of patients on a daily basis in connection with his treatment of hip injuries. During his examination of Ms. Brown, he found that she complained of pain that is not physiologically possible. He touched her in various places on her body that could not possibly cause pain in the areas of the body that she complained of given the nerves that necessarily must be implicated in order to cause that pain. He also found that she engaged in symptom amplification. Even when he touched her in the lightest possible way, she would complain of severe pain.

With respect to the alleged right knee injury, Dr. Froehlich testified that Ms. Brown informed him that it was not currently symptomatic. He further testified that he is not aware of any medical basis for Dr. Foster's opinion that the alleged right knee injury is causally related to the left knee injury.

Dr. Froehlich also testified that there are no limitations on plaintiff's activity as a result of the left knee injury, and that the only activities that he would recommend she not engage in are frequent stair climbing, squatting and kneeling.

Dr. Froehlich testified that he frequently engages in examinations of patients for the purpose of determining disability in a worker's compensation setting, and he opined that Ms.

21

Brown is not totally, permanently disabled.  Rather, she is only partially disabled based upon the

above referenced minor limitations on her activity (i.e., frequent stair climbing, squatting and

kneeling).  Finally, he testified that although based upon the length of time Ms. Brown has been

out of work, he expects that she will not return to work, oftentimes a failure to return to work

under such circumstances is attributable to ongoing litigation.

> 2.    Dr. Edward Feldmann
>       Department of Clinical Neuroscience
>       110 Lockwood Street, Suite 324
>       Providence, R.I.  02903

Dr. Feldmann is an Attending Neurologist and the Vice Chairman of the Department of

Neurology at Rhode Island Hospital.  He is also a Professor of Neurology at the Brown

University School of Medicine.  He is a 1979 graduate of Cornell University and a 1983

graduate of Harvard Medical School.

Dr. Feldmann will testify live at trial on the morning of Wednesday, August 8, 2007.  He

reviewed the entirety of Ms. Brown's medical records concerning the treatment she received for

the injuries she alleges to have suffered as a result of the fall at the KFC Restaurant as well as

voluminous prior medical records.  In addition, he conducted an Independent Medical

Examination of Ms. Brown on June 12, 2007, during which he conducted an examination of

plaintiff's back.

Based upon his expertise, review of Ms. Brown's medical records and IME of Ms.

Brown, Dr. Feldmann will express the following opinions to a reasonable degree of medical

certainty: Ms. Brown suffered a soft tissue injury to her lower back as a result of the incident at

the KFC Restaurant.  The soft tissue injury should have resolved in a matter of weeks.

Dr. Feldmann's examination of Ms. Brown's back was objectively normal.  Ms. Brown's

22

complaints of pain during his examination did not correlate with nerve root disease. There were no objective findings during his examination that could support a diagnosis of disc and nerve root impingement. His nerve conduction velocity testing of Ms. Brown was normal. The MRI scans of plaintiff's lumbar spine revealed degenerative changes that are commonly found in the general population of individuals who are asymptomatic. Finally, the symptoms expressed by Ms. Brown do not relate to the degenerative structural changes reflected by the MRI scans.

11.    **Exhibits**

   **Plaintiff**:

      1. Medical records of Dr. Timothy Foster marked as Exhibits to his deposition.

      2. Boston Medical Center Records

      3. New England Home for Little Wanders Personnel Records

      4. Shield's MRI Center Records

      5. Medial bills - Dr. Foster.

      6. Medical bills - Boston Medical Center

      7. Medical bills - Shields MRI Center

      8. Medical bills - Spaulding Rehabilitation Hospital

      9. Medical bills - other health care providers

**Defendant**:

      1. Boston Medical Center ("BMC") Emergency Room Treatment and Admission Record dated 6/2/02;

      2. BMC  Lab Report Dated 8/8/02 Re Pelvis and Lumbar Spine;

      3. BMC Physical Therapy Records concerning plaintiff's left knee;

      4. BMC Emergency Department Treatment and Admission Record dated 9/17/02;

23

5. BMC Phone Note Re Fall dated 9/26/02;

6. BMC Office Visit Record dated 10/29/02 Re Rose Duver MD;

7. BMC Office Visit Record dated 11/26/02 Re Adriana Cervantes MD;

8. BMC Phone Note dated 12/10/02 Re back pain;

9. BMC Report of Dr. Christopher M. Bono dated 12/17/02;

10. Dr. Foster's Records;

11. 2/9/03 Report Re MRI of Right Knee;

12. BMC MRI of Lumbar Spine dated 3/23/03;

13. Letter from Dr. Ordia to Dr. Foster dated April 3, 2003;

14. BMC Lab Report Bilateral Standing Knees dated 7/9/03;

15. BMC Lab Report dated 12/3/03;

16. BMC Office Record dated 7/7/04 Re Feng Wang MD;

17. Letter from Dr. Reed of BMC to Dr. Chu dated May 18, 2005;

18. Letter from Dr. Reed to Dr. Chu dated August 30, 2005;

19. The Home for Little Wanderers W-2 Statements for Gloria Brown for the years 2000 and 2001.

## 12. **Remaining Objections to Evidence.**

The parties reserve the right to object to the opposing party's examination of Dr. Froelich, as raised at his deposition, which transcript has not been prepared.

24

Respectfully submitted,

The plaintiff,                                  The defendant,
By her attorneys,                               By its attorney,

/s/ John N. Lewis_____                     /s/ Lawrence R. Holland_____
John N. Lewis (BBO #298520)                      Lawrence R. Holland (BBO #554839)
Lawrence R. Mehl (BBO #566235)                   Legal Management Services, LLC
JOHN N. LEWIS & ASSOCIATES                       55 Hammarlund Way
21 Merchants Row, 5th Floor                      Middletown, RI 02842
Boston, MA  02109                                (401)  843-8400
(617) 523-0777