UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GLORIA BROWN,<br>    Plaintiff | )<br>)<br>) |
| v. | )   CIVIL ACTION NO. 05-CV-11167-MBB<br>) |
| KFC CORPORATION,<br>    Defendant | )<br>)<br>) |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE
TO LIMIT THE TESTIMONY OF DEFENDANT'S MEDICAL EXPERTS**

Subsequent to the plaintiff's deposition of her treating physician, Dr. Foster, the defendant brought a motion to exclude portions of his testimony on two grounds: (1) that he was not qualified to render an opinion regarding the plaintiff's back (a) because his orthopaedic speciality was knees, not backs and/or (b) because he did not treat her back; and (2) that the plaintiff had not disclosed that he would testify as an expert with regard to her back and her disability. This Honorable Court found, as the defendant conceded, that Dr. Foster was a treating physician who was not an "expert" within the meaning of Rule 26(a)(2) and therefore the plaintiff did not need to provide his report; but, to the extent his testimony constituted an expert opinion, it fell within Rule 702, requiring advanced disclosure. Memorandum and Order, Doc. 59. As a matter of fairness, considering that the trial had been continued, this Honorable Court gave the defendant, at its request, 90 days to retain its own experts and to re-depose Dr. Foster. Id. The plaintiff cooperated, to the best of her ability, including, with this Honorable Court's encouragement, attending two medical examinations in Providence, Rhode Island, as soon as they were scheduled and providing the defendant with available dates for Dr. Foster to be re-deposed, although it decided not to avail itself of that opportunity.

2

The order giving the defendant additional time to retain its own experts was entered on March 19, 2007 and the trial was eventually rescheduled to August 6, 2007. Even though it had over four months and even though it represented to this Honorable Court that it only need three months to prepare, it did not schedule the defense medical examinations until June 12, 2007 and did not provide the plaintiff with its doctor's reports until June 19, 2007 for Dr. Froelich and June 28, 2007 for Dr. Feldman. Exhibits 1 and 3, respectively. It then scheduled Dr. Froelich's deposition for one month later, July 26, 2007. The defendant informed the plaintiff that it intended to call Dr. Feldmann to testify at trial and provided no further disclosure.

Dr. Froelich's report, which, in conjunction with an earlier pre-examination record review, Exhibit 2, was the only disclosure made prior to his deposition. The first three pages of the report are Dr. Froelich's findings. The last three-quarters page are his opionions. With regard to his opinion, he states succinctly, "Her recovery from these injuries has been quite protracted and atypical." At his deposition, Dr. Froelich was asked detailed questions by defendant's counsel about the plaintiff "engaging in symptom amplification." Froelich Deposition, p. 28. Exhibit 4. That term does not appear in his report, nor does any opinion as to amplification, which carries the implication that it is being intentionally exaggerated. The defendant tries to excuse its lack of disclosure by claiming that the plaintiff waived her right to object by not raising an objection at the deposition. However, the objection is not to the relevancy, materiality or competence of the testimony, but to the prejudice caused by the plaintiff's inability to adequately prepare her cross-examination. The defendant goes on to claim that its counsel objected to the plaintiff's questioning and, therefore, tit for tat. However, the defendant's objections to her treating physician's testimony was as to his expression of an

3

opinion that it claimed he was not qualified to render and to his rendering an expert opinion on any subject absent disclosure. See Defendant's Memorandum of Law in Support of Its Motion to Exclude from the Trial Portions of the Videotaped Trial Testimony of Dr. Timothy E. Foster, Doc. 48:

> As stated above, Dr. Foster is an orthopedist whose medical practice is limited to treating shoulder and knee injuries. At no point prior to his videotaped trial testimony did paintiff disclose any qualifications on the part of Dr. Foster to evaluate back injuries. Id., p.3.
>
> Plaintiff did not identify any expert witnesses in response to defendant's expert witness interrogatories. Nor did plaintiff provide the expert witness disclosures required by Fed.R.Civ. P. 26. Id.

Further in response to a question by plaintiff's counsel about the basis for the opinion in his report, that his prognosis was "guarded based on the fact that she has not pursued gainful employment now for some five years and has a chronic pain syndrome," Dr. Froelich testified about literature showing the longer a person was out of work the less likely it was that they would return. That corresponded to Dr. Foster's deposition testimony, for which the defendant had been asking for the citation. However, Dr. Froelich went on to gratuitously talk about studies that show people who bring law suits are also less likely to return to work:

> Well, there are some statistics with injured workers in terms of returning to work that if they're beyond a certain period of time statistically the likelihood of them returning to work is much smaller. There are some studies that suggest people involved in litigation have a lower return-to-work fate. Froelich Dep., p. 55.

Dr. Froelich's report only speaks about how long a person has been out of work. It does not give any indication that his opinion is also based on the fact the plaintiff is involved in litigation.

