UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GLORIA BROWN,
        Plaintiff,


        v.                                    CIVIL ACTION NO.
                                              05-11167-MBB


KFC CORPORATION,
        Defendant.



MEMORANDUM AND ORDER RE:
PLAINTIFF'S MOTION FOR NEW TRIAL (DOCKET ENTRY # 91);
PLAINTIFF'S MOTION FOR A NEW TRIAL AND TO ENLARGE
TIME FOR FILING MEMORANDUM AND HEARING
(DOCKET ENTRY # 79)

June 13, 2008

BOWLER, U.S.M.J.

        This personal injury action arises from a June 21, 2002 fall
suffered by plaintiff Gloria Brown ("plaintiff") in a parking lot
outside a restaurant in Roslindale, Massachusetts.  Pending
before this court are two, timely filed motions for a new trial.

        The first motion, filed by plaintiff Gloria Brown's counsel,
seeks relief because:  (1) the $115,501 jury verdict was against
the weight of the evidence; (2) certain inflammatory and improper
statements made by counsel for defendant KFC Corporation during
closing argument; and (3) the jury selection process was
discriminatory because of the absence of African American jurors
in the venire.  (Docket Entry # 79).  Defendant KFC Corporation
("KFC") opposes the motion.  (Docket Entry # 84).  After

conducting a hearing on September 27, 2007, this court took the first new trial motion (Docket Entry # 79) under advisement.

The second motion for a new trial, filed pro se by plaintiff on August 17, 2007, is also ripe for review.  The pro se motion seeks a new trial because:  (1) a jury note specified the jury's numerical division; (2) plaintiff was not in the courtroom during certain unidentified proceedings; (3) plaintiff's counsel was ineffective because he failed to object to the inflammatory statements made during closing argument; (4) the jury did not properly review the evidence given the short time period of the deliberations; (5) the jury selection was discriminatory; and (6) there was insufficient evidence to support the verdict.[1]  (Docket Entry # 91).


BACKGROUND

Plaintiff, a Massachusetts resident and citizen, initially filed this suit in Massachusetts Superior Court (Suffolk County) against defendants Yum! Brands, Inc. ("Yum") and Lojon Property II, LLC ("Lojon").  Yum, a North Carolina Corporation with a principal place of business in Louisville, Kentucky, and Lojon, a New York limited liability corporation with a principal place of business in New York City, timely removed this action to federal

---

[1]  The last two arguments correspond with the first and third arguments in the first new trial motion and are therefore discussed together infra.

2

court based upon diversity jurisdiction.

In October 2005, plaintiff filed an amended complaint containing a single count for negligence against Yum, Lojon, KFC, a Delaware Corporation with a principal place of business in Louisville, Kentucky, and defendants KFC America, Inc. ("KFC America"), a California corporation with a principal place of business in Louisville, Kentucky, and KFC National Management, Inc.[2]  In July 2006, the parties stipulated to the dismissal of Yum, Lojon, KFC America and KFC National Management, Inc. Accordingly, KFC, successor in interest to KFC America which owned and operated the restaurant, remained as the only defendant.

In March 2007, KFC stipulated to liability on the negligence claim while disputing the nature of plaintiff's injuries, proximate cause and the amount of damages.  On August 6, 2007, jury selection took place.  The venire sent to this court from the qualified jury wheel consisted of 30 randomly chosen individuals.  Plaintiff correctly points out that none of the 30 individuals was African American.  After excusing three members of the venire and allowing each party three strikes, a jury of

_____

[2]  The amended complaint identifies KFC National Management, Inc. as a foreign corporation with a principal place of business in Louisville, Kentucky.  In answer to the amended complaint, KFC Management, Inc. states that its correct name is KFC National Management, Co. which is not a legal entity capable of being sued.

eight was seated and sworn as a panel.[3]  Plaintiff did not object to the absence of African Americans in the venire or in the panel.

The following witnesses testified during the four day trial: plaintiff; Timothy E. Foster, M.D. ("Dr. Foster"), a board certified orthopedic surgeon with a current practice limited to shoulder and knee surgery; Edward Feldmann, M.D. ("Dr. Feldmann"), a board certified neurologist; Akirah Brown, plaintiff's 12 year old granddaughter; and John A. Froehlich, M.D. ("Dr. Froehlich"), an assistant clinical professor at Brown University School of Medicine in Providence, Rhode Island with a focus on sports medicine and reconstructive surgery.  Dr. Foster and Dr. Froehlich testified by videotaped depositions.

On August 9, 2007, this court charged the jury and provided the jury with one copy of the charge to review during deliberations.  The charge instructs the jury that it should "never state or specify your numerical division."

After hearing three days of testimony, the jury began deliberating at 10:08 a.m. on August 9, 2007.  At 1:17 p.m., the foreperson sent a note to the clerk at which point this court held a conference in the courtroom.  Plaintiff's counsel as well as KFC's counsel attended the conference.  Opening the note, this

---

[3]  On August 8, 2007, the juror in seat number three was dropped from the panel after being admitted to a local hospital. Prior to seating the jury, counsel agreed to go forward with as few as six jurors.

court advised counsel that the jury had specified a division.

With the parties in agreement, this court brought the jury to the

courtroom and instructed them as follows:

> Members of the jury, your verdict must represent the
> considered judgment of each juror.  In order for you to
> return a verdict it is necessary that each of you agree to
> that verdict.  That is, your verdict must be unanimous.
>
> Each of you must decide the case for yourself, but you
> should do so only after considering all the evidence,
> discussing it fully with the other jurors, and listening to
> the views of the other jurors.  As members of the jury, you
> have the right to disagree with each other.  Do not feel
> compelled to reach an agreement.  You should reach an
> agreement only after you have made a conscientious
> determination.  Do not be afraid to change your opinion if
> you think you are wrong but do not come to a decision simply
> because the other jurors think it is right or for the sole
> purpose of getting a verdict.[4]

At 1:28 p.m., the jury returned to the jury room for further

deliberations.