The plaintiff understands that this Honorable Court was considerate in the exercise of its discretion with regard to her own doctor's testimony. However, the defendant was given ample

4

time to remedy any prejudice. Here, the undisclosed testimony is highly prejudicial and there is no opportunity for remediation. Striking the embellished testimony about "symptom amplification" at pp. 28-29, with its negative connotation, where there is ample prior testimony to the plaintiff's pain being disproportionate to and inconsistent with her injury, e.g, without prejudice.:

> Q. [Mr. Holland] You mentioned chronic pain syndrome. Can you tell me what that is?
>
> A. [Dr. Froelich]. Well, its pain out of proportion to what one would expect for an injury, and probably a recovery. Usually what goes along with that is a recovery out of proportion to what one would expect for a given injury. The – so its kind of atypical. Froelich Dep., p. 24. (The term "atypical" is what is used by Dr. Froelich in his report).

would not significantly alter the gist of Dr. Froelich's testimony. Similarly, striking his embellished testimony about people who bring law suits having prolonged disability would not compromise his opinion that the longer people are out of work, the less likely it is that they will return, as stated in his report.

As to Dr. Feldmann, the plaintiff has no information as to his opinion besides his "impression" on the last half of the last page of his three page report. He should be restricted in his testimony to that opinion.

WHEREFORE, for the foregoing reasons, the plaintiff moves to limit the testimony of defendant's medical experts, Dr. Froelich and Dr. Feldmann, to the facts and opinions disclosed in their reports.

5

Respectfully submitted,

The plaintiff,
By her attorneys,

　　/s/ *John N. Lewis*　
John N. Lewis
BBO# 298520
Lawrence Mehl, of Counsel
BBO# 566235
JOHN N. LEWIS & ASSOCIATES
21 Merchants Row, 5th Floor
Boston, MA 02109

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 3, 2007

　　　/s/ *John N. Lewis*　　
John N. Lewis




JOHN A. FROEHLICH, M.D.

*Clinical Assistant Professor*
*Brown Medical School*

*Sports Medicine*
*Adult Reconstruction*

*Medical Office Center/Suite 200*
*2 Dudley Street*
*Providence, RI 02905*

*Office  (401) 457-1500*
*Fax     (401) 831-5926*

UNIVERSITY ORTHOPEDICS, INC.

Michael G. Ehrlich, M.D.
Roy K. Aaron, M.D.
Edward Akelman, M.D.
W. Lloyd Barnard, M.D.
Christopher T. Born, M.D.
Manuel F. DaSilva, M.D.
Christopher W. DiGiovanni, M.D.
Craig P. Eberson, M.D.
Paul D. Fadale, M.D.
Gary M. Ferguson, M.D.
John A. Froehlich, M.D.
Andrew Green, M.D.
Michael J. Hulstyn, M.D.
Julia A. Katarincic, M.D.
Richard S. Limbird, M.D.
Phillip R. Lucas, M.D.
James O. Maher, III, M.D.
Mark A. Palumbo, M.D.
Alexander P. Robertson, M.D.
Robert M. Shalvoy, M.D.
Patricia M. Solga, M.D.
Richard M. Terek, M.D.
Peter G. Trafton, M.D.
Arnold-Peter C. Weiss, M.D.

Razib Khaund, M.D.
James Leffers, M.D.
Randall L. Updegrove, M.D.

*Chief Operating Officer*
Beverly A. Russell, MBA

ORTHOPEDIC RESEARCH
Qian Chen, Ph.D.
Deborah Ciombor, Ph.D.
J.J. Trey Crisco, Ph.D.
Braden Fleming, Ph.D.
Junming Luo, M.D.
Douglas C. Moore, M.S.
Ming Pei, Ph.D.
Xiao-juan Sun, M.D.
Shou Wang, M.D.
Zhengke Wang, Ph.D.
Lei Wei, M.D., Ph.D.
Xu Yang, M.D., Ph.D.

Brown, Gloria                                                        June 12, 2007

Mrs. Brown is a 58-year-old woman who is seen for purposes of an independent medical evaluation. She is accompanied by her attorney Mr. Larry Mehl.

Her injury dates back to June 21, 2002. At that time she was with her granddaughter at a KFC restaurant. She was stepping out of the car and her left foot went into a depression. Her right foot got tangled behind her and she twisted and fell and landed against the hubcap of the car striking her lower back. She has been out of work since that event. Her medical care for this injury is summarized in a separate document. She was cared for orthopedically for her left knee by Dr. Foster. She had arthroscopic surgery with a partial medial menisectomy and chondroplasty. Her last visit was in March or April of this year. She relates that the doctor stated no other treatment was indicated. She uses a simple brace for her perceived weakness and swelling. In terms of her back she recently was seen at a clinic at the Massachusetts General Hospital. This was in April 2007 and she was seen by a doctor Najhan. An epidural injection was recommended. She did not pursue that. She also has mild right knee pain. She says this really is not an issue and not a true impairment.

On a typical day she says she gets swelling when she is up on her left knee and her back acts up. She will take pain medication as early as 5 or 6 a.m.. She stays in the house most of the day. She is leery of driving because of her medications. She uses a cane all the time. She uses a back brace when she is up. Her walking endurance is less than 100 feet and with discomfort. She avoids stairs. Her bedroom is upstairs, but she sleeps on the lower level. She rates her left knee pain in the range of seven or eight out of 10. Her back is seven out of 10. She feels these are equally uncomfortable. When she stands her knee hurts. If she lies on her side, her back hurts. She does a lot of icing. She tells me a she lies on her right side, her entire right leg goes on fire. She says if she lies on her left side she gets a headache and her head hurts. Her back pain is in the lower lumbar area. She says her right leg often has pins and needles, which radiates down to her foot. She frequently will get spasms four to six times per day and these start in her lower back and then ascend into the mid-thoracic area. She declined an epidural injection, because she was fearful of paralysis, dating back to a comment that was made when she was delivering her daughter, who is now in her 20s. She feels like she's

RECEIVED JUN 1    2007

Brown, Gloria
June 12, 2007
Page 2

been about the same now for several years. She describes it as a nightmare.