     At 2:50 p.m., the jury returned with a unanimous verdict.

In conjunction with the delivery of the completed verdict form,

---

[4] The foregoing supplementary instruction dovetails a
similar passage in the unanimous verdict section of the charge
which instructed the jury as follows:

> It is your duty as jurors to consult with one another, and
> to deliberate in an effort to reach agreement if you can do
> so without violence to individual judgment.  Each of you
> must decide the case for yourself, but only after an
> impartial consideration of the evidence in the case with
> your fellow jurors.  In the course of your deliberations, do
> not hesitate to re-examine your own views and to change your
> opinion if convinced it is erroneous.  But do not surrender
> your honest conviction as to the weight or effect of the
> evidence solely because of the opinion of your fellow
> jurors, or for the mere purpose of returning a verdict . .
> ..

the foreperson sent a second note apologizing for the first note. In answer to the two questions in the verdict form, the jury found that KFC's negligence proximately caused plaintiff's injury or injuries and awarded damages in the amount of $115,501. A final judgement issued the same day in the same amount.

The evidence, viewed in KFC's favor, showed that plaintiff suffered a small medial meniscus tear in the left knee and a soft tissue lumbar sacral strain as a result of the June 21, 2002 fall in the parking lot outside a KFC restaurant in Roslindale. Plaintiff underwent successful arthroscopic surgery of the left knee without complications on September 6, 2002. The surgery involved resecting and shaving cartilage from the patella and a small radial tear of the medial meniscus. Subsequent physical therapy sessions significantly improved the condition.

Patients typically recover from such surgery in four to six weeks or a couple of months. Likewise, patients typically recover from a sacral lumbar strain within approximately 12 weeks with or without treatment. As opined by Dr. Froehlich, there was no correlation between the June 21, 2002 accident and any injury or pain experienced in plaintiff's right knee from the fall. Summarizing the evidence in greater detail, it shows the following.[5]

---

[5] This court's summary of the evidence does not reflect the entire testimony and all of the exhibits contained in the record.

6

On May 31, 2002, before the June 2002 fall, plaintiff, a 58 year old African American female,[6] was in an automobile accident. She experienced pain in her back while lying on the stretcher which worsened that night.

On June 21, 2002, plaintiff drove to the parking lot of the KFC restaurant in the afternoon with her then seven year old granddaughter to have something to eat because plaintiff did not feel like cooking. After she parked the vehicle, her granddaughter got out of the car leaving the back door open. Plaintiff then got out of the car, turned to close the back door and stepped into a hole in the parking lot with her left foot. Plaintiff then lost her balance, spun around and fell with her spine landing on a hub cap.

Experiencing pain and swelling in the left knee, she told her granddaughter to go to the corner and then plaintiff got back up. A woman plaintiff knew from church came up to plaintiff and asked if she was all right to which plaintiff affirmatively replied that she was all right. Feeling pain in her left knee and back, plaintiff then walked into the restaurant and told a gentleman that, "You guys have a hole in your parking lot and I just fell into it." Plaintiff does not remember if she had food at the restaurant. When she and her granddaughter left the restaurant, plaintiff telephoned her daughter. Plaintiff also

---

[6]  Plaintiff was 53 years old at the time of the accident.

telephoned her husband and told him that she had slipped in a hole.  An ambulance was also called.

Plaintiff was taken to the Boston Medical Center ("BMC") and evaluated in the emergency room, treated and released.  X-rays were negative.  A discharge report additionally reflects plaintiff complaining of lumbar spine pain.

Referred by her primary care physician to Dr. Foster, plaintiff first saw Dr. Foster on July 17, 2002, for an evaluation of the left knee.  Upon physical examination, Dr. Foster noted significant swelling as well as an antalgic or painful gait with a knee brace and crutches.  Medications included ibuprofen twice a day.  Suspecting a meniscus tear, he ordered a magnetic resonance imaging scan ("MRI") of the left knee.

The July 21, 2002 MRI showed a medial meniscus tear and swelling.  Because plaintiff was complaining of lumbar spine pain, Dr. Foster also ordered an MRI of her spine.  The August 31, 2002 MRI showed mild stenosis at the L5 to S1 region and milder stenosis at the L4 to L5 region.

Plaintiff underwent the aforementioned arthroscopic surgery in September 2002 followed by a course of physical therapy.  Physical therapy sessions significantly improved the left knee.  As noted in Dr. Foster's September 12, 2002 office note, plaintiff was taking Percocet and Motrin for the pain.

During an October 10, 2002 office visit, plaintiff

complained of pain in the lumbar spine.  Dr. Foster provided her

with prescriptions for Percocet and physical therapy at BMC.  He

also referred her to a spine specialist in his group at the time,

Dr. Christopher M. Bono, M.D. ("Dr. Bono").[7]

Dr. Bono examined plaintiff on December 17, 2002, and

reviewed the spinal MRI.[8]  He believed that plaintiff had a

muscular injury.  Although noting evidence radiographically of

mild nerve impingement, he did not see signs of a nerve root

impingement.  He described plaintiff as a "difficult patient to

discern exactly where her pain is coming from."  (Ex. 19).

Because plaintiff expressed dissatisfaction with Dr. Bono,

Dr. Foster referred her to Joseph Ordia, M.D. ("Dr. Ordia"), a

neurosurgeon.  Plaintiff underwent a second MRI of the spine in

March 2003.  Reviewing the second MRI and examining plaintiff in

April 2003, Dr. Ordia made findings similar to those of Dr. Bono.