She says her left knee swells a lot. She tells me if she lies on her right side it feels like someone is trying to put a knife into her left knee as if she is being cut. With knee flexion she also gets anterior pain. She gets some transient improvement with icing. She relates no improvement with cortisone injection.

She worked for NYNEX as an executive assistant to the director. She retired in 1995. She then became an overnight counselor, with childcare supervision for about six years until her injury in 2002. She has not worked now for some five years. She tells me she would like to get a job but can't get one secondary to all her medications. She is embarrassed by this. She is also troubled in that her mother has Alzheimer's. She has not been able to help in her care. Her only child is a daughter, who is a police officer in Boston. She lives with her husband, who is also retired. Her husband does the cooking, cleaning and shops. She tries to help out.

She has allergy to latex. She is on morphine and Percocet for her pain. She takes multiple medications for hypertension. She takes elavil, and peroxetine for pain and nerves. She has had left knee arthroscopic surgery in 2002. She has had a cesarean and removal of ovary in the past. She really does not exercise. She smokes a quarter pack per day. She drinks socially.

Physical exam: she tells me she is claustrophobic. She is wearing a simple knee brace on her left knee. She has a prefabricated lumbar brace/support. She uses a cane in her left hand. She is able to walk in the hall without assistance but relies on her cane. She has an awkward gait.
Neck is non-tender to palpation. No appreciable spasm. Range of motion is without significant limitation. No evidence for cervical radiculopathy. Muscle testing is normal including biceps, triceps, wrist extension, EPL and intrinsics. Sensation seems grossly normal.

Brown, Gloria
June 12, 2007
Page 3

Reflexes of biceps, triceps and brachioradialis are equal and symmetric.
Palpation in the mid-lumbar level even the lightest touch causes her to report symptoms down her right leg, which she describes as pins and needles. She also describes considerable pain to palpation in the coccyx area. This was to the lightest of touch. She tolerates about 10° of hyper extension and 40° of forward flexion. She has no appreciable spasm. She has atypical/ inconsistent pain with rotation of her back and pelvis in unison. Light stroking of her lower lumbar region causes her to report symptoms in her right calf. She describes subjectively decreased sensation from the proximal thigh on the right distal in a stocking like distribution. I thought reflexes at knee and ankle were equal and symmetric. Sitting straight leg raise is negative, bilaterally. Supine she can straight leg raise 60°. She has good pedal pulses. She has normal motor power in EHL, AT, peroneals and gastroc-soleus.
Bilateral hips: There is no swelling about the hip. Pelvis seems level. No trochanteric tenderness. No pain with log roll. No irritability with abduction or flexion. No pain or restriction with internal/external rotation. Abductor strength seems normal.
Right knee: alignment is appropriate. She describes some pain in the medial retinaculuar area. She has no effusion. She has no joint line tenderness. She has negative McMurray. She is stable to varus, valgus, AP stress. Range of motion is preserved. She does not seem to have any patellofemoral discomfort.
Left knee: she has three arthroscopic portals that are well healed. She has minimal swelling. She does not have an effusion. Alignment is appropriate. She has some very soft crepitus which appears to emanate from the patellofemoral joint with range of motion. She has no joint line tenderness. She has negative McMurray. She is stable to varus, valgus, AP stress. She does have discomfort with motion of the patella in the trochlear groove and patellar compression with active quad contraction.

Records review: these are outlined in a separate document.

Review of x-ray/other testing: none provided

Brown, Gloria
June 12, 2007
Page 4

Diagnosis:  1. Status post arthroscopy for torn medial meniscus.
2. Residual patellofemoral discomfort/symptoms left knee.
3. Lumbar strain.
4. Chronic pain syndrome

Causal relationship: based on the medicals reviewed, history and physical examination, it is my belief that Mrs. Brown sustained a torn medial meniscus to her left knee and a lumbar strain secondary to the event which occurred in June 2002. She has some reproducible patellofemoral symptoms on the left as well. Her recovery from these injuries has been quite protracted and atypical. She clearly has a chronic pain type syndrome.

Prognosis: guarded based on the fact that she has not pursued gainful employment now for some five years and has a chronic pain syndrome

Disability: partial. Objectively, she has some patellofemoral type discomfort residual in her left knee. She should avoid frequent stairclimbing squatting and kneeling type activities. No other restrictions would be necessary. Her back injury appears to have been a simple lumbar strain. She continues to have a normal neurologic exam except for some gross inconsistencies consistent with pain amplification and a chronic pain type syndrome.

MMI: I do not think any other diagnostic studies or surgical intervention is indicated. Mrs. Brown has pursued psychological treatment/counseling in the past and I believe this would be beneficial in the long term. The only other intervention, which has been offered, but not pursued would be an epidural steroid injection in the hopes of alleviating some of her chronic pain complaints attributable to her back.