In addition to complaints regarding the spine and left knee,

plaintiff reported experiencing pain in the right knee in or

around August 2002 and testified to missing a step with her cane

in August 2002.  After plaintiff complained about continued pain

---

[7]  Dr. Foster is part of a faculty practice that includes
approximately ten other orthopedic surgeons who all teach at the
medical center.

[8]  Plaintiff insists that Dr. Bono never touched her or
examined her.

in the right knee, Dr. Foster ordered an MRI.[9]  The February 9, 2003 MRI of the right knee showed no disruption that would imply a radial tear and only early degenerative changes.  All ligaments remained intact.  In an April 3, 2003 office note, Dr. Foster refers to continued reports of pain in both knees with limited range of motion.

Dr. Foster believed that the pain in the right knee resulted from using crutches.  He opined that the right knee pain was causally related to the accident due to gait compensation.  In contrast, Dr. Froehlich, as noted _infra_, opined that there was no correlation between the left and right knee injuries.

At trial, plaintiff testified about continued pain in the knees and spine.  She had physical therapy for her back in 2003 and notes reflect continued lower back pain since the June 2002 fall as well as prescriptions for pain medication.  By the end of 2003, she had not experienced an improvement in back pain and suffered from medial and lateral joint pain in both knees.  She remains on pain medication, travels less and her husband performs most household chores.

The accident has also affected her home life and she is often sad.  She no longer travels as frequently to visit her parents in Pennsylvania.  Whereas before the accident she took

---

[9]  Dr. Foster's December 4, 2002 office note states that plaintiff will eventually require arthroscopic surgery in the right knee.

10

her granddaughter to amusement parks and cookouts, after the accident she no longer takes her granddaughter on these family trips.

Since the accident, plaintiff has not returned to work. Prior to June 21, 2002, she worked at the Home for Little Wanderers as an overnight counselor. From 1996 or 1997 to the time of the accident, she worked approximately four nights a week counseling children. She enjoyed her work and performed her duties in an able and admirable manner. Prior to working at the Home of Little Wanderers, plaintiff worked at AT & T for 29 years. She earned a gross pay of $25,867.34 in 2000 and $28,495.27 in 2001 at the Home for Little Wanderers.

After her last visit to Dr. Foster in December 2003, plaintiff saw various doctors. In June 2007, she underwent independent medical evaluations by Dr. Feldmann and Dr. Froehlich. Dr. Froehlich explained and supported an opinion of symptom amplification on the part of plaintiff. He testified that plaintiff's level of function, quality of life and reports of back and knee pain in the range of seven or eight out of ten were very discrepant with the injury to her knees and back.[10]

---

[10] Prior to trial, this court denied a motion in limine (Docket Entry # 69) from the bench on August 6, 2007, stating that plaintiff had an adequate opportunity to cross examine Dr. Froehlich at the deposition. The motion in limine, filed by plaintiff, sought to strike the testimony of Dr. Froehlich regarding symptom amplification and referring to studies suggesting that people involved in litigation have a lower return to work ratio.

With respect to the left knee, Dr. Froehlich testified that most patients recover from meniscus knee surgery within weeks to a couple of months.  X-rays did not show significant arthritic change.  The kind of injury to the left knee and the treatment of arthroscopic surgery to repair the small meniscus tear experienced by plaintiff were out of proportion to the reported pain and the reported limitations.  According to Dr. Froehlich, one would expect some acute pain early on with only occasional and mild residual discomfort years later.  The mild swelling he noted in the left knee would not keep an individual out of work for a five year period.

Dr. Froehlich opined that the June 21, 2002 fall caused the meniscus tear in the left knee and could have aggravated pre-existing minor wear in the left knee.  Contrary to Dr. Foster, Dr. Froehlich opined that there was no correlation between the left and right knee injuries.

Similar to other testimony in the record, Dr. Froehlich believed it was not likely that plaintiff would return to work. He also opined that plaintiff suffered a lumbar strain as a result of the fall.  Typical recovery time for such an injury, however, is 12 weeks.  The spine specialists believed the back

_____

Dr. Froehlich's June 12, 2007 letter, which plaintiff attached to the supporting memorandum, refers to "gross inconsistencies consistent with pain amplification" as well as "inconsistent pain" and therefore encompasses symptom amplification.

injury was muscular.  Unable to find a physiological cause for plaintiff's reported pain, Dr. Froehlich concluded that she suffered from a chronic pain syndrome and had symptom or pain amplification.  Tellingly, when Dr. Froehlich simply touched plaintiff's back she reported pain all the way down her leg.  The ankle reflex, however, which corresponds to the S1 nerve root noted in the MRI, was normal.  She did not complain of radicular pain when the sciatic nerve was stretched.  Similarly, her description of numbness from the middle of her thigh down would have to involve five or six nerve roots as opposed to a single nerve root.

Like Dr. Froehlich, Dr. Feldmann believed that plaintiff suffered from chronic pain syndrome.  With respect to the spine, nerve conduction velocities were normal.  There was no atrophy or muscle weakness.  Subjective sensory signs upon examination did not correspond with a nerve injury.  Based upon this and his review of other material, Dr. Froehlich opined that plaintiff suffered a soft tissue injury, in other words, a lumbar strain.

### STANDARD OF REVIEW

A motion for a new trial under Rule 59 requires a finding that "the verdict is so seriously mistaken, so clearly against the law or evidence, as to constitute a miscarriage of justice." TransAmerica Premier Insurance Company v. Ober, 107 F.3d 925, 929 (1st Cir. 1997) (internal quotation marks omitted); accord

13

<u>Goulet v. New Penn Motor Express, Inc.</u>, 512 F.3d 34, 44 (1st Cir. 2008) ("court should grant a motion for a new trial only if 'the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice'"). In other words, a court can therefore "order a new trial under Federal Rule of Civil Procedure 59(a) 'only if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice.'" <u>Crowe v. Marchand</u>, 506 F.3d 13, 19 (1st Cir. 2007); <u>accord</u> <u>Colon-Millin v. Sears Roebuck De Puerto Rico, Inc.</u>, 455 F.3d 30, 35 (1st Cir. 2006) (new trial under Rule 59(a) "ordered when the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice"); <u>Sanchez v. Puerto Rico Oil Company</u>, 37 F.3d 712, 717 (1st Cir. 1994) (court will set aside verdict only if it "is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice").