John A. Froehlich, M.D.
University Orthopedics




JOHN A. FROEHLICH, M.D.
Clinical Assistant Professor
Brown Medical School

Sports Medicine
Adult Reconstruction

Medical Office Center/Suite 200
2 Dudley Street
Providence, RI 02905

Office   (401) 457-1525
Fax      (401) 831-5926

UNIVERSITY ORTHOPEDICS, INC.
Michael G. Ehrlich, M.D.
Roy K. Aaron, M.D.
Edward Akelman, M.D.
W. Lloyd Barnard, M.D.
Christopher T. Born, M.D.
Manuel F. DaSilva, M.D.
Christopher W. DiGiovanni, M.D.
Craig P. Eberson, M.D.
Paul D. Fadale, M.D.
Gary M. Ferguson, M.D.
John A. Froehlich, M.D.
Andrew Green, M.D.
Michael J. Hulstyn, M.D.
Julia A. Katarincic, M.D.
Richard S. Limbird, M.D.
Phillip R. Lucas, M.D.
James O. Maher, III, M.D.
Mark A. Palumbo, M.D.
Alexander P. Roberson, M.D.
Robert M. Shalvoy, M.D.
Patricia M. Solga, M.D.
Richard M. Terek, M.D.
Peter G. Trafton, M.D.
Arnold-Peter C. Weiss, M.D.

Razib Khaund, M.D.
James Jeffers, M.D.
Randall L. Updegrove, M.D.

Chief Operating Officer
Beverly A. Russell, MBA, FACMPE

ORTHOPEDIC RESEARCH
Qian Chen, Ph.D
Deborah Ciombor, Ph.D.
J.J. Trey Crisco, Ph.D
Braden Fleming, Ph.D
Junming Luo, M.D.
Douglas C. Moore, M.S.
Ming Pei, Ph.D.
Xiao-juan Sun, M.D.
Shou Wang, M.D.
Zhengke Wang, Ph.D.
Lei Wei, M.D., Ph.D.
Xu Yang, M.D., Ph.D.

May 19, 2007

Mr. Lawrence Holland
Attorney at Law
Legal Management Services
55 Hammarlund Way
Middletown, RI 02842

Dear Mr. Holland:

This is in follow-up to our recent phone conversation. I reviewed all the medicals forwarded concerning care provided to Gloria Brown. This includes the 12 sections of medicals as well as the deposition of Dr. Mark Foster.

Initial sections of the medical record document a motor vehicle accident for which she was evaluated on several occasions in 1992. She had neck and shoulder complaints. In 1997 she had multiple visits to physicians and emergency room for an allergic reaction presumably to latex. In 1999 she had the beginning of multiple visits to her medical care providers concerning atypical chest pain. She also at this point had low back pain. Cardiac evaluation was negative.

In January 2002 she had a trauma to her left shin at work when she hit an open drawer. She was seen at an urgent care center for this some two months later. She was seen orthopedically in May 2002 and felt to have a contusion to her leg. Conservative measures were recommended. She was seen in the emergency room on June 2, 2002 after a motor vehicle accident two days prior. She was seen for a trapezius and forearm strain. She was a restrained passenger that was rear ended.

As you know, on June 21, 2002 she fell at a KFC restaurant. She was seen that same day at the Boston Medical Center emergency department for a knee strain and the next day for a lumbar strain. She was seen again a week later, on June 28 for poor pain control. She was referred to orthopedics and was seen on July 17, 2002 by Dr. Timothy Foster. It was felt she might have a meniscus tear and an MRI study was

Brown, Gloria
Page 2

obtained. An MRI in fact was obtained on July 21, 2002. It showed a torn medial meniscus. She continued to have lower back pain and was seen in the emergency room again on August 8 with complaints of lower back and buttock pain. She went on to have an MRI of her lower back on August 31, 2002. She had a mild bulge at L4/5 with associated degenerative change of the facets and at L5/S1 also a protrusion with again some right facet and foraminal narrowing.

On September 6, 2002 she had a left knee arthroscopy. She had cartilage delamination of the distal aspect of the patella which was smoothed with shaver and a small radial tear of the medial meniscus for which a partial medial menisectomy was performed. Physical therapy was initiated.

Regarding her right knee, she was seen at the Boston medical center emergency room. The date of this evaluation is not clear. Report states patient slipped down stairs and attached report dated September 17, 2002 notes patient fell on 8/29 and injured right knee with complaints of persistent pain. Subsequent notes of Dr. Foster note progression and improvement of the left knee with physical therapy.

She was evaluated for her spine by Dr. Christopher Bono on December 17, 2002. She had tenderness throughout the lumbar spine and pelvis. She had negative neurologic signs. Interpretation of the MRI by Dr. Bono showed mild L4/5 stenosis and even more mild at L5/S1. Dr. Bono felt it was difficult to discern exactly the origin of her pain. Physical therapy was recommended. As of December 2002 Mrs. Brown was on Percocet typically one to three tablets per day to manage her pain.

In January 2003 Dr. Foster comments that the patient has made significant improvements regarding her left knee. He considered obtaining an MRI of the right knee. Regarding the spine, Dr. Foster notes that Dr. Bono felt she had a muscular injury. He requested a second opinion by Dr. Joseph Ordia from neurosurgery.