    "This strict standard of review is especially appropriate if the motion for new trial is based on a claim that the verdict is against the weight of the evidence." <u>TransAmerica Premier Insurance Company v. Ober</u>, 107 F.3d at 929 (internal quotation marks omitted). Although the court can weigh the evidence and assess the credibility of various witnesses, "a jury verdict that is supported by the evidence may not be set aside simply because the trial judge would have reached a different result." <u>Data</u>

General Corporation v. Grumman Systems Support Corporation, 825
F.Supp. 340, 348 (D.Mass. 1993), aff'g in part and remanded in
part on other grounds, 36 F.3d 1147 (1st Cir. 1994); Insurance
Company of North America v. Musa, 785 F.2d 370, 375 (1st Cir.
1986) ("[i]n considering a new trial motion, the court may weigh
the evidence and assess the credibility of witnesses").


## DISCUSSION

    Plaintiff initially argues that the verdict is against the
weight of the evidence.  She points out that the opinions of
KFC's two experts were that she "was disabled as a result of her
chronic pain syndrome."  (Docket Entry # 79).  Maintaining that
she was still suffering from chronic pain syndrome and therefore
disabled at the time of trial, plaintiff asserts that the
$115,501 award is not supported by the evidence and, in fact,
less than the lost wages since the June 2002 accident.[11]

    It is true that both Dr. Froehlich and Dr. Feldmann
testified that plaintiff has chronic pain syndrome.  They did
not, however, opine to a reasonable degree of medical certainty

---

    [11] Lost wages reflected in the W2s evidence annual wages
between $25,000 and $29,000 prior to the accident.  Multiplying
the average amount by the five year period from the time of the
accident to the time of the trial yields approximately $135,000.
Referring to $11.34 and $17.01 hourly regular and overtime pay,
plaintiff's counsel argued in his closing that the 267 weeks
since the time of the accident result in lost wages of "$166,527,
if you give her credit for being disabled through today."  As
explained below, the jury did not give plaintiff credit for being
totally disabled up to the time of the trial.

that plaintiff was permanently disabled or remained totally
disabled at the time of trial as a result of the chronic pain
syndrome or as a result of the accident.  Dr. Froehlich testified
that she suffered from chronic pain syndrome but also engaged in
symptom amplification.  While disabling from her perspective and
surmising that she was not likely to return to work, Dr.
Froehlich testified that the pain was out of proportion to the
injury.  Viewing the record in KFC's favor, plaintiff's
subjective testimony of a severe level of pain was discordant
with several objective findings in the record including the MRIs.
The injury itself is very discrepant from how plaintiff presents
herself and the level of pain she reports, according to Dr.
Froehlich.

Dr. Feldmann opined that plaintiff had a muscle injury and
acknowledged that she has chronic pain syndrome.  Before arriving
at the diagnosis, he conducted a comprehensive review of all of
the medical records to date, including the March 2003 MRI report,
and read the depositions of Dr. Foster and Dr. Froehlich.
Together with the June 12, 2007 visit, he concluded that
plaintiff had a soft tissue injury.  He further pointed out that
nerve conduction was normal and there was no atrophy or muscle
weakness.

The first spinal MRI evidences a muscle strain in the lumbar
spine with mild foraminal stenosis at L4 to L5 and milder
stenosis at L5 to S1.  Dr. Bono noted "evidence radiographically

of some mild nerve impingement" (Ex. 19) but still believed plaintiff had a muscular injury.

Accordingly, the jury could reasonably conclude from the evidence that the small tear and the uneventful arthroscopic surgery to repair the tear followed by successful physical therapy belie the existence of the level of pain reported by plaintiff or the existence of a disabling, long term condition. Contrary to plaintiff's assertion, there were discrepancies and conflicts in the record.[12]  Although plaintiff suffered a torn medial meniscus in the left knee and a lumbar strain proximately caused by the accident, the jury could conclude that the injuries should and did resolve well before the time of trial.  The jury could also reasonably conclude that plaintiff exaggerated and magnified her injuries which, accordingly, did not warrant a complete or total loss of earning capacity for an extended period of time.  Likewise, the jury could readily find that plaintiff amplified the level of pain and suffering.

In light of the foregoing, a portion of the $115,501 award could include an award for the continued presence of chronic pain syndrome up to the time of the trial as well as a loss of earning

---

[12]  Plaintiff's pro se single sentence argument that the evidence does not support the verdict because there was no evidence of discrepancies as outlined in the jury charge (Docket Entry # 91, ¶ 6A) does not warrant a new trial.  The medical records, objective evidence in the record and the testimony of KFC's experts refute the existence of injuries lasting for an extended period of time as well as the existence of the level of pain reported by plaintiff.

capacity albeit not up to the time of the trial.  Taking into account all of the components of the damages award, including the past medical expenses, the $115,501 award is not against the clear weight of the evidence and does not amount to a miscarriage of justice.  <u>See</u> <u>generally</u> <u>Bogosian v. Mercedes-Benz of North America, Inc.</u>, 104 F.3d 472, 482 (1st Cir. 1997) ("new trial is warranted only if the verdict, though rationally based on the evidence, was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice") (internal quotation marks and citation omitted).