Brown, Gloria
Page 3

An MRI of the right knee was obtained on February 9, 2003. There is noted to be some abnormality in signal of the medial meniscus but no discrete tear. Another MRI of the lumbar spine was obtained on March 23, 2003. It showed at the L4/5 level some facet degenerative change. No disk herniation is identified. She was seen by rehabilitation medicine. She was evaluated by Dr. Ordia on April 3, 2003. He reviewed both MRI studies from 2002 and 2003. He felt the patient had a back strain with mechanical findings but no focal neurologic deficits. He did not feel any surgical intervention was necessary. She was subsequently referred by rehabilitation medicine to Dr. Sokolove a psychologist who works with patients with chronic pain. She infact was seen on June 3, by Dr. Sokolove. It was felt she suffered from both depression and a post traumatic stress disorder. She was placed on antidepressant medication. She declined facet joint injections. She was seen again by Dr. Foster regarding her knees and he considered Synvisc injections. X-rays of both knees, showed mild degenerative change. Again, this was on a bilateral basis.

She was seen regularly in 2004 by rehabilitation medicine. Basically her complaints of lower back discomfort were unchanged. She declined injections by pain management. She reported greater difficulty with activities of daily living. Her amitriptyline was increased to help with her pain and sleep. She attended chronic pain classes. In May 2004 she rated her pain nine out of 10 at a rehab visit. She was felt to present with pain behavior during the entire exam. In July 2004 she had EMG/nerve conduction studies. The nerve conduction study was normal. The EMG portion was not completed. In December 2004 she rated her pain as eight out of 10 and noted that she was becoming psychologically impaired due to her chronic pain.

In May 2005 she was seen by Dr. Reed, a neurosurgeon for evaluation. It was recommended that she have a repeat MRI study. In June 2005 this was obtained and showed a posterolateral disc at L5/S1 with mild stenosis and no change

Brown, Gloria
Page 4

from prior study. She was seen again on August 30, 2005 by Dr. Reed. It was recommended that she have EMG/nerve conduction studies. As best I can tell, she missed an appointment to have this and it was never performed.

In January 2006 she was seen emergently by psychiatry. It was recommended that she have inpatient hospitalization for mood stabilization and medication adjustment.

The deposition of Dr. Timothy Foster is also reviewed. This was done on December 14, 2006. It was the doctor's belief that Mrs. Brown sustained a tear of the medial meniscus to her left knee from the event in 2002. He goes on to opinion that her discomfort in the contralateral right knee was secondary to the use of crutches/cane for a long period of time. Regarding her recovery, the doctor notes that patients with meniscal pathology typically recover within a three month interval. Dr. Foster is of the opinion that Mrs. Brown's left knee, right knee and back problems are all causally related to the fall which occurred on June 21, 2002. Additionally, the doctor was of the opinion that Ms. Brown will have a slow progressive deteriorating course regarding her knee. He also feels she will be unable to work. The doctor last saw the patient in December 2003.

Based on the above review, it is my impression that Ms. Brown sustained two injuries at the time of her fall on June 21, 2002. The first was an injury to her left knee involving her medial meniscus. This was a very small tear. The changes on her patella in all likelihood do not relate to the event in question but could have been aggravated by that fall. Her treatment was most appropriate i.e. arthroscopic evaluation and partial medial menisectomy/chondroplasty patella. Her recovery from this is quite atypical. Most individuals are fully recovered within a six to 12 week interval with minimal if any residual symptoms. This type of injury and surgery should not lead to the need for additional intervention or long-term disability.

Brown, Gloria
Page 5

Her second injury attributable to the fall was to her lower back. Based on the multiple evaluations as well as diagnostic studies, I believe this is best described as a lumbar sacral strain. There is no evidence in multiple neurologic exams for any radiculopathy. She was evaluated by multiple specialists both orthopedic and neurosurgical and not felt to have any true structural lesion. Again the typical recovery from such a soft tissue type injury is in the range of three to four months. Clearly Ms. Brown has a chronic pain type syndrome. Her degree of impairment is far greater than one would expect from the type of injury she sustained as well as her physical examination and multiple diagnostic studies, and time frame from the event.

Finally, I would disagree with Dr. Foster, regarding the contralateral right knee impairment and its relation to the use of crutches on a long-term basis. I do not believe there was any specific injury to the right knee at the time of her initial injury in June 2002. Additionally, the injuries/changes in her left knee were and continue to be quite mild. I also do not know of any literature to support the contention that an injury such as she had on the left would result in a symptom complex and disability described on the right.

I hope you find this review of help in this further evaluation of Ms. Brown and her medical conditions. Please feel free to contact me directly if you have any additional questions or concerns.