Plaintiff next seeks a new trial based upon statements made by KFC's counsel during closing argument.  Plaintiff asserts that the following italicized statements by KFC's counsel during closing argument unfairly and prejudicially deprived her of a fair trial:

> Her husband took pictures of the hole[13] for the purposes of this litigation and for no other reason.  It's all about this litigation.  Her husband rushed down to the scene to take pictures.  *It is all about the money* for this litigation.  The *plaintiff's attorney will ask you for millions of dollars for stepping in a hole.*

Plaintiff argues that the comment about seeking "millions of dollars" was based on KFC's counsel's knowledge from settlement

---

[13]  Plaintiff makes no argument that the comments about her husband rushing to the scene to take pictures was not based on evidence in the record.  As explained <u>infra</u>, however, this court does not view the "millions of dollars" and the "all about money" comments in a vacuum.

negotiations in violation of Rule 408, F.R.E. ("Rule 408") and that KFC's counsel had no way of knowing if plaintiff's counsel would ask the jury "for millions of dollars." (Docket Entry # 79). Plaintiff points out "[t]here was no testimony or evidence offered as to how much [money] the plaintiff sought." (Docket Entry # 79). Plaintiff additionally submits that opposing counsel violated Rule 3.4 of the Massachusetts Rules of Professional Conduct ("Rule 3.4") which prohibits inter alia an attorney from asserting "personal knowledge of facts" or stating a personal opinion about "the justness of a cause." Plaintiff submits that there was no evidence to support the "millions of dollars" comment which "was based on his personal knowledge from settlement negotiations." (Docket Entry # 79). Plaintiff's reply brief reiterates this argument and, in support therefore, states there was no evidence to support the statement that plaintiff would ask "for millions of dollars." Plaintiff objects to both this comment and the comment that this "is all about money" because the only evidence to support the assertion consisted of Dr. Froehlich's testimony about literature suggesting that people involved in litigation are less likely to return to work.[14] (Docket Entry ## 79 & 94).

---

[14] Plaintiff objected to the admission of this testimony in a motion in limine. See fn. 10. Plaintiff did not object to the closing argument either during the argument or immediately thereafter at side bar. Contrary to the implication in the supporting memorandum, plaintiff's objection to the admission of the testimony does not equate to an objection to comments made by

Before addressing these arguments, it is helpful to point out that plaintiff does not accurately quote KFC's counsel's closing argument. The actual argument separates the husband's actions from the forecast about plaintiff's counsel asking the jury for millions of dollars. Near the beginning of the argument, KFC's counsel points out that, "on the very day [plaintiff] suffered this injury, her husband came rushing down to the KFC and starts taking pictures of the hole. Why do you think he did that? For purposes of this lawsuit, no doubt." KFC's counsel then summarized the evidence including the findings and opinions made by various physicians. He then informed the jury that:

> [A]ny findings on that MRI are not causing her pain. What's causing her pain is this ongoing litigation and the amount of money she's seeking to recover in this case. Plaintiff's attorney I believe is going to ask you for millions of dollars-millions of dollars-for somebody stepping in a hole at the KFC restaurant and suffering a very minor injury.

At trial, plaintiff did not object to these statements.

"[S]tatements of counsel's opinions or personal beliefs have no place in a closing argument of a criminal or civil trial." Polansky v. CNA Insurance Co., 852 F.2d 626, 628-629 (1st Cir. 1988); see also Wilson v. Town of Mendon, 294 F.3d 1, 16 (1st Cir. 2002) (insinuation in closing argument that the plaintiff "had concocted 'stories' with the connivance of his lawyer should not have been made"). Likewise, as an ethical matter, an

---

opposing counsel during closing argument.

20

attorney should not offer his personal opinion about "the justness of a cause, the credibility of a witness" or "the culpability of a civil litigant."  Rule 3.4(e), Massachusetts Rules of Professional Conduct.  "In assessing the effect of improper conduct by counsel," this court "must examine the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself."  P.R. Aqueduct & Sewer Authority v. Constructora Lluch, Inc., 169 F.3d 68, 82 (1st Cir. 1999).

The statements by KFC's counsel about his personal belief that plaintiff's counsel will ask the jury for millions of dollars was therefore improper.  Polansky v. CNA Insurance Co., 852 F.2d at 628-629.  Likewise, the opinion that plaintiff's husband took pictures solely "[f]or purposes of this lawsuit" and that money was the cause for plaintiff's pain constitute inadvisable expressions of the personal opinions of KFC's counsel.  See Hatfield-Bermudez v. Aldanondo-Rivera, 496 F.3d 51, 57 (1st Cir. 2007) (characterizing the plaintiff's counsel's "personal opinion on Berríos's testimony" during closing as one of several "lapses").  The comments, however, are not as severe as plaintiff asserts.[15]  See generally United States v. Sullivan,

_____

[15]  The statements were not a direct comment about how much money the jury should award.  Cases relied upon by plaintiff

85 F.3d 743, 751 (1st Cir. 1996) (finding no plain error in criminal case from statements in government's closing including statement that all of the witnesses "were telling the truth"); accord U.S. v. Robinson, 473 F.3d 387, 396 (1st Cir. 2007) (paraphrasing this and other excerpts from Sullivan).  There was also no miscarriage of justice.

First, the statements, were not made in a vacuum.  After closing arguments, this court charged the jury and provided a written copy of the charge to the jury in the jury room.  The charge spells out that statements by attorneys are not evidence. For example, after explaining in mandatory terms to the jury that "you must consider only the evidence [the court] has admitted in the case" and defining evidence as the testimony, the exhibits and the stipulations of fact, the charge cautions the jury to "remember that any statements, objections or arguments made by the lawyers are not evidence in the case."  Two paragraphs later, the charge reiterates that, "What the lawyers say is not binding

_____

concerning comments about numerical amounts that a jury should award, Gardner v. State Taxi, Inc., 142 N.E.2d 586 (Mass. 1957) (ordering new trial due to comments by counsel asking jury to award $200 and $100 weekly amounts for total and partial disabilities); see Harlow v. Chin, 545 N.E.2d 602, 607 (Mass. 1989) (argument concerning money damages of numerical amounts in other cases improper), are therefore not directly on point.  In addition and for obvious reasons, this case does not involve a government prosecutor placing "the prestige of his office behind" a witnesses's truthfulness.  U.S. v. Page, 2008 WL 820741 at * 4 (1st Cir. March 28, 2008); U.S. v. Robinson, 473 F.3d 387, 396 (1st Cir. 2007) (vouching occurs when "government 'place[s] the prestige of the United States behind a witness by making personal assurances about the credibility of a witness'").

on you."