Sincerely,

John A. Froehlich, MD

# EXHIBIT 3

## Rhode Island Hospital
*A Lifespan Partner*



**BROWN UNIVERSITY**
**SCHOOL OF MEDICINE**

**Department of Neurology**

Physicians Office Building
Suite 324
Providence, RI 02903

Tel 401 444-8806
Fax 401 444-8781
Email
edward_feldmann@brown.edu

**Edward Feldmann, MD**
*Director*
Cerebrovascular Laboratory
Rhode Island Hospital
*Professor*
Program in Neurology
Department of Clinical
Neurosciences
Brown University
School of Medicine

June 26, 2007

Susan B. Koerner
Paralegal
Legal Management Services LLC
55 Hammarlund Way
Middletown, RI 02842

Re: Gloria Brown

Dear Mr. Koerner:

Thank you for asking me to examine and review the records of Gloria Brown. I had the opportunity to see her on June 12, 2007. I also had the opportunity to review the following: podiatry notes beginning May 20, 1992, Emergency Room notes from a hospital I could not identify around that time period, Boston City Hospital notes beginning December 31, 1992, Boston City Hospital orthopedic notes beginning January 25, 1993, Boston City Hospital physical therapy notes beginning February 11, 1993, General Internal Medicine notes beginning May 6, 1999, notes from Dr. Creevy beginning May 2, 2002, Boston Medical Center Emegency Room notes from June 21, 2002, Boston Medical Center Emergency Room notes from June 22, 2002, Boston Medical Center Emergency Room notes from July 12, 2002, notes from Dr. Foster beginning July 17, 2002, MRI of the knee on July 21, 2002, lumbar MRI on August 31, 2002, Physical Therapy notes beginning September 24, 2002, lumbar MRI from March 23, 2003, notes from Dr. Dhar beginning April 2, 2003, notes from Dr. Ordia beginning April 3, 2003, notes from Dr. Sokolove beginning June 3, 2003, notes from Dr. Wenger beginning September 23, 2003, notes from Dr. Kaplan beginning November 26, 2003, notes from Dr. Tran beginning January 14, 2004, sacrum and coccyx films from May 24, 2004, notes from Dr. Manasian beginning May 24, 2004, notes from Dr. Reed beginning May 18, 2005, the deposition of Dr. Foster on December 14, 2006, the notes from Dr. Froehlich beginning May 19, 2007 and the records ended with a note from Dr. Froehlich on June 12, 2007.

I obtained the following history and physical in my office. The patient is a 58 year old woman who attended the visit with Mr. Mehl, her attorney. I told them that this was an independent medical examination and I would not be assuming her medical care. She told me that this visit reflected a low back injury on June 21, 2002.

Medications include Percocet, Morphine, Atenolol, Hydrochlorothiazide, Nifedical, Lisinopril and Nortriptyline. She uses no over the counter medications. She smokes but does not drink alcohol.

Her father died of Alzheimer's disease and heart disease. Her mother has Alzheimer's disease. She has seven brothers and one daughter who are healthy.

She is not working outside the home. She last worked at the time of the accident of record. She had already retired on one occasion from her main career as a secretary at ATT/Verizon. At the time of the accident of record she was working as a counselor at the Home for Little Wanderers, age four to 12. This was a physical job.

Primary physician is Dr. Benson Chu. Review of systems is notable for hypertension, depression treated with Nortriptyline and having been hospitalized for this in the past and surgery on her left knee.

She had no prior injuries such as the one we are discussing today. In the accident of record she got out of a car and stepped in a hole in the ground. She fell to her left and tried to move her right foot to the left to help gain her balance. She fell backwards and landed with her tailbone being struck. She injured her left knee and low back. She landed with her spine on the hubcap. She attended an Emergency Room and was discharged to be followed by many physicians including Drs. Reed and Foster.

She had left knee pain immediately. Dr. Foster performed surgery which helped but not 100%. She does not think she walks normally as a result of this injury. She walks with a cane in her left hand. At first she used the cane in her right hand and then switched to the left.

Her low back injury involves landing on her tailbone. She had immediate low back pain. Low back pain radiates to the posterior right leg, not the left. It radiates to the top of the foot. She believes the pain started about one week to one month after the accident of record but is not sure. She was in a lot of pain at that time regardless. She has numbness, tingling and weakness of the right leg. Bowel and bladder function are intact. Symptoms are made worse by sitting, walking and sitting a particular way which will produce headache. Nothing makes her symptoms better. She had an MRI performed that she remembers having to take Valium or some other drug for. She had an EMG. The diagnosis is disc protrusion and impingement on the nerve. She was treated with physical therapy, heat, ice and bracing. Epidural steroid injections were declined. The brace does help in a general way. She was not, however, told that she had any instability of the spine. Surgery was never recommended. She did see a neurosurgeon. Her low back pain did not improve.

Losses include remaining out of work. She lives with her husband. He performs all home activities of daily living which is a major change since the accident of record. She gave up bike riding. She is not able to take her grandchildren out. She does not go shopping to the mall. She does not go to Foxwoods or Mohegan Sun. She does not go to Martha's Vineyard. She goes to church less. She does not like taking all the pills she has to take and needs more hypertension medications. Her sexual activity with her husband has diminished.

On examination she was alert and oriented with normal language, memory and spatial ability by gross bedside observation. Cranial nerves II through XII were intact. She limped on her left leg. She could stand on her heels and toes but was in pain doing so. At 15 cm above the knee the thigh circumference was 47 cm bilaterally, while at 15 cm below the knee the calf circumference was 37 cm bilaterally. She had no tenderness or spasm of the lower back but palpation produced pain radiating to the posterior right leg. She had diminished range of motion of the lower back. Power was normal throughout. She had diminished touch sensation of all aspects of the right leg except for the medial calf. Reflexes were 2+ and symmetric with bilateral flexor plantar responses.