The jury charge additionally admonishes the jury to base a verdict on the evidence as opposed to sympathy. At the outset, the charge instructs that:

> It would be a violation of your sworn duty to base a verdict upon any view of the law other than that given in the instructions of the court, just as it would also be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything other than the evidence in this case.
>
> In deciding the facts of this case you must not be swayed by bias or prejudice or favor as to any party. Our system of law does not permit jurors to be governed by prejudice or sympathy or public opinion. Both the parties and the public expect that you will carefully and impartially consider all of the evidence in the case, follow the law as stated by the court, and reach a just verdict regardless of the consequences.

Near the end of the charge, it again cautions the jury not to base a damages award on sympathy or prejudice.[16] Such language minimizes to a degree the effect of any improper language regarding the suit being "all about the money" or that "plaintiff's attorney will ask you for millions of dollars." See Smith v. Kmart Corp., 177 F.3d 19, 27-28 (1st Cir. 1999) (jury charge that jury "should apply the law without being governed by sympathy or prejudice" and the "plaintiffs were only entitled to receive compensatory damages for injuries they had suffered and

---

[16] The charge instructs that, "Damages should not be based on sympathy, prejudice, bias or emotion" and informs the jury that, "Whether damages should or should not be allowed . . . is a matter solely within your discretion in accordance with the rules of law that I am now giving you."

proven" mollified prejudice from counsel's improper statements);
see also Wilson v. Town of Mendon, 294 F.3d 1, 16 (1st Cir. 2002)
("we are confident, that if there was any prejudice [from
improper comment during closing], it was cured by the court's
admonition to the jury, both in its preliminary and concluding
instructions, that the lawyers' statements and arguments were not
to be considered as evidence").

Second and even more notable is the curative action taken by
plaintiff's counsel at the outset of his closing argument.
Turning around the language used by KFC's counsel, plaintiff's
counsel began by telling the jury that, "The case is worth what
you say it is worth."  Plaintiff's counsel therefore treated the
amount of damages as a matter for the jury decide, an entirely
correct position.

The statement by plaintiff's counsel lessened to a large
degree the impact on the jury of the improper statements by KFC's
counsel.  Moreover, the stated belief and the forecast by KCF's
counsel that plaintiff's counsel will ask you for millions of
dollars was not prejudicial.  If anything, the statements
negatively effected the credibility of KFC's counsel because
plaintiff's counsel never asked the jury for millions of
dollars.[17]  See generally Johnson v. National Sea Products, Ltd.,

---

[17]  Instead, he cleverly informed the jury that, "I wasn't
going to ask you for millions of dollars, but if you think the
case is worth it, you could certainly award it."

35 F.3d 626, 631 (1st Cir. 1994) ("[f]ar from abusing [trial court's] discretion, the trial judge in this case gave an unnecessary curative instruction [regarding statements made in closing argument], which if anything, could have caused harm to the defendants, not the plaintiffs"). Accordingly, there is little if any prejudice.

Finally, the argument that KFC's counsel flagrantly violated Rule 408 is misplaced. KFC's counsel did not refer to or discuss any settlement negotiations. Rather, he referred to a future event, to wit, that plaintiff "will ask you for millions of dollars" and to plaintiff's motives by stating "it is all about money." Like the following opening statements made by counsel in Brandt upheld by the First Circuit, these statements do not refer to a settlement:

> Brandt says that one of the defendant's opening statements at trial mentioned Brandt's settlements with other parties. However, the passages that Brandt identifies refer not to settlements but to the fact that Brandt had initially sued 69 people or businesses. The thrust was not that other defendants had settled (and were therefore the real perpetrators) but rather that Brandt was a plaintiff who sued everyone in sight regardless of whether the individual defendant was responsible. This was not an offer of proof of, or a reference to, a settlement, which is what Rule 408 . . . [is] concerned with.

Brandt v. Wand Partners, 242 F.3d 6, 20-21 (1st Cir. 2001).

The statements made by KFC's counsel do not reveal the amount of money plaintiff sought or discussed during past

settlement negotiations.[18]  The comments were not repeated
throughout the closing argument.  In deference to the jury,
plaintiff's counsel astutely told it that, "The case is worth
what you say it is worth."  Plaintiff's counsel did not over
emphasize the comments.[19]  The charge properly instructed the
jury that statements made by counsel are not evidence and that
the issue of damages was solely a matter within its discretion to
determine.  Given the nature of the statements, the manner in
which plaintiff and this court treated the statements as well as
the strength of the case against plaintiff, the improper comments
by KFC's counsel do not require a new trial under the totality of
the circumstances.

    In the pro se motion, plaintiff additionally maintains that
her counsel was ineffective because he did not object to the
foregoing statements.  She further complains without elaboration
that her "attorney never objected when defendant's witness
testified to the wrong body part injury."[20]  (Docket Entry # 91).

---

    [18]  Indeed, plaintiff represents that her actual demand
during settlement discussions and mediation was never in the
millions of dollars.  (Docket Entry # 79, n. 1).

    [19]  Plaintiff's counsel did not request a supplementary,
curative instruction and this court decided not to provide one
sua sponte.