Impression: With a reasonable degree of medical certainty, the accident of record produced a lumbar strain. The patient presented in the Emergency Room with symptoms of soft tissue injury. At some point thereafter, pain radiated to both legs or to the right leg. On some occasions symptoms radiating to the left leg were also described, such as on April 3, 2003. I obtained a history of symptoms radiating to the right leg in a right L4 and a right S1 nerve root distribution.

Despite the patient's symptoms, examinations supported the diagnosis of soft tissue injury. Consistent neurological symptoms on an objective basis, particularly those correlating with right L4 and right S1 nerve root symptoms were not described in the medical records. My personal examination of the patient was objectively normal. The patient had subjective sensory signs on examination that did not correlate well with nerve root disease. The patient's MRI scans of the lumbar spine revealed multilevel abnormalities that are commonly found on a degenerative basis in the general population of asymptomatic individuals. The key issue in this patient is that they cannot be correlated with consistent neurological symptoms and objective neurological findings to support a diagnosis of disc and nerve root impingement. Indeed the abnormalities cited on the first MRI in 2002 were not detected at the same severity on the second MRI in March of 2003. Therefore, with persistent symptoms, it is difficult to relate those symptoms to the structural MRI changes.

Nerve conduction velocities were normal.

In summary, this is the clinical presentation of a soft tissue injury of the lumbar spine that resolves over several weeks to several months. There is no evidence on an objective basis of any other injury of the lower back in this patient. I would be pleased to review the patient's actual MRI films and the notes of Dr. Bono if you can obtain them for my review.

Sincerely,

Edward Feldmann, MD

EF/cmf

Page 26

1    materials don't fit the picture, and she describes
2    this terrible pain. She rated her pain as 7 or 8,
3    I believe, when I saw her. Her left knee pain
4    ranges 7 or 8 out of 10 and I tell people 10 is
5    the worst pain you can imagine, and Miss Brown
6    says it's 7 or 8. That's pretty extreme.
7    Similarly, her back, I think she had a back
8    strain. Most people from a back strain recover
9    within about twelve weeks, with or without
10   treatment. She's had ongoing treatment now,
11   evaluations, multiple MRI's, multiple evaluations
12   by spinal specialists for five years. Her back
13   pain is 8 out of 10. She is taking chronic
14   narcotic medication from basically when she gets
15   up in the morning, although she tries to limit it,
16   and she's a very reasonable person, but she is
17   on -- been on, excuse me, chronic pain medication
18   now for -- of multiple different types for five
19   years. So, again, the injury, and her recovery
20   from those injuries are very discrepant from the
21   picture she presents herself as or that we see
22   here in terms of her level of pain, her level of
23   function, her quality of life, all these things.
24 Q. Is the lack of your ability to find a
25   physiological cause for her pain during your

Page 27

1    examination, is that a factor in your conclusion
2    that she's suffering from chronic pain syndrome?
3 A. Yes. I think that's a fair statement.
4 Q. And how does that impact your conclusion in that
5    regard?
6 A. I guess I'm not sure as to how or what you
7    mean by that. I mean she had a torn meniscus and
8    that was treated appropriately, arthroscopically.
9    She had some minor wear to her kneecap, which may
10   or may not have been related to the event, but
11   could have been aggravated by the event, you know,
12   giving her the benefit of doubt, but all those
13   things, the recuperation from that is typically
14   weeks to a couple of months, and she's, by her own
15   admission, she's not getting better, and she's
16   describing knee and back pain, you know, 6, 8 out
17   of 10, every day. So, I think -- and her X-rays
18   don't show significant arthritic change. And in
19   terms of her back, she doesn't have substantial
20   findings. She's been seen by multiple individuals
21   for her back, all of which feel that it's either
22   muscular or simple mechanical, and most people
23   cope with that and function well with that. Miss
24   Brown is not coping and functioning well, and she
25   admits to depression. I know, based on the review

Page 28

1    of the medicals, she's had care for that as well.
2 Q. Did you make any findings -- based upon your
3    expertise, your review of the medical records, and
4    your examination of Miss Brown, did you make any
5    findings or, excuse me, do you have an opinion to
6    a reasonable degree of medical certainty as to
7    whether Miss Brown is engaging in symptom
8    amplification?
9 A. I do.
10 Q. What is your opinion in that regard? Well, first
11   of all, let me ask you what is symptom
12   amplification?
13 A. Well, I think symptom amplification,
14   Mr. Holland, goes along with this chronic pain
15   where her reported pain, her reported limitations,
16   her quality of life, all are out of proportion to
17   what one would expect for an injury like she had,
18   and the time frame for that injury, and the
19   treatment from that injury. In other words, one
20   would expect someone perhaps to have some pain
21   early on acutely after an event like this, but I
22   think if you would describe the injury to the
23   majority of orthopedic surgeons or treating
24   surgeons, the kind of injury she had, you would
25   say, well, the patient had an arthroscopic