    [20]  Plaintiff also objects to the failure of her attorney to
file an appeal of her Fourteenth Amendment rights.  By supporting
the withdrawal of her counsel (Docket Entry # 89), plaintiff may
file her own appeal of any issue thereby mooting this argument.
Alternatively, the remedy is not a new trial but, rather, an
action of malpractice as explained infra.  This court expresses

The difficulty with plaintiff's argument is that an ineffective assistance of counsel claim "may only be properly raised in criminal cases and not in civil cases." <u>Barnes v. Quinn</u>, 1993 WL 437724 at * 1 (E.D.Pa. Oct. 22, 1993). The proper remedy, if any, "in a civil matter is a separate action for malpractice." <u>Id</u>. In other words, there is "'no constitutional or statutory right to effective assistance of counsel in a civil case,' and . . . the proper remedy in such cases is an action for malpractice." <u>Taylor v. Dickel</u>, 293 F.3d 427, 431 (8th Cir. 2002); <u>accord</u> <u>Pokuta v. Trans World Airlines, Inc.</u>, 191 F.3d. 834, 840 (7th Cir. 1999) (no constitutional right to effective assistance of counsel in civil cases and remedy, if any, lies in action for malpractice); <u>Green v. Dean</u>, 2005 WL 1806427 at * 1 (D.Kan. Aug. 1, 2005) (the "plaintiff was not entitled to counsel, so even if his counsel was ineffective, granting plaintiff's motion for a new trial or judgment as a matter of law is not warranted").

In any event, as already discussed, plaintiff was not prejudiced by the comments made by KFC's counsel in closing argument. Objecting to the statements might have overly emphasized them in the mind of the jury. The decision not to object during the closing argument and, instead, advise the jury that their decision controlled was more than likely an

---

no opinion on the merits of such an action.

27

objectively reasonable, strategic decision.  See Zakrzewski v.
McDonough, 455 F.3d 1254, 1259 (11th Cir. 2006) (objectively
reasonable attorney could prefer "not to make objections during
closing argument unless the objection is a strong one"), cert.
denied, __U.S.__, 127 S.Ct. 2051 (2007).

Plaintiff also moves for a new trial on the basis that the
jury selection process was discriminatory.  She maintains "there
were no black jurors in the venire" thereby "depriving her of her
Constitutional right to a fair trial."  (Docket Entry # 79).[21]
Because this is not a criminal prosecution, plaintiff wisely does
not mount a Sixth Amendment challenge.  She does, however, cite
to United States v. Green, 389 F.Supp.2d 29 (D.Mass. 2005),
noting that the decision, which involved two African American men
charged with a capital offense, "brought attention to the
inadequate procedures of this trial court."  (Docket Entry # 79 &
91).  The First Circuit, however, reversed the decision.[22]  In re
U.S., 426 F.3d 1 (1st Cir. 2005).

---

[21]  She makes a similar argument in the pro se motion.

[22]  The lower court's decision nonetheless provided an
impetus for the United States District Court for the District
Court of Massachusetts ("the court") to form a committee "to
review the court's Jury Plan in light of the district court's
findings in Green."  Http://www.mad.circ1.dcn/policyplan.  In
March 2007, the court amended the plan to incorporate a
supplementary jury wheel for an original summons returned as
undeliverable.  Resident lists are drawn twice a year as opposed
to annually.  In other respects relevant to this proceeding, the
plan remains the same as that depicted by the First Circuit in In
re U.S.  See Http://www.mad.circ1.dcn/policyplan.

Turning to the merits of the argument, "In Massachusetts, as in other district courts, the jury selection process is governed by a 'plan' adopted by the district court pursuant to the Jury Selection and Service Act," 28 U.S.C. §§ 1861 et seq.  In re U.S., 426 F.3d at 8.  Effective March 1, 2007, the publically available plan randomly selects names from a resident source list for placement in a master jury wheel.  Id. at 3.[23]  Names randomly drawn from the master and the supplemental jury wheels are sent jury summonses and qualification forms.  Id.; Httpp://www.mad.circ1.dcn/policyplan.  Once culled to exclude disqualified individuals, the remaining names constitute a qualified jury wheel from which "jurors are randomly drawn and eventually dispatched to court" for jury selection.  Id.

In order for an equal protection challenge to succeed, there must be "intentional discrimination."  U.S. v. Royal, 174 F.3d 1, 6 (1st Cir. 1999).  Although African Americans are a cognizable racial group, plaintiff fails to argue let alone establish that the selection procedure employed was "susceptible of abuse or is not racially neutral."  Castaneda v. Partida, 430 U.S. 482, 494 (1977); see Cunningham v. Zant, 928 F.2d 1006, 1013-1014 (11th Cir. 1991) (establishing equal protection violation requires showing "that the venire was selected under a practice providing

---

[23]    The plan selects the names at random and provides that, "No citizen shall be excluded from service as a grand or petit juror on account of race, color, religion, sex, national origin or economic status."  Httpp://www.mad.circ1.dcn/policyplan.

an opportunity for discrimination"). There is no showing that the aforementioned random selection provided any opportunity for discrimination. See Cunningham v. Zant, 928 F.2d at 1014 (rejecting equal protection argument "[b]ecause Cunningham has failed to show that the venire was selected under a practice that provides an opportunity for discrimination"). Plaintiff also fails to make a statistical showing that African Americans have "been substantially underrepresented on the venire over a period of time." Cunningham v. Zant, 928 F.2d at 1014 n. 9 (explaining that prima facie showing is not made by merely showing under representation on the particular venire). The equal protection argument therefore does not merit a new trial.

Plaintiff next contends that the jury did not review all of the evidence given the brevity of its deliberations. No rule "'requires a jury to deliberate for any set length of time.'" Ahern v. Scholz, 85 F.3d 774, 785 (1st Cir. 1996) (further referencing a criminal case upholding verdict on 32 counts reached in only four hours after five week trial). As previously explained, there was sufficient evidence to support the verdict. See Id. ("'[i]f the evidence is sufficient to support the verdict, the length of time the jury deliberates is immaterial'"). The jury heard all of the evidence and listened attentively throughout the trial. A new trial is not required.