Page 29

1    surgery, what would you expect five years -- it's
2    like patients ask what would you expect after the
3    surgery, I tell them activity guided by your
4    comfort. You may occasionally have some residual
5    to mild residual discomfort, but a small radial
6    tear in the meniscus is not something that
7    typically results in ongoing disability.
8 Q. During the course of your practice, do you make
9    determinations as to disability of patients?
10 A. Absolutely.
11 Q. How often do you do that?
12 A. Impairment and disability typically is a
13   common part of the treatment of injured workers
14   because it's the basis for the benefits and how
15   much benefits they derive at different points of
16   their recovery from an injury. So, both
17   impairment ratings and disability status is
18   something that I do virtually every day of my
19   practice.
20 Q. You previously testified that approximately 20
21   percent of your practice involves work-related
22   injuries; is that correct?
23 A. 15 to 20 percent is injured workers, yes.
24 Q. Based upon your expertise, your review of the
25   medical records and your examination of Miss

Page 54

1   me.
2   Q.  Would she be symptom free?
3   A.  I'm not convinced that any treatment, based
4       on Mrs. Brown's condition, was going to make her
5       symptom free.  Even Dr. Foster, her treating
6       physician, didn't feel there was much more he
7       could do for her, at least when he left it after
8       the arthroscopic surgery.  Her findings on MRI and
9       other diagnostic studies don't really substantiate
10      other surgical treatment.  So, people are offered
11      things that are kind of palative for the treatment
12      of pain, if you will, as opposed to any true
13      pathology, things like anti-inflammatory
14      medications, the judicious use of cortisone, and
15      these lubricant shots, though the lubricant shots
16      are typically used for people who have advanced
17      arthritis, and Mrs. Brown didn't really have
18      advanced arthritis.  So, again, we have someone
19      who has these terrible complaints of pain and
20      disability, we're not able to help her much.
21  Q.  Mrs. Brown has been out of work for five years,
22      according to the history you took, correct?
23  A.  That is correct.
24  Q.  Since right after the accident?
25  A.  That is correct.

Page 55

1   Q.  And based on what you see, she's not going back to
2       work any time soon, correct?
3           MR. HOLLAND:  Objection.
4   A.  I think the likelihood if someone's been out
5       of work for five years of them all of a sudden
6       saying, you know, tomorrow I'm going to get a job
7       or go back to work is very unlikely.
8   Q.  What makes you say that it is unlikely that a
9       person who has been out of work five years is
10      going to go back to work?
11  A.  Well, there are some statistics with injured
12      workers in terms of returning to work that if
13      they're beyond a certain period of time
14      statistically the likelihood of them returning to
15      work is much smaller.  There are some studies that
16      suggest people involved in litigation have a lower
17      return-to-work rate.  So, those studies are out
18      there.  It just makes sense, common sense, that if
19      someone has not returned to work for five years,
20      the likelihood of them returning to work in year 6
21      is probably not very high.
22  Q.  Would that make a difference if they were in
23      chronic pain as to whether they went back to work
24      or not?
25  A.  Presumably Miss Brown has not gone back to

Page 56

1   work because of her chronic pain because the
2   doctors can't find anything else.
3       MR. LEWIS:  I have no further questions.
4       RE-EXAMINATION BY MR. HOLLAND
5   Q.  Doctor, when you were asked about, I believe
6       disability in connection with chronic pain, I
7       believe you testified from Miss Brown's
8       standpoint, chronic pain is disabling, what do you
9       mean by that?
10  A.  We have the subjective complaints and the
11      reports of Mrs. Brown, i.e., severity of her pain
12      being 8 to 10 -- 8 out of 10 in terms of her knee
13      and her back.  We have her history of requiring
14      narcotic medication to get through the day.  We
15      have her report that she can't do all these
16      things.  It's what she reports.  I don't dispute
17      it.  It's what she tells me, and I believe her to
18      be truthful.  No reason to believe otherwise.
19      That is her perception.  The other side of the
20      coin is we have someone, the generic someone who
21      has a torn meniscus, and the recovery from that is
22      clearly extremely discrepant from the recovery
23      Miss brown had.
24  Q.  You also stated her reports of pain did not --
25      excuse me, I believe you testified that the MRI

Page 57

1   findings did not correlate with her clinical exam;
2   what did you mean by that?
3   A.  In other words, Mr. Lewis had referred to one
4       with irritation of the S1 nerve root.  Yet when we
5       do studies to stress the S1 nerve root to check
6       her reflex for the S1, the ankle reflex is the S1
7       nerve root, she had a normal nerve root -- normal
8       reflex, excuse me.  Her sensation in the S1
9       distribution of the leg is normal, and when we
10      stretch the sciatic nerve, she doesn't complain of
11      radicular pain.  Yet discrepant from that, if I
12      simply touch her back, she describes pain all the
13      way down her leg.  Doesn't make sense, or she
14      describes numbness from the mid thigh down, which
15      would have to involve 5 or 6 nerve roots, not a
16      single nerve root.  So, these are the
17      discrepancies, if you will, between her exam and
18      her exam neurologically is normal, but she
19      complains of this terrible pain.  She's disabled
20      by her knee but the only real finding on her knee
21      is some mild swelling with some irritation of her
22      patellofemoral joint.  That, typically, would not
23      keep someone out of work for five years, require
24      chronic narcotic medication, require chronic
25      medical care.  So, that's the discrepancy that I