Plaintiff also alleges that, "Some evidence in this case was left in the courtroom until after the trial." (Docket Entry #

30

91).  The only "evidence" left in the courtroom were charts
including a drawing made by Dr. Feldmann.[24]  The drawing was a
"pedagogical device."  See Gomez v. Great Lakes Steel Division
National Steel Corporation, 803 F.2d 250, 257-258 (6th Cir. 1986)
(explaining distinction between charts used as evidence and
charts used as pedagogical devices).  It was not offered into
evidence and this court did not accept it into evidence.  The
clerk placed all of the exhibits in the jury room for the jury to
review during its deliberations.  During the deliberations, the
jury therefore had all of the exhibits admitted into the record.
Accordingly, there is no basis for a new trial.

     Plaintiff next moves for a new trial because of the note
from the jury identifying the numerical division of the panel.
Plaintiff asserts that the numerical division "could have caused
someone to agree to something they did not want to do."  (Docket
Entry # 91).

     "The appropriate course of action when a trial court
receives a note from a deliberating jury involves sharing the
note with counsel at the earliest practicable opportunity."
Cipes v. Mikasa, Inc., 439 F.3d 52, 56 (1st Cir. 2006).  As
specified in greater detail by the First Circuit in a criminal
case, the "preferred practice for addressing a question from a

---

     [24]  The pro se motion for a new trial does not identify the
evidence left in the courtroom.  (Docket Entry # 91).  A
withdrawn motion for a new trial refers to the drawing by Dr.
Feldmann.

deliberating jury includes ensuring that the question is reduced to writing, marking the note as an exhibit for identification, sharing it with counsel, and affording the lawyers an opportunity to suggest an appropriate rejoinder." U.S. v. Hernandez, 146 F.3d 30, 35 (1st Cir. 1998). This court adhered to this practice. It received the note, marked it as an exhibit, shared the substance of the note with both counsel at the earliest opportunity and crafted a response with their approval. The decision not to reveal the exact numerical division to counsel and to seal the note was proper. See, e.g., United States v. Robinson, 560 F.2d 507, 516 (2nd Cir. 1977) (rejecting argument that court should not have sealed note and should have informed counsel of division).

Jury coercion "typically arises when 'the jury, having been unable to agree, is sent back by the judge for further deliberations' and 'the judge's instruction in sending the jury back had a "possibly coercive effect."'" U.S. v. Lloyd, 515 F.3d 1297, 1302 (D.C.Cir. 2008). Contrary to plaintiff's argument, neither the numerical division nor the notes from the jury "caused someone to agree to something" against his wishes (Docket Entry # 91).

Plaintiff did not object to the supplementary instruction or move for a mistrial. Courts uphold the use of similar supplementary instructions after receipt of notes revealing numerical divisions. See U.S. v. Changco, 1 F.3d 837, 842 (9th

Cir. 1993) (no impermissible coercion where jury informed court
that one holdout remained and supplementary instruction urged
jury to continue deliberations and encouraged "individual jurors
not to surrender their conscientiously-held beliefs"); United
States v. Green, 962 F.2d 938, 944 (9th Cir. 1992); U.S. v.
Rengifo, 789 F.2d 975, 985 (1st Cir. 1986) ("this court has held
that it is not reversible error for the jury to reveal its
division voluntarily"); United States v. Cook, 663 F.2d 808, 809
n. 3 (8th Cir. 1981) (supplementary instruction may be given even
if "the jury's numerical division is given, without solicitation,
by the jury"); Sanders v. United States, 415 F.2d 621 (5th Cir.
1969) (upholding instruction given after court learned numerical
division of jury).  The supplementary instruction was balanced
and informed the jury that each juror must decide the case for
himself and not feel compelled to reach a verdict.  It did not
have any coercive effect, possible or otherwise.

As a final argument, plaintiff maintains she was denied her
rights under the Fourteenth Amendment when this court conducted
proceedings without her presence.  In particular, plaintiff's pro
se motion for a new trial alleges that she was denied her
Fourteenth Amendment rights because "[p]roceedings . . . were
held while [she] was in the court, just not in the courtroom."
(Docket Entry # 91, ¶ 3).  She does not identify the proceedings
at issue.  She was, however, present throughout the testimony as
well as during jury selection, opening statements and closing

33

arguments.  Because she makes the argument immediately after
setting out her complaint about the notes from the jury, this
court assumes that she is objecting to an absence during the
colloquy in the courtroom about the first note.

There was no objection to any absence on the part of
plaintiff.  First and foremost, she was represented by counsel
who was at all times present in the courtroom.  Alternatively, by
absenting herself from the courtroom, she waived the right,
assuming one exists in a civil case,[25] to be present.  See
generally L'Abbe v. DiPaolo, 311 F.3d 93, 97 (1st Cir. 2002)
(quoting in parenthetical of the "'prevailing rule' that a
[criminal] defendant who voluntarily absents himself from his
trial waives his right to be present"); Smith v. Massachusetts
Institute of Technology, 877 F.2d at 1110 ("[l]awyers cannot be
compelled to be present during jury deliberations but if they
choose to neglect their duty, they take their chances on what is
said and done by the court in their absence").  A new trial is
not required.


CONCLUSION

Accordingly, in light of the above discussion, the motions
for a new trial (Docket Entry ## 79 & 91) are **DENIED**.

_____

[25]  This is not a criminal trial where a defendant may have
a Sixth Amendment right to be present at trial or during
deliberations.  See Rule 45, Fed. R. Crim. P.; Taylor v. U.S.,
414 U.S. 17, 18 (1973).

34

   /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge